## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, <br><br> Plaintiff, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, *in her official capacity as Attorney General of the United States*, <br><br> Defendants. | Case No.: _____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.  Minnesota brings this lawsuit to stop President Trump and his administration from bullying vulnerable children in this state.

2.  Title IX is a federal civil rights law that prohibits schools from discriminating against students on the basis of their sex, which includes a prohibition on discrimination against students because of their gender identity. The Minnesota Human Rights Act includes the same prohibition. Nevertheless, as part of his unconscionable attack on this tiny minority of the population, President Trump has issued Executive Orders that purport to reverse those civil rights protections for transgender students.

3.    When asked, Minnesota Attorney General Keith Ellison issued a formal opinion in February of 2025, clarifying that Minnesota law still requires schools to allow children to participate in sports consistent with their gender identity.  Now the Trump Administration threatens to deprive Minnesota schools of federal funds unless the Minnesota Attorney General reverses that formal opinion.

4.    But the Minnesota Attorney General's opinion remains a correct statement of law.  President Trump's Executive Orders do not and cannot reverse the federal and state statutes that prohibit discrimination against vulnerable populations.  To protect this small group of children from the federal government, as well as to maintain important funding to Minnesota schools, Minnesota asks this Court to: declare that the two Executive Orders at issue violate the U.S. Constitution and federal law; stop the Federal Government from violating Minnesota's sovereignty by using those Executive Orders as the basis of funding threats; and reaffirm that Minnesota's strong anti-discrimination laws remain intact.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this Complaint under 28 U.S.C. §§ 1331 and 1346 because this action arises under the U.S. Constitution and the laws of the United States, including the Administrative Procedure Act (APA), 5. U.S.C. §§ 701-706, and because it seeks relief against federal agencies or federal officers in their official capacities. The Court has the authority to grant the relief requested under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202; the APA, 5 U.S.C. §§ 702 and 706; Fed. R. Civ. P. 57 and 65; and the general legal and equitable powers of the Court.

6.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are federal agencies or federal officers sued in their official capacities. The State of Minnesota is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## PARTIES

### I.  PLAINTIFFS

7.      Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison, who is authorized to sue on the State's behalf. *E.g.*, Minn. Stat. § 8.01.

8.      Minnesota has a non-sovereign interest in grants from the Department of Justice (DOJ) and other federal agencies to state entities, including public schools; Minnesota has a sovereign interest in the validity and enforceability of Minnesota law, including the Minnesota Human Rights Act, and in the authority of its Attorney General; and Minnesota has quasi-sovereign interests in (a) the health and well-being of its residents and in protecting those residents from discrimination and (b) in maintaining equal sovereignty and in avoiding federal pressure to change state law.

9.      The Gender Ideology Order, the Sports Ban Order, and the DOJ Letters (all terms that are defined below) harm Minnesota's non-sovereign, sovereign, and quasi-sovereign interests in several ways, including, without limitation: (a) threatening Minnesota schools with the loss of DOJ grants and other vital federal funds; (b) purporting to "interpret" Title IX to preempt all contrary Minnesota law; (c) coercing the Minnesota

Attorney General, through federal funding cuts, to withdraw his opinion on the meaning of Minnesota law; and (d) discriminating against transgender Minnesotans.

## II. DEFENDANTS

10.    Defendant Donald J. Trump is the President of the United States. President Trump is responsible for issuing the challenged Executive Orders.  President Trump is sued in his official capacity.

11.    Defendant U.S. Department of Justice is a cabinet agency within the executive branch of the United States government.  28 U.S.C. § 501.

12.    Defendant Pam Bondi is the Attorney General of the United States.  She is the head of the U.S. Department of Justice and responsible for all the decisions and actions of that agency.  28 U.S.C. § 503.  She is sued in her official capacity.

13.    Unless otherwise noted, President Trump, the U.S. Department of Justice, and U.S. Attorney General Bondi are collectively referred to as the "Federal Defendants."

## FACTUAL ALLEGATIONS

## I. MINNESOTA LAW HAS LONG PROHIBITED DISCRIMINATION BECAUSE OF GENDER IDENTITY AND PROTECTED TRANSGENDER MINNESOTANS

14.    For over three decades, Minnesota law has prohibited discrimination based on gender identity in housing, public accommodations, public services, and education.

15.    In 1990, Minnesota Governor Rudy Perpich appointed a Task Force on Gay and Lesbian Minnesotans (Task Force) to study discrimination and to make recommendations to end that discrimination.  In 1992, the Task Force expanded to cover transgender and bisexual experiences.  The Task Force's recommendations—as well as

tireless advocacy from community leaders—led Minnesota to amend its Human Rights Act (the MHRA) in 1993.[1]

16.    The 1993 amendments to the MHRA added sexual orientation as a prohibited basis for discrimination.  In doing so, the definition of "sexual orientation" was expanded to include "having or being perceived as having a self-image or identity not traditionally associated with one's biological maleness or femaleness."  2023 Minn. Laws ch. 22, § 2. This amendment made Minnesota the first state to protect transgender individuals from discrimination.[2]

