# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **STATE OF MINNESOTA,** *by and through its Attorney General Keith Ellison* | Court File No. 25-CV-1608 (ECT/DLM) |
| Plaintiff, | |
| v. | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT** |
| **DONALD J. TRUMP,** *in his official capacity as President of the United States:* **UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI** *in her official capacity as Attorney General of the United States* | |
| Defendants. | |

Plaintiff has severely "jumped the gun" in prematurely filing this lawsuit prior to the Agency Defendants[1] completing their ongoing compliance reviews. Just after the Agency Defendants commenced reviews to assess three Minnesota educational programs' compliance with Title IX, 20 U.S.C. § 1681, Plaintiff State of Minnesota preemptively and prematurely filed this suit even though the Federal Defendants have not taken the first step in Title IX's multi-step process to rescind any federal funding, *see* 20 U.S.C. § 1682. What's worse, Plaintiff is attempting to prematurely drag the Federal Defendants

---

[1] "Federal Defendants" means Defendants Donald J Trump, in his official capacity as President of the United States, United States Department of Justice, and Pamela Bondi, in her official capacity as Attorney General of the United States. "Agency Defendants" means all Federal Defendants except the President.

into court based on its flawed interpretation of Title IX's prohibition of discrimination "on the bases of sex." 20 U.S.C. § 1681

Consequently, this Court lacks subject matter jurisdiction over Plaintiff's premature suit. Fed. R. Civ. P. 12(b)(1). Plaintiff lacks an authorized cause of action necessary to invoke this Court's subject matter jurisdiction because there is nothing close to final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq*. Nor can Plaintiff retitle its premature APA claim by invoking the term "ultra vires," as Plaintiff cannot meet the "extraordinary circumstances" necessary for a non-APA ultra vires cause of action. Additionally, Plaintiff's stated speculative risk of future injury is not imminent and not constitutionally ripe for review. This Court accordingly should dismiss the Complaint, ECF. No. 1, for lack of subject matter jurisdiction under Rule 12(b)(1).

Because this Court lacks subject matter jurisdiction, it should dismiss the Complaint without reaching whether the Complaint's claims state plausible claims on which relief should be granted. But even if this Court had subject matter jurisdiction, the Court should still dismiss the claims because they fail to state claims as a matter of law under Rule 12(b)(6). Plaintiff's claims center on whether Title IX's prohibition of discrimination "on the basis of sex" includes discrimination based on gender identity. It does not. This Court should accordingly dismiss the Complaint pursuant to Rule 12(b)(6).

# I.    BACKGROUND

On February 5, 2025, the President issued Executive Order 14201, *Keeping Men out of Women's Sports*, 90 Fed. Reg. 9279 (February 11, 2025) ("Sports Executive Order").  *See* Compl. Ex. B, ECF No. 1-2.  The Sports Executive Order sets forth the President's policy of "oppos[ing] male competitive participation in women's sports" because of safety, fairness, and ensuring "women and girls the equal opportunity to participate and excel in competitive sports."  Sports Executive Order § 1.  The Sports Executive Order particularly references Title IX, and that under Title IX "educational institutions receiving Federal funds cannot deny women an equal opportunity to participate in sports."  *Id.*  The Sports Order incorporates the definitions of "sex" from Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (January 30, 2025) ("Gender Executive Order").  *See* Compl. Ex. A, ECF No. 1-1.  The Sports Executive Order accordingly reaffirmed that Title IX's use of term "sex" means biological sex and not gender identity.  Sports Executive Order § 2 (incorporating Gender Executive Order § 2 definitions).

On February 12, 2025, the United States Department of Education announced an investigation of the Minnesota State High School League ("MSHSL") for potential violations of Title IX.  Compl. ¶ 49.  After the notice of investigation, on February 14, 2025, the MSHSL sought an opinion from the Minnesota Attorney General as to whether the Sports Executive Order preempts the Minesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*  Compl. ¶¶ 50-51; *id.* at Ex. C, ECF No. 1-3.

On February 20, 2024, the Minnesota Attorney General issued an opinion finding that Sports Executive Order does not have the force of law and therefore does not preempt the MHRA or other state law.  Compl. ¶ 52; *id.* at Ex. D, ECF No. 1-4.  The opinion found that complying with the Sports Executive Order "and prohibiting students from participation in extracurricular activities consistent with their gender identity would violate the MHRA."  *Id.*  The opinion acknowledged that Title IX contains an administrative process before a federal agency can rescind federal funding.  Compl. Ex. D. at 3.  The opinion, however, did not opine on or consider whether the MHRA conflicts with Title IX.  *See* Compl. Ex. D.