17.    Minnesota courts have described the MHRA as "aim[ing] to 'change society's biases or prejudices' that emerge from 'society's discriminatory tendencies.'" *Daniel v. City of Minneapolis*, 923 N.W.2d 637, 651 (Minn. 2019) (quoting *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 378-79 (Minn. 1990)).  Then, as now, transgender Minnesotans faced significant discrimination.  Indeed, in 1995, the Task Force (whose work continued after the 1993 amendments) found that "fear and ignorance often foster prejudice against transgender people," and that transgender teenagers often experience higher rates of suicide.[3]

18.    Over the last three decades, Minnesota courts have consistently understood the plain language of the MHRA to protect Minnesotans from differential treatment based

---

[1]  Joshua Preston, *Senator Allan Spear and the Minnesota Human Rights Act*, Minnesota History (Fall 2016), https://perma.cc/786R-CZLY (last accessed Apr. 21, 2025).

[2]  *See* The Governor's Task Force on Gay and Lesbian Minnesotans, *Report* 51 (Aug. 1995), https://perma.cc/DXA2-YM6N (Task Force Report) (last accessed Apr. 21, 2025).

[3]  Task Force Report, *supra* n.2, at 49, 52.

on their transgender status, gender identity, and gender expression. For instance, in 2020, the Minnesota Court of Appeals held that prohibiting transgender students from using facilities that align with their gender identity constituted discrimination in education under the MHRA. *N.H. v. Anoka-Hennepin Sch. Dist. No. 11*, 950 N.W.2d 553, 566 (Minn. Ct. App. 2020).

19.     In 2023, the Minnesota Legislature amended the MHRA to separate gender identity and sexual orientation into two different protected classes. 2023 Minn. Laws ch. 52, Art. 19, §§ 45-61, 63-71 (codified at Minn. Stat. §§ 363A.02-.11, 363A.12-.17). The Minnesota Legislature also updated the definitions of "sexual orientation"[4] and "gender identity."[5]  *Id.*  These amendments cement Minnesota's longstanding commitment to protecting its transgender citizens.

20.     Minnesota law protects transgender students in additional ways. For one, the Safe and Supportive Schools Act requires schools and school districts to implement written policies to prevent bullying on the basis of, among other things, "gender identity and expression." Minn. Stat. § 121A.031, subd. 2(g).

21.     To help schools effectuate this legislation, the Minnesota Department of Education published a Toolkit for Ensuring Safe and Supportive Schools for Transgender

---

[4] "'Sexual orientation' means to whom someone is, or is perceived of as being, emotionally, physically, or sexually attracted to based on sex or gender identity. A person may be attracted to men, women, both, neither, or to people who are genderqueer, androgynous, or have other gender identities." Minn. Stat. § 363A.03, subd. 44.

[5] "'Gender identity' means a person's inherent sense of being a man, woman, both, or neither. A person's gender identity may or may not correspond to their assigned sex at birth or to their primary or secondary sex characteristics. A person's gender identity is not necessarily visible to others." Minn. Stat. § 363A.03, subd. 50.

and Nonconforming Students in 2017 (the Toolkit).[6]  The Toolkit advises schools to "work with transgender and gender nonconforming students to ensure that they are able to access needed facilities in a manner that is safe, consistent with their gender identity and does not stigmatize them."  The Toolkit also instructs schools to provide a private space for any student who desires increased privacy.

22.    Minnesota's experience with these laws and policies has proved successful. Minnesota has found no increase in privacy or safety concerns in public schools, and Minnesota has had no reported instances of transgender students harassing cisgender students when using restrooms or locker rooms consistent with their gender identity. Minnesota's experience is consistent with the school administrators in 31 states and the District of Columbia.[7]  The evidence across the country shows that sex-based protections for gender identity in bathroom- and locker room-use policies result in no safety or privacy risks, nor is there evidence that cisgender students pose as transgender to gain improper restroom access.[8]

## II.    TITLE IX DOES NOT CONFLICT WITH MINNESOTA LAW

23.    Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

---

[6]  Minn. Dep't of Educ., *A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students* (Sept. 25, 2017), https://perma.cc/RK3E-HFTM (last accessed Apr. 21, 2025).

[7]  *See* Br. of Amici Curiae Sch. Adm'rs at 12-14, *Gloucester Cnty. Sch. Bd. v. G.G.*, No. 16-273 (U.S. Mar. 2, 2017), https://perma.cc/CP7G-XYQ7 (last accessed Apr. 21, 2025).

[8]  *See* Herman et al., *Safety and Privacy in Public Restrooms and Other Gendered Facilities*, Williams Inst., UCLA School of Law 3-4 (Feb. 2025), https://perma.cc/S53J-GEZQ (last accessed Apr. 21, 2025).

discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Title IX does not define "sex" or "on the basis of sex," nor does any valid regulation.

24.     Congress enacted Title IX under its Spending Clause authority. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639 (1999).