On February 25, 2025, United States Attorney General Pamela Bondi sent the Minnesota Attorney General and the MSHSL a letter notifying them that the Department of Justice intended to hold states that violate federal law accountable.  Compl. ¶ 53, *id.* at Ex. E. ("Bondi Letter"), ECF No. 1-5.  The Bondi Letter referenced the Minnesota Attorney General's opinion, and relayed that "[r]equiring girls to compete against boys in sports and athletic events violates Title IX."  Bondi Letter at 1.  The Letter explained that states must follow Title IX as "'the supreme Law of the Land,'" U.S. Const. Art. VI, despite any conflicting state law.  Bondi Letter at 1.  The Letter reiterated that the United States Department of Education "has begun a Title IX investigation into the" MSHSL, and "*if*" that "investigation shows that relevant Minnesota entities are indeed denying girls an equal opportunity to participate in sports and athletic events by requiring them to compete against boys, the Department of Justice stands ready to take all appropriate action to enforce federal law."  *Id.* (emphasis added)*.*  Attorney General Bondi ended by

4

noting her "hope that it does not come to this.  The Department of Justice does not want to have to sue states or state entities, or to seek termination of their federal funds.  We only want states and state entities to comply with the law."  *Id.* at 2.

More than a month later, on April 8, 2025, United States Assistant Attorney General Harmeet Dhillon sent the Minnesota Attorney General a notice letter.  Compl. ¶ 56, *id.* at Ex. F ("Dhillon Letter"), ECF No. 1-6.  The Dhillon Letter provided notice that the Department of Justice was "commencing a compliance review of Minnesota entities" pursuant to Title IX, and requested a clarification of the Minnesota Attorney General's opinion.  Dhillon Letter at 1.  The Letter noted that in conducting the "compliance review," Department of Justice remained "gravely concerned with [the] opinion," but that the opinion "did not expressly mention Title IX."  *Id.* at 1-2.  The compliance review notice specifically asked that the Minnesota Attorney General "clarify that [the] opinion does not require Minnesota schools to require man and boys to compete in women and girl's sports."  *Id.* at 2.  The Dhillon Letter noted that a failure to respond by April 15, 2025, would be taken as a confirmation, which would "leave the Department with no choice to seek judicial resolution to ensure Minnesota schools are permitted to fulfill their obligations under Title IX and maintain federal funding."  *Id.*

The Department of Justice granted the Minnesota Attorney General's office a requested extension to April 22, 2025.  Compl. ¶ 60; *see also* Email from N. Christmas, USDOJ, to J. Keller, MNAG, April 11, 2024, Compl. Ex. G, ECF No. 1-7.  While allowing the requested extension, the Department of Justice relayed that the particular entities the Department has initiated a compliance review for [are] the University of

Minnesota, Metropolitan State University, and St. Paul Public Schools (ISD #625), regarding funding they receive directly from the Department of Justice." *Id.*

Despite the ongoing Title IX compliance reviews and investigations, Plaintiff prematurely filed suit on April 22, 2024. Compl., ECF No. 1. The Complaint alleges four claims, with three alleging ultra vires executive action, and one alleging an APA violation. Compl. ¶¶ 73- 104. Claim 1 alleges ultra vires executive action in violation of the Constitution's "separation of powers," and that the "Constitution does not authorize the Federal Defendants to amend Title IX by Executive Order." Compl. ¶ 81, *see generally id.* ¶¶ 73-84. Claim 2 alleges ultra vires executive action in violation of Title IX, alleging that under "Title IX, discrimination 'on the basis of sex' covers discrimination against individuals because of their gender identity." *Id.* ¶ 87, *see generally id.* ¶¶ 85-90. Claim 3 alleged ultra vires executive action in violation of the Tenth Amendment, alleging that the Federal Defendants are commandeering and coercing the Minnesota Attorney General into changing his legal opinion. *Id.* ¶ 96; *see generally id.* ¶¶ 91-98. Claim 4 alleges that Bondi and Dhillon Letters violate the APA as alleged final agency action that conflicts with Title IX. *Id.* ¶ 102; *see generally id.* ¶¶ 99-104. The Complaint asks for a declaration that the Executive Orders, and the Bondi and Dhillon Letters, are "unconstitutional and unlawful" and an injunction preventing the Federal Defendants from implementing and enforcing them. Compl. at p. 29.

The Complaint does not allege that any Department of Education or Department of Justice compliance review or investigation has been completed or made a finding. As of the filing of this Motion, these compliance reviews and investigations remain ongoing.