25.     To enforce Title IX, Congress "authorized and directed" every federal agency providing financial assistance to education programs or activities to "effectuate the provisions of [Title IX] by issuing rules, regulations, or orders of general applicability." 20 U.S.C. § 1682.

26.     Under the robust administrative enforcement scheme in Title IX, any school that violates the statute must first receive notice of noncompliance and be allowed to come into voluntary compliance with Title IX. *Id.*

27.     Nothing in Title IX requires discrimination against students on the basis of their gender identity. Title IX does not require a school to prohibit a transgender girl from participating on a girls' sports team, or to prohibit a transgender boy from playing on a boys' sports team.

28.     In fact, until three months ago, the DOJ took the position that Title IX's prohibition on discrimination on the "basis of sex" covered discrimination on the basis of sexual orientation and gender identity.

29.     In 2020, the U.S. Supreme Court held that it is a violation of Title VII for employers to discriminate against transgender employees. Title VII outlaws employment discrimination "because of . . . [the] individual's . . . sex." The Court held that "it is

impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020).

30.     The following year, the DOJ, HHS, and the U.S. Department of Education announced that the reasoning in *Bostock* applied to Title IX.  In other words, the Federal Government concluded that Title IX prohibits discrimination against transgender individuals.  *See* U.S. Dep't of Educ., *Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021) ("[T]he Department interprets Title IX's prohibition on sex discrimination to encompass discrimination based on sexual orientation and gender identity."); HHS, *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27,984-02 (May 25, 2021) (same); *Memorandum on Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972 from Principal Deputy Assistant Att'y Gen., Pamela S. Karlan*, U.S. Dep't of Just., Civ. Rts. Div., to Fed. Agency Civ. Rts. Dirs. and Gen. Counsels (Mar. 26, 2021) (concluding that reasoning in *Bostock* applied to Title IX).[9]

31.     Federal courts have agreed that Title IX prohibits discrimination against transgender individuals.  *See, e.g., B.P.J. v. West Va. State Bd. of Educ.*, 98 F.4th 542, 562-

---

[9]  In February 2025, the DOJ reversed its position on *Bostock*.  *See* Guidance from the Acting Associate Att'y Gen. to Civ. Rts. Div. (Feb. 12, 2025), https://perma.cc/U982-6GN4 (last accessed Apr. 21, 2025).

63 (4th Cir. 2024); *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 670 (8th Cir. 2023) (Kelly, J., concurring); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616-19 (4th Cir. 2020); *Tirrell v. Edelbut*, 748 F. Supp. 3d 19, 41-45 (D.N.H. 2024); *Doe v. Hanover Cnty. Sch. Bd.*, No. 3:24cv493, 2024 WL 3850810, at *6-9 (E.D. Va. Aug. 16, 2024).

### III.  PRESIDENT TRUMP ISSUES EXECUTIVE ORDERS TARGETING TRANSGENDER PEOPLE, AND HE BANS ALL TRANSGENDER GIRLS FROM SCHOOL SPORTS

#### A.  In January 2025, President Trump Targets Transgender People Through a Flurry of Executive Orders.

32.    On January 20, 2025, Donald J. Trump was sworn in as President of the United States.

33.    President Trump has a long history of rhetoric that reflects animus towards transgender people.  He has referred to transgender people as "sick,"[10] falsely claimed that schools are secretly obtaining gender-affirming surgeries for children,[11] speculated that "transgender hormone treatments and ideology" increase the risk of violence,[12] promised to drive out "transgender insanity" from schools,[13] described gender nonconforming people

---

[10]  GLADD, *Fact Sheet: Donald Trump on LGBTQ Issues: Transgender Americans* (Aug. 20, 2024), https://perma.cc/893L-BDQS (last accessed Apr. 21, 2025).

[11]  Daniel Dale, *Fact Check: Trump falsely claims schools are secretly sending children for gender-affirming surgeries*, CNN (Sept. 4, 2024, 11:59 A.M. EDT), https://perma.cc/D399-A7FL (last accessed Apr. 21, 2025).

[12]  Ryan Bort & Charisma Madarang, *Trump says he'll launch probe into whether trans 'ideology' leads to mass shootings*, Rolling Stone (Apr. 14, 2023), https://perma.cc/VR8W-UTC8 (last accessed Apr. 21, 2025).

[13]  Will Graves, *Donald Trump said he wants to ban trans athletes from competing. The reality is more nuanced*, AP (Dec. 18, 2024) https://perma.cc/LJ84-XJJN (last accessed Apr. 21, 2025).

as belonging to a "transgender cult," [14] and asserted that "gender ideology" is responsible for inflation.[15]

34.    Consistent with those views, President Trump has issued a series of Executive Orders targeting transgender individuals, in all facets of life, from military service, to health care, to education, and to employment.

35.    On his first day in office, President Trump issued Executive Order 14168, entitled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the Gender Ideology Order), Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).  A copy of the Gender Ideology Order is attached as Exhibit A.  The "purpose" of the Gender Ideology Order was to fight "[e]fforts to eradicate the biological reality of sex," and to "defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male."  Ex. A § 1.