6

## II.    LEGAL STANDARD: MOTION TO DISMISS

Federal Rule of Civil Procedure 12(b)(1) authorizes motions to dismiss for this Court's "lack of subject matter jurisdiction," which includes the constitutional requirement that plaintiffs establish an Article III live case or controversy, *Agred Found. v. United States Army Corps of Engineers*, 3 F.4th 1069, 1073 (8th Cir. 2021), and overcome sovereign immunity, *FDIC v. Meyer,* 510 U.S. 471, 475 (1994); *Brown v. United States*, 151 F. 3d 800, 804 (8th Cir. 1998).  The plaintiff seeking to invoke a federal court's subject matter jurisdiction bears the burden of showing that the court has jurisdiction.  *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011); *Osborn v. United States*, 918 F.2d 724, 729-30 (8th Cir. 1990).  Rule 12(b)(1) authorizes both "facial attacks" and "factual attacks."  *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quoting *Osborn*, 918 F.2d at 729 n.6).  For a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)."  *Id.* (citations omitted).   For a factual attack, "the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards."  *Id.* (internal quotation marks omitted).

Rule 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The court must "accept as true the facts alleged, but not legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). As such, the court need not accept any wholly conclusory allegations or legal conclusions that a plaintiff draws from the facts pleaded. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019). A plaintiff's factual allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The well-pleaded facts must establish more than a "mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. For a claim to proceed, the complaint must allege enough facts to plausibly establish each material element of the claim and "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

On a Rule 12(b)(6) motion, courts should disregard matters outside the complaint, but "may consider those materials that are necessarily embraced by the pleadings" such as "documents whose contents are alleged in a complaint and whose authenticity no party questions." *Hughes v. City of Cedar Rapids, Iowa*, 840 F.3d 987, 998 (8th Cir. 2016) (citations omitted); *see also* Fed. R. Civ. P. 12(d).

### III.    ARGUMENT

**A. THE COURT LACKS SUBJECT MATTER JURISDICTION.**

**1.  Plaintiff Lacks an Authorized Cause of Action.**

This Court should dismiss Plaintiff's claims for lack of jurisdiction because Plaintiff's attempts to invoke the APA and "ultra vires" fail to trigger the APA's limited waiver of sovereign immunity for final agency action.

A federal court lacks subject matter jurisdiction over claims against the United States or its officers unless the government waives its sovereign immunity and consents to suit. *FDIC v. Meyer,* 510 U.S. 471, 475 (1994); *accord United States v. Miller*, 145 S. Ct. 839, 849 (2025). "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983); *accord Meyer*, 510 U.S. at 475. "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted). Plaintiff bears the burden of demonstrating the unequivocal waiver. *See Snider v. United States*, 468 F.3d 500, 509 (8th Cir. 2006).

As explained below, Plaintiff lacks an authorized cause of action against the Federal Defendants because Plaintiff: (a) cannot invoke the APA's limited sovereign immunity waiver because there is no final agency action; (b) does not meet the exceptional circumstances necessary to invoke the narrow exception for their non-APA "ultra vires" claims; and (c) cannot obtain relief directly against the President.

This Court accordingly should dismiss their claims for lack of jurisdiction under Rule 12(b)(1).

### a. Plaintiff Cannot Invoke the Administrative Procedure Act Because There is No Final Agency Action.

Claim 4 alleges that the Bondi and Dhillon Letters violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq.* The APA provides a limited waiver of sovereign immunity for actions in federal district court by "person[s] suffering legal wrong because of agency action." 5 U.S.C. § 702; *id.* § 706(2)(A)-(C) (permitting courts to "set aside agency action . . . otherwise not in accordance with law; contrary to constitutional right . . . [or] in excess of statutory jurisdiction"); *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (confirming APA provides a "limited waiver" of sovereign immunity). But this limited waiver applies only to "final agency action," 5 U.S.C. § 704;[2] *Bennett v. Spear*, 520 U.S. 154, 175 (1997). No such waiver applies here because the Letters are part of ongoing investigations and not "final agency action."[3]

Final agency action requires two conditions:

First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations and internal quotation marks omitted).

---

[2] The APA also provides a limited waiver for "[a}gency action made reviewable by statute," 5 U.S.C. § 704, but Plaintiff does not assert that as a basis here.

[3] While Plaintiff does not assert the APA claim against the Executive Orders, the Federal Defendants note that the President's Executive Orders themselves are not "final agency action" because the "President is not an agency within the meaning" of the APA and therefore cannot take "agency action." *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) (plurality opinion).

The Bondi and Dhillon Letters are not final action because they are part of ongoing investigations and compliance reviews and thus are not "the consummation of the agency's decisionmaking process." The Bondi Letter makes multiple statements showing its "interlocutory nature," including that the Department of Education "has begun" but not finished its Title IX investigation, that "if" that investigation eventually shows violations the "the Department of Justice stands ready to take all appropriate action to enforce federal law" but that Department "hope[d] that it does not come to this." Bondi Letter at 1-2.