36.    The Gender Ideology Order declared that it was "the policy of the United States to recognize two sexes, male and female," which are "not changeable and are grounded in fundamental and incontrovertible reality."  *Id.* § 2.  The Gender Ideology Order also issued the following definitions, which are not in alignment with science or law:

   a.    "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of gender identity.

---

[14] Erin Burnett, *Trump's remarks on transgender people reveal flip flop*, CNN (June 17, 2023), https://perma.cc/FDW9-SBWN (last accessed Apr. 21, 2025).

[15] Kevin Breuninger, *Trump accuses Fed, Powell of creating inflation on heels of rate decision*, CNBC (Jan. 29, 2025), https://perma.cc/MRS5-N5C2 (last accessed Apr. 21, 2025).

b. "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

c. "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

d. "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

e. "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

f. "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

g. "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

*Id.*

37.    The definitions in the Gender Ideology Order are inconsistent with decades of scientific research and evidence on how human bodies develop, physically and cognitively.

38.    The definition ignores the existence of intersex people.[16]

---

[16]  Kiara Alfonseca, *Trump's definition of 'male,' 'female' criticized by medical and legal experts*, ABC News (Jan. 23, 2025, 11:54 A.M.), https://perma.cc/9XUZ-RQGU (last accessed Apr. 21, 2025).

39.    Most relevant to this lawsuit, the Gender Ideology Order denies the existence of transgender people altogether.

40.    Among other things, the Gender Ideology Order purports to rewrite Title IX by claiming that discrimination against individuals on the basis of their gender identity is required under federal law.  It directs the Secretary of State "to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order." Ex. A § 3(d). It demands all federal agencies and employees "enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.* § 3(b).  And it requires all federal agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology." *Id.* § 3(e).

41.    Section 3(g) of the Gender Ideology Order further directs that "[f]ederal funds shall not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g).

42.    The next week President Trump issued two more Executive Orders targeted at transgender individuals.  On January 27, 2025, President Trump issued Executive Order 14183—entitled "Prioritizing Military Excellence and Readiness"—which rescinded a Biden-era Executive Order permitting transgender individuals to serve in the U.S. military. President Trump's Order reinstated a prior ban on transgender military service members. Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025).  The Order falsely said that

transgender people have a "mental and physical health condition[] . . . incompatible with active duty." *Id.* § 1.  The Order also falsely said that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."  It also falsely said that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.*

43.     The next day, on January 28, 2025, President Trump issued Executive Order 14187, which was entitled "Protecting Children from Chemical and Surgical Mutilation." Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).  This Order targeted gender-affirming care for transgender youth.  The Order described gender affirming care as "a stain on our Nation's history" and "junk science." *Id.* §§ 1, 3.  And it declared that the United States "will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures." *Id.* § 3.

**B.     In February 2025, Trump Bans Transgender Girls from Participating in School Sports.**

44.     On February 5, 2025, President Trump issued yet another Executive Order targeting transgender people: "Keeping Men Out of Women's Sports." Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025) (the Sports Ban Order).  A copy of the Sports Ban Order is attached as Exhibit B.  The Sports Ban Order offensively and inaccurately refers to transgender girls and women as "men." *See generally* Ex. B.  It asserts that allowing transgender girls to compete in women's sports "is demeaning, unfair, and

dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports." *Id.* § 1.  The Sports Ban Order declares that it "is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy." *Id.*

45.    The Sports Ban Order incorporates the unscientific and indeterminable definitions of "sex," "male," and "female" from the Gender Ideology Order. *Id.*

46.    Moreover, Section 3(b) of the Sports Ban Order provides:  "All executive departments and agencies (agencies) shall review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply with the policy established in this order." *Id.* § 3(b).

47.    This Section directs every federal agency to rescind funding to any educational program—whether it be a K-12 school or a university—that permits transgender girls and women to participate on a sports team for girls and women, regardless of their age, their testosterone levels, or the level of athletic competition.

## IV.   THE TRUMP ADMINISTRATION RETALIATES AGAINST MINNESOTA

48.    The day after President Trump issued the Sports Ban Order, the Minnesota State High School League (MSHSL) reaffirmed its commitment to Minnesota's anti-discrimination laws.  The MSHSL stood by its policy that allows students to play on teams consistent with their gender identity.  MSHSL's policy has been in place since 2015.[17]

---

[17] *MSHSL Votes to Approve Policy for Transgender Athletes*, WCCO News (Dec. 4, 2024, 7:17 P.M. CST), https://perma.cc/Q2CA-DYPE (last accessed Apr. 21, 2025).

In an email to its members, MSHSL stated that it would "continue to review existing state laws alongside the new Presidential Executive Order and its timeline."[18]

49. On February 12, 2025, the U.S. Department of Education announced that it would investigate MSHSL for alleged violations of Title IX.[19]

50. After receiving this notice, MSHSL requested an opinion from Attorney General Ellison under Minnesota Statutes section 8.07. Section 8.07 requires the Minnesota Attorney General to give legal opinions, in writing, on "questions of public importance." Minn. Stat. § 8.07. Section 8.07 further provides that "[o]n all school matters," the Minnesota Attorney General's "opinion shall be decisive until the question involved shall be decided otherwise by a court of competent jurisdiction." *Id.*

51. Invoking section 8.07, the MSHSL asked for guidance on whether the Sports Ban Order preempts the MHRA and whether prohibiting students from participating in extracurricular activities consistent with the students' gender identity would violate the MHRA. A copy of the MSHSL request is attached as Exhibit C.