Similarly the Dhillon Letter provided notice that the Department of Justice was "*commencing* a compliance review of Minnesota entities" pursuant to Title IX, not that the Department had completed the reviews or found any violations. Dhillon Letter at 1 (emphasis added). The Letter noted that the Department remained "gravely concerned with [the Minnesota Attorney General's] opinion," but noted that the opinion "did not expressly mention Title IX" and sought clarification on the opinion's scope. Dhillon Letter at 1-2. This requesting of further information shows the lack of a final determination.

Courts routinely find that investigative warning letters like those here are not final agency action. *See, e.g., Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (finding Department's warning letter not final action and "[a]gencies routinely use such letters to warn regulated entities of potential violations before saddling them with expensive and demanding enforcement actions"); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (finding FDA warning letters about a

product's noncompliance with the law did not constitute final agency action); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (noting that "practical consequences, such as the threat of having to defend in an administrative hearing should the agency actually decide to pursue enforcement, are insufficient to bring an agency's conduct under [the court's] purview"); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (finding agency letter announcing "preliminary determination" and requesting "voluntary corrective" measures was not final, as "the agency has not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences"); *Schering–Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 505 (7th Cir. 2009) (finding FDA's letters advising a company that its product was misbranded, which could cause FDA to rescind the approval, was "not final agency action").

Title IX itself requires much more than just the Letters before the United States can enforce compliance. The Department cannot file an enforcement suit unless the funding agency first notifies the funding recipient of a finding of a "failure to comply" with Title IX, and also "determine[s] that compliance cannot be secured by voluntary means." 20 U.S.C. § 1682. As the investigations and compliance reviews are ongoing, the Letters make neither of these required findings. Moreover, to terminate funding the statute also separately requires an "express finding on the record, after opportunity for hearing, of a failure to comply." *Id.* And even after that administrative finding after a hearing, the agency must file a full written report with Congress explaining the grounds for the termination and wait 30 days after that report to terminate the funding. *Id.* The

12

Complaint does not (and could not) allege that any of the above administrative actions in this multi-step process have started.  *See Reliable Automatic Sprinkler Co.* 324 F.3d at 731-32 (finding agency letter not final, as "the agency has not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences").

Instead, Plaintiff simply claims the Letters are "final agency action" because they "reflect the agency's final position on the requirements of Title IX" and "bind the agency to a legal view that will create significant legal consequences for Minnesota schools." Compl. ¶ 100.  But final agency action requires a legal injury to rights or obligations, and an "an agency does not inflict [legal] injury 'merely by expressing its view of the law.'" *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. United States Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001) ("The Commission has not inflicted any injury upon AT&T merely by expressing its view of the law—a view that has force only to the extent the agency can persuade a court to the same conclusion.")).

Given this lack of final agency action, Plaintiff cannot invoke the APA to overcome sovereign immunity and this Court should accordingly dismiss Claim 4.

### b.  *Plaintiff's Purported Ultra Vires Bases Fails To Authorize a Cause of Action.*

The Complaint's references to "ultra vires" and "the general legal and equitable powers of the Court," Compl. ¶ 5, also fail to provide the necessary authority to overcome the lack of final agency action.  The Plaintiff cannot sidestep the APA by

retitling its attacks on agency action as "ultra vires." After the enactment of the APA, Plaintiff's ultra vires claim is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n, v. Texas*, No. 23-1300, 2025 WL 1698781, at \*9 (U.S. June 18, 2025) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). This Court should find Plaintiff cannot meet the extraordinary circumstances necessary for a non-statutory ultra vires claim.

The Supreme Court just recently reaffirmed the incredibly limited nature of a non-statutory ultra vires claim in *Nuclear Regul. Comm'n*. The Court recounted that "[b]efore enactment of the APA, those challenging agency action often lacked a statutory cause of action" and courts thus recognized a "a right to equitable relief where an agency's action was ultra vires." *Id.* at \*8. The Court rejected the petitioners' argument that "the APA did not displace pre-existing nonstatutory ultra vires review." *Id.* "Because ultra vires review could become an easy end-run around the limitations of" "judicial-review statutes" like the APA, the Court explained that non-statutory ultra vires review was "strictly limited." *Id.* at \*9. The "narrow" exception for ultra vires claims "does not apply simply because an agency has arguably reached 'a conclusion which does not comport with the law.'" *Id.* (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). "Rather, it applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*'" in a statute. *Id.* (quoting *Railway Clerks v. Association for Benefit of Non-contract Employees*, 380 U.S. 650, 660, (1965)).

Importantly, the Court further found that "[u]ltra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'" *Id.* (quoting *Board of Governors, FRS v. MCorp Financial, Inc.*, 502 U.S. 32, 43 (1991)).