52. On February 20, 2025, Attorney General Ellison issued a formal opinion (the State Opinion) in response to MSHSL's request. A copy of the State Opinion is attached as Exhibit D. In the State Opinion, the Minnesota Attorney General concluded that the

---

[18] Jim Paulsen, *Trump's order forces MSHSL to re-examine policy on transgender athletes in girls sports*, Minn. Star Trib. (Feb. 6, 2025), https://perma.cc/V3S4-S3HT (last accessed Apr. 21, 2025).

[19] *U.S. Department of Education Launches Title IX Investigations Into Two Athletic Associations*, U.S. Dep't of Educ. (Feb. 12, 2025), https://perma.cc/5YND-87QV (last accessed Apr. 21, 2025).

Sports Ban Order does not have the force of law, and therefore does not preempt the MHRA. The Minnesota Attorney General also concluded that prohibiting students from participating in extracurricular activities consistent with their gender identity would violate the MHRA.

53. On or around February 25, 2025, U.S. Attorney General Bondi sent a letter to Attorney General Ellison and the Executive Director of the MSHSL in response to the Minnesota Attorney General's opinion. A copy of this letter is attached as Exhibit E. Bondi said that the DOJ had recently sued two states that "defied federal immigration laws," and it stands "ready to sue states and state entities that defy federal discrimination law." Ex. E at 1.

54. U.S. Attorney General Bondi also claimed that Title IX requires discrimination against transgender girls. *Id.* She provided no legal support for that claim. *Id.*

55. U.S. Attorney General Bondi further stated that the U.S. Department of Education's Office of Civil Rights had begun a Title IX investigation into MSHSL. *Id.*

56. The head of the civil rights division at the DOJ, Harmeet Dhillon, sent a second letter to Attorney General Ellison on or around April 8, 2025, informing him that DOJ was commencing a Title IX compliance review of "Minnesota schools and educational entities." A copy of the Dhillon Letter is attached as Exhibit F.

57. The Dhillon Letter asserted again that the Minnesota Attorney General's opinion on Minnesota law was "contrary to Title IX" because Title IX mandates discrimination against transgender girls. *Id.* It offered no support for that legal assertion.

58.    The Dhillon Letter asked Attorney General Ellison to "clarify" his previous opinion. *Id.* at 2.  But by demanding that the opinion allow schools to discriminate against transgender girls and women in sports, it functionally asked him to rescind or reverse the opinion.  And if Attorney General Ellison refused to comply within one week, Minnesota schools would "lose their federal funds" and the DOJ would seek "judicial resolution to ensure Minnesota schools are permitted to fulfill their obligations under Title IX and maintain federal funding." *Id.* at 1-2.

59.    The Bondi Letter dated February 25, 2025, and the Dhillon Letter dated April 8, 2025, are referred to collectively as "the DOJ Letters."

60.    Minnesota requested an extension and clarification.  DOJ extended the deadline to April 22, 2025, and clarified it was threatening DOJ grants to St. Paul Public Schools, Metropolitan State University, and the University of Minnesota.  A copy of this communication from DOJ is attached as Exhibit G.

61.    All the threatened grants to those three entities support law enforcement.  DOJ awarded two grants to St. Paul Public Schools in 2024—$140,000 for the STOP School Violence program, and $358,363 for the Enhancing Capacity to Address Youth Violence Grant.  Metropolitan State, which has no athletic programs, administers a DOJ grant that provides funds to various Minnesota counties to find alternatives to detention through a program called Juvenile Detention Alternatives.  Finally, DOJ's National

Institute of Justice office has granted $335,595 to the University of Minnesota for "Research and Evaluation on Sentencing and Resentencing."[20]

## V.  THE TRUMP ADMINISTRATION RETALIATES AGAINST OTHER STATES

62.  Minnesota is not the only state that the Trump Administration has targeted based on state anti-discrimination laws.

63.  The Maine Human Rights Act prohibits discrimination against various protected classes, including gender identity, in the areas of employment, housing, public accommodations, lending, and education.  5 M.R.S. §§ 4551-4634.

64.  On February 21, 2025, while speaking at a meeting with governors, President Trump specifically called out Maine Governor Janet Mills to ask whether she was going to comply with his Sports Ban Order.[21]  Governor Mills responded that she would comply with state and federal law.  *Id.*  To which Trump responded: "Well we are the federal law. You'd better do it.  You'd better do it, because you're not going to get any federal funding at all if you don't."  *Id.*  Governor Mills then stated: "See you in court."  *Id.*

65.  The same day, both the U.S. Department of Education's Office for Civil Rights  and U.S. Department of Health and Human Services' Office for Civil Rights notified Governor Mills and the Commissioner of the Maine Department of Education that

---

[20]  Information about DOJ awards to Minnesota can be found here: https://perma.cc/6XSC-AE5K (last accessed Apr. 21, 2025).