The APA already provides a statutory review scheme for the types of ultra vires claims Plaintiff asserts here. The APA's statutory granted ultra vires provision provides for court review of agency action that is "(B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). But the APA's ultra vires provision applies only to "final agency action." 5 U.S.C. § 704. As above, because the Bondi and Dhillon Letters are part of ongoing, uncompleted investigations there is no final agency action here. The APA provides "the adequate opportunity for judicial review," 2025 WL 1698781, at *9, if the Defendants Bondi or the Department of Justice ever reach final agency action, 5 U.S.C. § 704. ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.")

Moreover, the Federal Defendants actions here are not close to the meeting the extremely "narrow" exception for a non-statutory ultra vires claim that the Supreme Court recently reiterated in *Nuclear Regul. Comm'n*. As explained below, all Plaintiff's claims take issue with the Federal Defendants' recognition that Title IX's prohibition of discrimination "on the basis of sex" means biological sex, not gender identity. *See* 20 U.S.C. § 1681; *infra* Part III.B. That Plaintiff urges a mistaken, contrary interpretation

that Title IX applies to "gender identity" does not make the Federal Defendants' actions "entirely 'in excess of its delegated powers and contrary to a *specific prohibition*'" in a statute. 2025 WL 1698781, at *9 (quoting *Railway Clerks*, 380 U.S. at 660). Title IX even specifically "authorize[s] and direct[s]" agencies "to effectuate [its] provisions. 20 U.S.C. § 1682. While there is no final agency action here, Plaintiff's argument at best is that "an agency has arguably reached 'a conclusion which does not comport with the law,'" which the Supreme Court found insufficient. *Nuclear Regul. Comm'n,* 2025 WL 1698781, at *9 (quoting *Boire*, 376 U.S. at 481).

Plaintiff's claims thus do not meet the "extraordinary circumstances" necessary for a non-APA ultra vires claim, *Boire*, 376 U.S. at 479-80, and this Court should accordingly dismiss Claims 1-3 for lack of subject matter jurisdiction.

### c. *Plaintiff Cannot Obtain Relief Directly Against the President.*

Plaintiff cannot obtain relief directly against the President for issuing the Executive Orders. Courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *see also Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 (D.C. Cir. Feb. 15, 2025) ("[T]he President enjoys absolute immunity from injunctive actions." (citing *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992))). As the Supreme Court explained in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), under "the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character." *Id.* at 165-66. The Supreme

16

Court's refusal to police the President's discretionary acts is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citations omitted)). Plaintiff accordingly cannot obtain any relief it seeks directly against the President.

### 2. Plaintiff's Claims are not Constitutionally Ripe for Review.

Beyond not challenging final agency action, Plaintiff's asserted claims of speculative future injuries are not ripe. This Court should accordingly dismiss Plaintiff's claims for lack of jurisdiction under Rule 12(b)(1).

The Constitution limits the judiciary's power to hearing only actual "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1; *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "The ripeness doctrine flows both from the Article III 'cases' and 'controversies' limitations and also from prudential considerations for refusing to exercise jurisdiction." *Pub. Water Supply Dist. No. 10 of Cass Cnty., Mo. v. City of Peculiar, Mo.*, 345 F.3d 570, 572 (8th Cir. 2003) (citation omitted). The ripeness doctrine serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Sch. of the*

17

*Ozarks, Inc. v. Biden*, 41 F.4th 992, 997-98 (8th Cir. 2022) (citation omitted); *accord National Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003)

The ripeness analysis concerns two factors: fitness and hardship. *Texas v. United States*, 523 U.S. 296, 301 (1998); *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 993 (8th Cir. 2016). A claim lacks "fitness" when it depends on "contingent future events that may not occur as anticipated." *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas*, 523 U.S. at 300). As above, other than commencing the investigations, the Federal Defendant have not started the multi-step process of terminating funding under Title IX. Plaintiff's claims accordingly are not ripe because they are "contingent [on] future events that may not occur as anticipated." *Id.*

For similar reasons, Plaintiffs' claims also fail the ripeness "hardship" requirement. In evaluating hardship, the court looks to whether the "plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *Hughes*, 840 F.3d at 993. The threatened injury must be "certainly impending" to be ripe. *See Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 958-59 (8th Cir. 2001). Here, given that the ongoing nature of the investigations and the lack of even the first step of a federal agency finding a violation in Title IX's multi-step process, Plaintiff is not "immediately in danger" and threatened injury is not close to "certainly impending."