[21]  Lexie Schapitl, *'See You in Court': Trump and Maine's governor spar over trans athlete order*, NPR (Feb. 21, 2025, 4:15 P.M. ET), https://perma.cc/KK3X-37AY (last accessed Apr. 21, 2025).

they were initiating an investigation and compliance review respectively into the Maine Department of Education for alleged violations of Title IX.[22]

66.    On February 25, 2025, U.S. Attorney General Bondi sent a letter to Maine's Attorney General, similar to the letter that she sent to Minnesota's Attorney General, threatening loss of federal funding unless Maine required discrimination against transgender girls and transgender women.[23]

67.    Shortly thereafter, the acting Social Security Administrator Larry Dudek canceled the Enumeration at Birth program for the State of Maine.[24]  This program allows parents to register newborns for a social security number at a hospital or birthing site, and its cancelation would require Maine parents to register newborns in person at a federal office.  Dudek also canceled Maine's access to the Electronic Death Registry, which allows death certificates to be filed electronically.[25]  Dudek rescinded both orders on March 7, 2025.[26]  Subsequent reporting revealed that prior to the cancellation, Dudek told Social

---

[22] Compl. ¶¶ 49 & 50, Exs. 1 & 2, *State of Maine v. U.S. Dep't of Agric., et al.*, 25-cv-00131-JAW (D. Me., Apr. 7, 2025), ECF No. 1.

[23] *Id.* at ¶ 51; Ex. 3.

[24] Heather Miller, *Social Security head cancelled vital contract with Maine to punish governor, emails show*, Fox9 News (Apr. 3, 2025, 11:01 A.M. CDT), https://perma.cc/6UKC-QKNS (last accessed Apr. 21, 2025).

[25] Bill Trotter, *Social Security ends registration of newborns in Maine Hospitals*, Bangor Daily News, (March 7, 2025), https://perma.cc/UJ58-FNJZ (last accessed Apr. 21, 2025).

[26] Social Security Administration, *Statement from Lee Dudek, Acting Commissioner: Correcting Recent Decision Impacting People of Maine* (Mar. 7, 2025), https://perma.cc/N7AJ-TK8E (last accessed Apr. 21, 2025).

Security Administration staff that "no money will go from the public trust to a petulant child."[27]    The "petulant child" was Governor Mills.

68.    On April 2, U.S. Secretary of Agriculture Brooke Rollins sent a letter to Governor Mills, stating that she was freezing certain federal funds due to Maine's alleged Title IX violations.[28]    Secretary Rollins further stated that the U.S. Department of Agriculture was reviewing additional federal funding streams for compliance with Title VI, Title IX, "and the priorities of the Trump Administration."

69.    On April 7, 2025, Maine sued the U.S. Department of Agriculture and Secretary Rollins, for APA violations.  *See State of Maine v. U.S. Dep't of Agric., et al.,* 25-cv-00131-JAW (D. Me., Apr. 7, 2025), ECF No. 1. Maine also sought a temporary restraining order to enjoin any freezing or termination of federal funding.

70.    The district court granted Maine's temporary restraining order.  *State of Maine v. United States Dep't of Agric.,* 25-cv-00131-JAW (D. Me., Apr. 11, 2025), ECF No. 12.  The TRO was extended on April 16.  *Id.,* (D. Me., Apr. 11, 2025), ECF No. 16.

71.    On April 16, 2025, the Trump Administration sued the Maine Department of Education for violation of Title IX and for violating "contractual assurances" under Title IX.  *United States v. Maine Dept. of Ed.*, 25-cv-00173-JCN (D. Me., Apr. 16, 2025), ECF No. 1.  The complaint seeks declaratory and injunctive relief plus money damages

---

[27]  Heather Miller, *Social Security head cancelled vital contract with Maine to punish governor, emails show*, Fox9 News (Apr. 3, 2025, 11:01 A.M. CDT), https://perma.cc/6UKC-QKNS (last accessed Apr. 21, 2025).

[28]  Compl. ¶ 68, Ex. N, *State of Maine v. U.S. Dep't of Agric., , et al.*, 25-cv-00131-JAW (D. Me., Apr. 7, 2025), ECF Doc. 1.

72.    Minnesota and Maine are not alone.  In the past three months, the U.S. Department of Education's Office for Civil Rights has also announced Title IX investigations into the Massachusetts Interscholastic Athletic Association, San Jose State University, University of Pennsylvania, California Interscholastic Federation, Tumwater School District in Washington State, Illinois Department of Education, Chicago Public Schools District 299, Deerfield Public Schools District 109, Portland Public Schools, and Oregon School Activities Association.[29]

## CAUSES OF ACTION

### Claim 1—Against All Defendants
### Ultra Vires Executive Action (Separation of Powers)

73.    Minnesota realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

74.    The Constitution gives the power of the purse to Congress.  U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).  This is one of "Congress's most important authorities."  *Biden v. Nebraska*, 600 U.S. 477, 505 (2023).  The President does not control the public purse.