Beyond lack of ripeness, Plaintiff also fails to establish the "closely related" requirement of constitutional "standing." *Sch. of the Ozarks*, 41 F.4th at 997; *Kennedy v. Ferguson*, 679 F.3d 998, 1001 (8th Cir. 2012). To have standing, the plaintiff must

18

plausibly allege an injury in fact that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

Here, Plaintiff's purported injury is that the Bondi and Dhillon Letters, and the Executive Orders, allegedly "threaten[ ] Minnesota schools with the loss of DOJ grants and other vital federal funds" and "coercing" the Minnesota Attorney General through "federal funding cuts," and misinterpreting "Title IX to preempt all contrary Minnesota law." Compl. ¶ 9.[4]  Because of Title IX's mult-step process, 20 U.S.C. § 1682, any purported injuries from potential future funding cuts and related legal interpretations are too speculative and fail standing's imminency requirement.  Imminency requires that a "threatened injury must be *certainly impending* to constitute injury in fact"; allegations "of *possible* future injury" are not sufficiently imminent.  *Clapper*, 568 U.S. at 409; *see also All. for Hippocratic Med.*, 602 U.S. at 381.  The claims here thus are too "conjectural" or "hypothetical," *Lujan*, 504 U.S. at 560-61, and this Court accordingly should dismiss them for lack of standing.

This Court accordingly should dismiss Plaintiff's claims for lack subject matter jurisdiction.

---

[4]  The Complaint's only mention of "harm" appears in Paragraph 9; the word "injury" (or iterations) appears nowhere in the Complaint.

### B. PLAINTIFF'S FOUR CLAIMS ALL FAIL TO STATE CLAIMS.

Because this Court lacks subject matter jurisdiction, this Court should dismiss the Federal Defendants without reaching whether the Complaint's four claims state plausible claims on which relief should be granted. But even if this Court had subject matter jurisdiction, the Court should still dismiss the claims because they fail to state claims as a matter of law under Rule 12(b)(6).

All four claims essentially center on whether Title IX's prohibition of discrimination "on the basis of sex" includes discrimination based on gender identity. *See, e.g.*, Compl. ¶¶ 86, 102. It does not. As explained below, this Court should dismiss all of Plaintiff's claims under Rule 12(b)(6) because Title IX's protections do not extend to gender identity

#### 1. The Title IX Claim Fails.

In Claim 2, Plaintiff asserts that the Bondi and Dhillon Letters, and the Executive Orders, conflict with Title IX allegedly because under "Title IX, discrimination 'on the basis of sex' covers discrimination against individuals because of their gender identity. Compl. ¶ 87. Plaintiff's Title IX claim fails because Title IX protects against discrimination based on sex, not "transgender status" or "gender identity."

##### a. Title IX's Text

Title IX requires that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Because the statute does not define "sex," the term

should "be interpreted as taking [its] ordinary, contemporary, common meaning."
*Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted).  When
Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what
the term has always meant: biological sex.  *See Adams v. Sch. Bd. Of St. Johns County*, 57
F.4th 791, 812-13 (11th Cir. 2022) (consulting nine contemporary dictionaries for
definitions); *see also id.* at 812-15 (finding Title IX refers to biological sex).  And Title
IX's statutory text uses the term consistent with biological sex, referring to a binary
classification based on biological differences.  For instance, right after the general
prohibition in 20 U.S.C. § 1681(a), the statute expressly provides that this "section shall
not preclude father-son or mother-daughter activities at an educational institution, but if
such activities are provided for students of *one sex*, opportunities for reasonably
comparable activities shall be provided for students of the *other sex*."  20 U.S.C.
§ 1681(a)(8) (emphasis added).  The statute elsewhere also clarifies that "nothing
contained herein shall be construed to prohibit any educational institution receiving funds
under this Act, from maintaining separate living facilities for the different sexes."  20
U.S.C. § 1686.  Similarly, the statute provides a grace period for an "institution which
admits only students of *one sex* to being an institution which admits students of *both
sexes*."  20 U.S.C. § 1681(a)(2) (emphasis added).  These provisions could not sensibly
function if the term "sex" includes "gender identity," which, unlike "sex," is a spectrum
and may not be limited to two categories.

### b. Title IX's Historical Context

Historical context further confirms that Congress used the word "sex" in its ordinary biological sense and that Congress's bar on sex discrimination still allowed separating biological males and females in sports. "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities, which was documented in hearings held in 1970 by the House Special Subcommittee on Education." *McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *see also North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523 n.13 (1982). Against that backdrop, members of Congress voting on Title IX and any politically engaged citizen would have understood the statute as directed at eliminating discrimination in education based on biological sex—*i.e.*, unequal treatment of men and women—consistent with the term's ordinary meaning.