---

[29] U.S. Dept. of Education, *U.S. Department of Education to Investigate Title IX Violations in Athletics* (Feb. 6, 2025), https://perma.cc/B2YE-WRUB; U.S. Dept. of Education*, U.S. Department of Education Launches Title IX Investigations Into Two Athletic Associations* (Feb. 12, 2025), https://perma.cc/5YND-87QV; U.S. Dept. of Education, *Office for Civil Rights Launches Title IX Investigation into Washington State School District* (Mar. 2, 2025), https://perma.cc/5LEG-7BF4; U.S. Dept. of Education, *OCR Launches Investigations into Illinois DOE, the Chicago Public School District 299, and Deerfield Public Schools District 109 Over Reported Title IX Violations* (Mar. 20, 2025), https://perma.cc/6NQB-AMY7; U.S. Dept. of Education, *Office for Civil Rights Launches Title IX Investigations into Portland Public Schools and the Oregon School Activities Association* (Mar. 25, 2025), https://perma.cc/E5FG-P8T9.

75.     Congress also possesses exclusive power to legislate.  U.S. Const. art.  I, § 1.
The Constitution does not authorize the President to enact, amend, or repeal statutes.
*Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

76.     The Constitution further provides that the Executive Branch must "take Care
that the laws be faithfully executed."  U.S. Const. art. II, § 3.  The Executive Branch
violates the Take Care Clause when it declines to execute or otherwise undermines statutes
enacted by Congress and signed into law.

77.     Title IX does not require the recipients of federal funds to discriminate
against students because of their gender identity, nor does it require the recipients of federal
funds to categorically ban all transgender women and all transgender girls from
participating on sports teams that align with their gender identity.

78.     Nevertheless, the Sports Ban Order directs "[a]ll executive departments and
agencies . . . [to] review grants to educational programs and, where appropriate, rescind
funding to programs that fail to comply" with the Order's policy.  Ex. B § 3(b).  That policy
categorically bans all transgender women and all transgender girls from participating on
sports teams that align with their gender identity.

79.     Similarly, the Gender Ideology Order directs that "[f]ederal funds shall not
be used to promote gender ideology, and requires every federal agency to "assess grant
conditions and grantee preferences and ensure grant funds do not promote gender
ideology." Ex. A § 3(g).

80.     Likewise, the DOJ Letters threaten to cut funding from Minnesota schools
for "disregard[ing] the federal government's interpretation of Title IX described President

Trump's Executive Order instructing federal agencies to keep men out of women's sports." Ex. F at 1; *see also* Ex. E at 1 ("Let me be clear. Requiring girls to compete against boys in sports and athletic events violates Title IX of the Educational Amendments Act of 1972").

81.     The Constitution does not authorize the Federal Defendants to amend Title IX by Executive Order.  Nor does it authorize the Federal Defendants to retroactively change the terms of Congressionally authorized grants.  The Federal Defendants cannot invoke an erroneous interpretation of Title IX to terminate or withhold federal grants from Minnesota schools because the President has different policy preferences about how transgender athletes are allowed to compete in Minnesota.

82.     The Federal Defendants' actions exceed the President's Article II powers and usurp Congress's Article I powers.

83.     Federal courts possess the power to grant declaratory and injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong v. Exceptional Child Ctr., Inc*, 575 U.S. 320, 326-27 (2015).

84.     Minnesota is thus entitled to a declaration that Section 3(g) of the Gender Ideology Order, Section 3(b) of the Sports Ban Order, and the DOJ Letters are ultra vires and without any legal effect because they each violate the separation-of-powers principle. Minnesota is further entitled to a permanent injunction barring the Federal Defendants from enforcing the Gender Ideology Order, the Sports Ban Order, and the DOJ Letters.

**Claim 2—Against All Defendants**
**Ultra Vires Executive Action (Title IX)**

85.     Minnesota realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

86.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

87.     Under Title IX, discrimination "on the basis of sex" covers discrimination against individuals because of their gender identity.

88.     The Gender Ideology Order, the Sports Ban Order, and the DOJ Letters discriminate based on sex and conflict with Title IX.  Specifically, the Federal Defendants discriminate on the basis of sex, in violation of Title IX, by requiring the recipients of federal funds to categorically ban all transgender women and girls from participating in sports that align with their gender identity.

89.     Federal courts possess the power to grant declaratory and injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong*, 575 U.S. at 326-27.

90.     Minnesota is thus entitled to a declaration that the Gender Ideology Order, the Sports Ban Order, and the DOJ Letters exceed the Federal Defendants' authority under federal law.  The Federal Defendants do not have the power to override Section 1681 of Title IX and require federal grantees like Minnesota to engage in the discrimination that

Title IX prohibits.  Minnesota is further entitled to a permanent injunction barring the Federal Defendants from enforcing the Gender Ideology Order, the Sports Ban Order, and the DOJ Letter.