Contemporaneous post-enactment history confirms Title IX refers to biological sex and does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment that directed the Education Department's predecessor to create regulations "implementing . . . [T]itle IX," which "shall include" regulations on "intercollegiate athletic activities." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including sports. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[5] Those

---

[5] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex

contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time."). Moreover, that evidence is particularly strong here because Congress got the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982).

Congress's actions in the more than 50 years following Title IX's enactment further confirm that "sex" in this statute does not encompass "gender identity." In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate from sex discrimination. For example,

---

where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."). These contemporaneous and longstanding agency interpretations also confirm that Title IX refers to biological sex.

when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender, sexual orientation, gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphasis added).

Congress accordingly used the Hate Crimes Prevention Act to amend or create several statutory provisions that prohibited or otherwise specifically addressed discrimination based on "gender identity," in addition to discrimination based on "sex" or "gender." *See* 18 U.S.C. § 249(a)(2)(A) & (c)(4) (prohibiting acts or attempts to cause bodily injury to any person "because of the actual or perceived religion, national origin, *gender, sexual orientation, gender identity,* or disability of any person," and defining "gender identity" as "actual or perceived gender-related characteristics" (emphasis added)); 34 U.S.C. § 30503(a)(1)(C) (regarding federal assistance to state, local, or tribal investigations of crimes "motivated by prejudice based on the actual or perceived race, color, religion, national origin, *gender, sexual orientation, gender identity,* or disability of the victim" (emphasis added)); *id.* § 30506(2) (construing violent acts motivated by actual or perceived race, color, religion, national origin, *gender, sexual orientation, gender identity*, or disability of a victim (emphasis added)); *id.* § 41305(b)(1) (regarding compiling statistics "about crimes that manifest evidence of prejudice based on race, *gender and gender identity*, religion, disability, *sexual orientation*, or ethnicity) (emphasis added)).

24

Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and gender identity. *See* 34 U.S.C. § 12291(b)(13)(A) (2013), *as amended by* Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), *sexual orientation,* or disability" (emphases added)).

These post-Title IX enactments illustrate that Congress knows how to prohibit discrimination based on "gender identity" when it wishes to do so. *DHS v. MacLean*, 574 U.S. 383, 394 (2015). "If Congress had meant to prohibit . . . transgender discrimination" in Title IX, "surely the most straightforward way to do so would have been to say so—to add . . . 'transgender status' or 'gender identity' to the list of classifications protected under" Title IX. *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 338 (5th Cir. 2019) (Ho, J., concurring) (addressing Title VII). Congress did not do so.

Finally, dismissal here aligns with the many courts that have concluded that Title IX allows separating the sexes and that Title IX does not include discrimination based on "gender identity." *See, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2-3 (6th Cir. July 17, 2024); *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4-5 (11th Cir. Aug. 22, 2024) (collecting cases).[6]

---

[6] The Federal Defendants contend that *Bostock v. Clayton County*, 590 U.S. 644 (2020), does not extend beyond Title VII and particularly has no relevance to Title IX

This Court accordingly should dismiss Plaintiff's Title IX claim under Rule 12(b)(6).

### 2. The Separation of Powers Claim Fails.

In Count 1, Plaintiff asserts that the Bondi and Dhillon Letters, and the Executive Orders, violate the Constitution's separation of powers because the "Constitution does not authorize the Federal Defendants to amend Title IX [and the] Federal Defendants cannot invoke an erroneous interpretation of Title IX to terminate or withhold federal grants. This claim is essentially just a reiteration of Plaintiff's Title IX claim above. Indeed, Title IX is a statute that places a condition on federal funds, so the lawfulness of the

---

here. *See, e.g.*, *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1229 (11th Cir. 2023) ("Because *Bostock* therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instant case."); *United States v. Skrmetti*, No. 23-477, 2025 WL 1698785, at *12 (U.S. June 18, 2025) ("We have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context."); *id.* at 27 (Barrett, J. concurring) ("[T]ransgender status implicates several other areas of legitimate regulatory policy—ranging from access to restrooms to eligibility for boys' and girls' sports teams . . . legislatures have many valid reasons to make policy in these areas."); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring) (finding, (as the author of *Bostock*), that reading *Bostock* to control the meaning of a constitutional provision is "implausible").

Regardless, even if *Bostock* were relevant, the case would not change the result here. *Bostock* makes clear that it requires a similarly situated analysis: "[D]iscrimination" means "treating [an] individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. In other words, *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated." *Id.* In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. Unlike in *Bostock*, males and females are not similarly situated when it comes to sports; sex is relevant to such decisions.

Executive Branch's application of Title IX is coterminous with its ability to withhold funds based on that application. The purported misapplication of the statute does not establish a separate constitutional claim. *See Dalton v. Specter*, 511 U.S. 462, 473-74 (1994) (noting that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review"). Otherwise a plaintiff could turn every purported executive branch violation of a statute into a constitutional claim.