**Claim 3—Against All Defendants**
**Ultra Vires Executive Action (Tenth Amendment)**

91.    Minnesota realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

92.    The Minnesota Attorney General is a State constitutional officeholder and Minnesota's chief law officer.  Minn. Const. art. V, § 1; *State ex rel. Young v. Robinson*, 112 N.W. 269, 272 (Minn. 1907).

93.    One of the Minnesota Attorney General's core powers is to issue formal opinions on significant issues of state law.  Minn. Stat. §§ 8.05, 8.07.  Moreover, under Minnesota law, the Attorney General's opinions "on all school matters" are "decisive until the question involved shall be decided by a court of competent jurisdiction."  Minn. Stat. § 8.07.  The Minnesota Attorney General also has a duty to defend state law.  *Cf. Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. 267, 277 (2022).

94.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.

95.    The Tenth Amendment protects state sovereignty.  The Tenth Amendment prohibits the federal government from commandeering the States to carry out federal law. *New York v. United States*, 505 U.S. 144, 161 (1992); *see also Printz v. United States*,

521 U.S. 898, 925 (1997).  It also prohibits the Federal Government from coercing States into implementing federal policy through financial coercion.  *NFIB v. Sebelius*, 567 U.S. 519, 577-78 (2012).

96.     The Federal Defendants are conditioning the receipt of federal funds on a change in the Minnesota Attorney General's State Opinion on the meaning of Minnesota law.  The Constitution does not allow the Federal Defendants to commandeer state legal decision-making to achieve federal policy goals.  Nor does the Constitution allow the Federal Defendants to coerce the Minnesota Attorney General into changing his opinion on state law by exerting economic pressure.  By doing so, the Federal Defendants have violated the Tenth Amendment.

97.     Federal courts possess the power to grant declaratory and injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong*, 575 U.S. at 326-27.

98.     Minnesota is thus entitled to a declaration that Section 3(g) of the Gender Ideology Order, Section 3(b) of the Sports Ban Order, and the DOJ Letters violate the Tenth Amendment.  Minnesota is further entitled to a permanent injunction barring the Federal Defendants from enforcing the Gender Ideology Order, the Sports Ban Order, and the DOJ Letters.

### Claim 4—Against Bondi and the DOJ
### Administrative Procedure Act, 5 U.S.C. § 706
### (Arbitrary and Capricious, Exceeds Statutory Authority, Contrary to Law)

99.     Minnesota realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

100.    The DOJ Letters are final agency action subject to judicial review, 5 U.S.C. § 704, because they: (1) reflect the agency's final position on the requirements of Title IX, *i.e.*, that Title IX does not allow the recipients of federal funds to allow transgender women and girls to participate in sports that align with their gender identity; and (2) bind the agency to a legal view that will create significant legal consequences for Minnesota schools.  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

101.    The APA requires courts to "hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory authority, or limitations, or short of statutory right."  *See* 5 U.S.C. § 706(2)(A), (C).

102.    As set forth above, the DOJ Letters are not in accordance with law and in excess of statutory authority because Title IX does not require recipients of federal funds to categorically bar all transgender women and girls from participating in sports that align with their gender identity.  On the contrary, Title IX prohibits discrimination "on the basis of sex," which covers discrimination against individuals because of their gender identity.

103.    The DOJ Letters are also arbitrary and capricious because they do not sufficiently explain the DOJ's change in position from prior guidance; they fail to consider or explain the implications for existing reliance interests; and they fail to provide the reasoned decision-making required by the APA because it does not explain why Title IX requires transgender girls to be categorically barred from participating in sports that align with their gender identity, nor does it explain why transgender girls should be treated differently than transgender boys.

104.    U.S. Attorney General Bondi and the DOJ did not act in accordance with the law and exceeded their statutory and regulatory authority when issuing the DOJ Letters, and they do not act in accordance with the law and exceed their statutory and regulatory authority when enforcing the policies established in the DOJ Letters.  The DOJ Letters should thus be set aside and vacated.

## PRAYER FOR RELIEF

WHEREFORE, Minnesota asks that the Court grant the following relief:

1.    Declare that the Section 3(g) of the Gender Ideology Order, Section 3(b) of the Sports Ban Order, and the DOJ Letters, and any action to enforce or implement those documents against Minnesota, are unconstitutional and unlawful;

2.    Enjoin the Federal Defendants, and all of their officers, agents, servants, employees, and attorneys, and any other person acting at their direction, from from enforcing or implementing Section 3(g) of the Gender Ideology Order, Section 3(b) of the Sports Ban Order, and the DOJ Letters against Minnesota;

3.    Award any applicable costs and fees; and

4.    Grant any additional relief as the interests of justice may require.

*[Signature on the following page]*

Dated: April 22, 2025

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

/s/ **Liz Kramer**
LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
ANNA VEIT-CARTER (#0392518)
MAURA ALLEN (#0504790)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
anna.veit-carter@ag.state.mn.us
maura.allen@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*