Accordingly, Plaintiff's separation of powers claim fails for the same reasons as its Title IX claim and should be dismissed under Rule 12(b)(6).

### 3. The APA Claim Fails.

In Count 4, Plaintiff asserts that the Bondi and Dhillon Letters violate the APA as "final agency action" that is contrary to law and "in excess of statutory authority." Compl. ¶¶ 100-02. This APA claim fails because, (as explained above Part III.A(1)(b)), the Letters are not "final agency action" because they are part of ongoing investigations and compliance reviews and thus are not "the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); 5 U.S.C. § 704.

Moreover, Plaintiff's APA claim would still fail even if the Letters constituted reviewable final agency action. Like Plaintiff's other claims, the APA claim centers on the Plaintiff's misconstruction of Title IX. It alleges that the "Letters are not in accordance with law and in excess of statutory authority because" "Title IX prohibits discrimination 'on the basis of sex,' which covers discrimination against individuals

because of their gender identity." Compl. ¶ 102. Like the Title IX and separation of powers claims above, this APA claim fails because Title IX protects against discrimination based on sex, not "transgender status" or "gender identity."

This Court accordingly should dismiss Plaintiff's APA claim under Rule 12(b)(6).

### 4. The Tenth Amendment Claim Fails.

In Count 4, Plaintiff asserts that the Bondi and Dhillon Letters, and the Executive Orders, violate the Tenth Amendment. This fanciful claim alleges that the "Federal Defendants are conditioning the receipt of federal funds on a change in the Minnesota Attorney General's State Opinion on the meaning of Minnesota law." Compl. ¶ 96. And based on that allegation the Federal Defendants are "commandeer[ing]" the Minnesota Attorney General and "coerc[ing]" him into changing his opinion on state law by exerting economic pressure." Compl. ¶ 96. The Federal Defendants, however, are not trying to unconstitutionally commandeer or coerce the Minnesota Attorney General or any state actor. Rather the Federal Defendants are attempting to ensure federal funding recipients comply with Title IX and that Minnesota educational programs do not use federal funds to discriminate on the bases of sex.

As an initial matter, just based on timing, the Executive Orders cannot unconstitutionally commandeer or coerce the Minnesota Attorney General to change his opinion because the Executive Orders preceded that opinion, and the opinion particularly responded to those Executive Orders.

Second, the Bondi and Dhillon Letters are aimed at ensuring compliance with Title IX. To the extent Plaintiff argues that Title IX itself violates the Tenth Amendment, that

28

argument fails.  Title IX does not commandeer the state because it applies to both state and private education programs that receive federal financial assistance.  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 475-76 (2018) ("The anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage.").  And Title IX also does not commandeer because it is a Spending Clause statute.  The Spending Clause empowers Congress "to pay the Debts and provide for the . . . general Welfare of the United States," U.S. Const. Art. I, § 8, cl. 1, and inherent that power is "the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l,* 570 U.S. 205, 213 (2013).  Title IX also does not unconstitutionally economically coerce because the coercion doctrine does not apply where Congress "condition[s] the receipt of funds on the States' complying with restrictions *on the use of those funds*, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'"  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) (emphasis added).

The Bondi and Dhillon Letters are consistent with Title IX's constitutionally permissible Spending Clause restrictions.  Overall, the Letters attempt to ensure Minnesota federal funding recipients comply with Title IX and that educational programs do not use federal funds to discriminate on the bases of sex.  They do not require the Minnesota Attorney General to change his opinion, but rather sought clarification on the opinion's scope and extension to Title IX.  The Minnesota Attorney General opined only on whether state law conflicted with the Executive Orders, and conspicuously left out

whether state law conflicted with Title IX.  In fulfilling its Title IX enforcement duty, the Department of Justice is entitled to clarify and question the opinion of the State's chief legal officer.  *See* Compl. ¶ 93.  Especially when that chief legal officer purports to represent the Minnesota recipients of federal financial assistance subject to Title IX, as his filing of this lawsuit confirms.

This Court accordingly should find no unconstitutional commandeering or coercion and dismiss the Tenth Amendment claim under Rule 12(b)(6).

## IV.    CONCLUSION

For the above reasons, this Court should dismiss all Plaintiff's claims against all the Federal Defendants.

Respectfully submitted,

  */s/ Matthew J. Donnelly*
MATTHEW J. DONNELLY
Attorney
Attorney ID Number 1186694CA
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530
Telephone: (202) 616-2788
Email: matthew.donnelly3@usdoj.gov

Counsel for the Defendants

Dated:  June 26, 2025