**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, | |
| Plaintiff, | Case No.: 25-cv-01608 (ECT/DLM) |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, *in her official capacity as Attorney General of the United States*, | |
| Defendants. | |

**OPPOSITION TO THE FEDERAL DEFENDANTS'**
**MOTION TO DISMISS COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 3

BACKGROUND ................................................................................................. 5

   I.   PRESIDENT TRUMP TARGETS TRANSGENDER INDIVIDUALS. ............................. 5

   II.   THE FEDERAL DEFENDANTS TARGET MINNESOTA, MAINE, AND CALIFORNIA. .................. 6

      A.   Build Up to the Bondi Letter on February 25. ............................................ 6

      B.   The DOJ Escalates Further. ...................................................................... 8

LEGAL STANDARD............................................................................................ 10

ARGUMENT ..................................................................................................... 11

   I.   THE COURT HAS SUBJECT MATTER JURISDICTION OVER MINNESOTA'S CLAIMS. ............. 11

      A.   Minnesota Has Standing and Its Claims Are Ripe..................................... 11

          1.   Minnesota alleges imminent injury to its nonsovereign, sovereign, and quasi-sovereign interests. ............................................................................. 11

          2.   Minnesota's claims are ripe. ................................................................... 14

      B.   Sovereign Immunity Does Not Bar Minnesota's Separation of Powers, Tenth Amendment, and Title IX Claims (Counts 1-3). ........................................... 16

          1.   Section 702 waives sovereign immunity for the constitutional and Title IX claims for nonmonetary relief. .......................................................... 16

          2.   Sovereign immunity does not bar claims seeking equitable relief against the federal defendants........................................................................... 17

      C.   The Court Has Jurisdiction over Minnesota's APA Claim (Count 4). .................. 21

      D.   Minnesota seeks declaratory—not injunctive—relief against the President. .......... 25

   II.   MINNESOTA HAS STATED PLAUSIBLE CONSTITUTIONAL, TITLE IX, AND APA CLAIMS. ... 26

      A.   Minnesota Has Stated a Plausible Title IX Claim (Count 2). ......................... 27

      B.   Minnesota Has Stated a Plausible Separation-of-Powers Claim (Count 1). ............. 32

      C.   Minnesota Has Stated a Plausible APA Claim  (Count 4)............................... 35

      D.   Minnesota Has Stated a Plausible Tenth Amendment Claim (Count 3)................... 36

CONCLUSION................................................................................................... 39

# INTRODUCTION

Since President Trump took office in January 2025, he has engaged in a forceful campaign against transgender rights by Executive Order. The President has ordered the federal government to rescind grants that promote "gender ideology." He has banned transgender people from the military. He has cut off federal funding to medical institutions that provide gender-affirming care to transgender youth. And he seeks to exclude all transgender girls from school sports.

The Department of Justice is enforcing the President's orders. At the President's behest, the DOJ asserts that Title IX of the Education Amendments of 1972—one of the nation's most important civil rights law—requires schools and other federal funding recipients to discriminate against transgender girls and to exclude them from girls' sports. The DOJ has repeatedly threatened three states that dared to include transgender girls— Maine, California, and Minnesota. And the DOJ has already sued Maine and California for alleged Title IX violations.

Minnesota did not need to wait to be sued by the DOJ before it could challenge the President's enforcement of Title IX. The President's position conflicts with the Minnesota Human Rights Act, which requires Minnesota schools to allow transgender youth to play on sports teams that align with their gender identity. This Court has equitable authority to hear Minnesota's claims that the President's interpretation of Title IX—and the funding threats associated with it—are unconstitutional and unlawful. The Court also has jurisdiction because the Administrative Procedure Act (APA) waives sovereign immunity for all claims against the United States for nonmonetary relief, and because the federal

government's final decision on the meaning of Title IX has legal consequences in Minnesota.

On the merits, Minnesota has stated plausible constitutional, statutory, and APA claims. The DOJ itself interpreted Title IX to prohibit gender-identity discrimination until last year based largely on Supreme Court precedent. The President cannot change that precedent, or Title IX, by executive fiat. The Complaint plausibly alleges that the President's attempt to do so violates the separation of powers, Title IX, the Tenth Amendment, and the APA.

Zooming out, the federal defendants repeatedly claim that Minnesota jumped the gun with this lawsuit because "compliance reviews and investigations remain ongoing." *E.g.*, Mem. 6. But the DOJ has concluded that states with the same law and policy as Minnesota violate Title IX, and there is no prospect that the DOJ will reach any other conclusion here. Dismissal will just result in the DOJ suing Minnesota over the same issues raised by the Complaint. Judicial economy is best served by resolving the Title IX issues now.

The federal defendants' motion to dismiss should be denied.[1]

---

[1] Unless otherwise noted, the term "federal defendants" refers to Donald J. Trump, in his official capacity as the President of the United States, the United States Department of Justice, and Pamela Bondi, in her official capacity as Attorney General of the United States.

## BACKGROUND

### I. PRESIDENT TRUMP TARGETS TRANSGENDER INDIVIDUALS.

For nearly a decade, Minnesota has allowed students to play on school sports teams that align with their gender identity. Compl. ¶ 48. That policy is consistent with the Minnesota Human Rights Act (MHRA), which prohibits discrimination based on gender identity in education. *Id.* ¶ 14; Minn. Stat. §§ 363A.03; 363A.13. Until January 20, 2025, the federal government agreed that Minnesota's law and policy aligned with Title IX—a federal civil rights law that prohibits education programs receiving federal financial assistance from discriminating on the basis of sex. Compl. ¶¶ 23, 28-30; 20 U.S.C. § 1681(a).

The federal government's position changed when President Trump was sworn into office, and he began to wield his executive power to target transgender individuals. Compl. ¶¶ 32-34. Within a week, President Trump issued Executive Order 14168, which was entitled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the Gender Ideology Order); Compl. ¶¶ 35-36, Ex. A. The Gender Ideology Order declared that it is "the policy of the United States to recognize two sexes, male and female," which are "not changeable and are grounded in fundamental and incontrovertible reality." Compl. ¶¶ 35-36. It went on to define the "two sexes" by referencing the size of the reproductive cells produced "at conception." *Id.* ¶ 36. These definitions are not supported by science and deny the existence of both intersex and transgender individuals. *Id.* ¶¶ 37-39. Still, the Gender Ideology Order demanded that all federal agencies implement the

definitions in policies, regulations, forms, communications, and every other aspect of their work. *Id.* ¶¶ 40-41. Section 3(g) of the Order further asserted that "[f]ederal funds shall not be used to promote gender ideology," and it required all federal agencies to "assess grant conditions and grantee preferences and [to] ensure that grant funds do not promote gender ideology." *Id.*

More Executive Orders followed. President Trump banned transgender individuals from serving in the U.S. military. *Id.* ¶¶ 42-43. He also cut federal funds to medical providers who offer gender-affirming care to transgender youth. *Id.*

Sports were next. On February 5, 2025, President Trump issued Executive Order 14201, entitled "Keeping Men Out of Women's Sports." Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025) (the Sports Ban Order); Compl. ¶ 44, Ex. B. The Sports Ban Order incorporates the definitions from the Gender Ideology Order and declares that it "is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities," *i.e.*, educational programs that allow transgender girls and women to participate. *Id.* ¶¶ 44-45, Ex. B. Section 3(b) of the Order also directs all federal agencies to rescind funding to educational programs that allow transgender girls and women to play on sports teams for girls and women. *Id.* ¶ 47.

## II.  THE FEDERAL DEFENDANTS TARGET MINNESOTA, MAINE, AND CALIFORNIA.

### A.  Build Up to the Bondi Letter on February 25.

The federal government immediately began implementing the Sports Ban Order against Minnesota and other states with inclusive sports policies. On February 12, 2025, the United States Department of Education announced an investigation into the Minnesota

State High School Sports League ("the League") after it opted to follow Minnesota law and allow students to participate on teams consistent with their gender identities. *Id.* ¶¶ 48-49. In response to that investigation, the League sought a legal opinion from Attorney General Ellison on whether the Sports Ban Order preempts the MHRA. *Id.* ¶¶ 50-51. Attorney General Ellison concluded that the Sports Ban Order lacks the force of law and does not preempt the MHRA. *Id.* ¶ 52, Ex. D. Attorney General Ellison's opinion is binding on Minnesota schools unless a court rules otherwise. *Id.*; Minn. Stat. § 8.07.

Five days later, U.S. Attorney General Pam Bondi and the DOJ responded with a threat. *Id.* ¶ 53. Bondi's letter to Attorney General Ellison and the League's Director, Erich Martens, was unequivocal: "Minnesota should be on notice" because DOJ "stands ready" to enforce Title IX.[2] *Id.* ¶¶ 53-55, Ex. E. Bondi did not suggest that the DOJ—or any other federal agency—was deliberating on whether or how to change the prior administration's interpretation of Title IX. She simply stated that "[r]equiring girls to compete against boys in sports and athletic events violates Title IX." *Id.*

Minnesota was not alone in drawing the DOJ's ire. Maine and California received letters at the same time.[3] *Id.* ¶ 66. Then, in March and early April, the federal government

---

[2]  Bondi's letter asserts that Minnesota "require[s] girls to compete against boys in sports and athletic events." Compl. Ex. E. Minnesota understands the reference to "boys" in that statement to be an inaccurate and offensive reference to transgender girls—not a reference to co-ed sports. Co-ed sports are consistent with Title IX and the MHRA, and they are offered in a variety of contexts in Minnesota schools.

[3]  Press Release, United States Department of Justice, *Attorney General Bondi Urges States to Comply with Federal Law by Keeping Men Out of Women's Sports* (Feb. 25, 2025), https://perma.cc/3HKU-MPRG.

took extraordinary enforcement measures against Maine. On April 2, 2025, the United States Department of Agriculture froze several federal funding streams due to Maine's alleged Title IX violations—including funds allocated to feed Maine schoolchildren. Compl. ¶¶ 68-70; *accord Maine v. U.S. Dep't of Agric.*, __ F. Supp. 3d __, 2025 WL 1088946, at *8 (Apr. 11, 2025). The federal government froze Maine's funds without notice and without following statutory procedures. Compl. ¶¶ 68-70; *Maine*, 2025 WL 1088946, at *22. Maine was forced to seek an emergency temporary restraining order to keep funds flowing. Compl. ¶ 69.

### B. The DOJ Escalates Further.

While the dispute in Maine heated up, the DOJ began to threaten reprisals within its control—DOJ grants and lawsuits. On April 8, 2025, the head of the civil rights division at the DOJ, Harmeet Dhillon, sent another letter to Attorney General Ellison. Compl. ¶¶ 56-58, Ex. F. The DOJ said it was commencing a compliance review of "Minnesota entities." *Id.* The justification was Attorney General Ellison's legal opinion, which "seemingly *requires* Minnesota schools to disregard the federal government's interpretation of Title IX described in President Trump's Executive Order." *Id.* The DOJ gave Attorney General Ellison one week to "clarify" his opinion. *Id.* If he did not—or if he failed to respond—the DOJ would have "no choice but to seek judicial resolution." *Id.* The DOJ also threatened to cut funding from Minnesota schools. *Id.*

Minnesota requested a short extension and a clarification regarding the specific grants that the DOJ was threatening. Compl. ¶¶ 60-61. The funding under review came

directly from the DOJ. Compl., Ex G. In other words, the DOJ controlled the federal funds it was threatening to terminate.

On April 16, 2025, the DOJ sued Maine, alleging that its inclusive sports policy violated Title IX. *Id.* ¶ 71. Rather than wait for funding cuts or litigation, Minnesota sued to protect its inclusive policy and the rights of all student-athletes. The Complaint alleges that Section 3(g) of the Gender Ideology Order and Section 3(b) of the Sports Ban Order, plus the DOJ actions to enforce the Orders, violate the separation of powers, Title IX, the Tenth Amendment, and the APA. *Id.* ¶¶ 77-104. The Complaint seeks declaratory and injunctive relief against the Executive Orders and the DOJ Letters implementing them.[4] *Id.*

Since Minnesota brought this action, President Trump and the DOJ have continued to vigorously enforce their interpretation of Title IX. On July 9, 2025, the DOJ sued California, alleging that its policy of allowing transgender girls to compete in girls' sports violated Title IX. *United States v. Cal. Interscholastic Fed'n*, ECF No. 1, Case No. 8:25-cv-01485 (C.D. Cal. July 9, 2025).[5] As in Maine, the DOJ seeks sweeping relief: a declaratory judgment adopting its interpretation of Title IX; an injunction that dictates state policy for school sports eligibility, sets up a system to monitor compliance, plus a process for compensating female athletes allegedly harmed by California's policy; as well as damages and attorney's fees. *Id.*

---

[4] This memorandum refers to the challenged portions of the Gender Ideology Order and the Sports Ban Order collectively as "the Executive Orders." It also refers to the Bondi and Dhillon Letters as "the DOJ Letters."

[5] On a motion to dismiss this Court "may take judicial notice of judicial opinions and public records." *Stutzka v. McCarville*, 420 F.3d 757, 761 n.2 (8th Cir. 2005).

**LEGAL STANDARD**

The federal defendants move to dismiss under both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). As the federal defendants note (Mem. 7), Rule 12(b)(1) challenges to subject matter jurisdiction are either factual challenges or facial challenges. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993) (citing *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir.1990)). Factual challenges ask the court to consider matters outside the pleadings—such as declarations or other evidence—to determine jurisdiction. *See, e.g.*, *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 915 (8th Cir. 2015). Facial challenges, by contrast, ask the court to consider only the complaint and the materials embraced by it. *Fairview Health Servs. v. Armed Forces Off. of Royal Embassy of Saudi Arabia*, 679 F. Supp. 3d 811, 816 (D. Minn. 2023) (Tostrud, J.). The federal defendants bring a facial attack because they do not ask the Court to make factual findings or consider materials beyond the complaint. *E.g.*, *BP Chemicals Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 680 (8th Cir. 2002).

The same standard governs facial challenges to subject matter jurisdiction under Rule 12(b)(1) and motions to dismiss for failure to state a claim under Rule 12(b)(6). *Wong v. Minnesota Dep't of Hum. Servs.*, 820 F.3d 922, 927 (8th Cir. 2016). For both, the court must construe the complaint in the light most favorable to the nonmoving party; assume the factual allegations in the complaint are true; and then assess whether the facts (a) establish subject matter jurisdiction, and (b) state plausible claims for relief. *Id.*

## ARGUMENT

### I.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER MINNESOTA'S CLAIMS.

The federal defendants argue that the Complaint should be dismissed based on standing, ripeness, sovereign immunity, and scope of relief. Mem. 9. The federal defendants are wrong. Minnesota has standing and its claims are ripe for resolution. Nor does sovereign immunity bar Minnesota's constitutional and Title IX claims for declaratory and injunctive relief. The Court has equitable authority to hear those claims. Likewise, Minnesota's APA claim can proceed because the DOJ Letters are not mere investigative warnings. They instead represent the DOJ's final position on the meaning of Title IX, and that position has direct legal consequences in Minnesota. Last, Minnesota may seek declaratory relief against the President.

#### A.    Minnesota Has Standing and Its Claims Are Ripe.

The federal defendants briefly argue that Minnesota's claims are not ripe and that Minnesota lacks standing to pursue them. Mem. 17-19. But the Executive Orders and DOJ's actions threaten grave injury to Minnesota, and they are fit for adjudication and judicial redress now.

##### 1.    Minnesota alleges imminent injury to its nonsovereign, sovereign, and quasi-sovereign interests.

For standing to exist, a plaintiff must allege (1) an injury in fact, (2) causation, and (3) redressability. *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022). The federal defendants do not dispute causation or redressability. *See* Mem. 17-19.

They argue only that Minnesota has not suffered an injury in fact because "potential future funding cuts and related legal interpretations are too speculative." *Id.* at 19.

Minnesota's alleged injuries are not speculative. An injury sufficient to confer standing must be "'actual or imminent.'" *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) (quoting *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024)). If the alleged injury has yet to occur, the imminence requirement is met "if the threatened injury is certainly impending or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation modified).

States can suffer a wide range of threatened injuries sufficient to confer standing. The three principal categories are injuries to (1) nonsovereign interests, (2) sovereign interests, and (3) quasi-sovereign interests. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barenz*, 458 U.S. 592, 601-02 (1982). Nonsovereign interests include harm to state entities and the state's pocketbook. *See id.* Sovereign interests include the state's power to create and enforce its own legal code. *Id.* at 601. And quasi-sovereign interests include the health and well-being of the state's residents, plus "not being discriminatorily denied [the state's] rightful status within the federal system." *Id.* at 607.

Minnesota alleges imminent injuries to all these interests. First, the Executive Orders—and the DOJ Letters that followed—directly threaten specific grants to public entities in Minnesota. Compl. ¶¶ 8-9, 53-58, 60. They also threaten Title IX funding in Minnesota more broadly. *Id.* The risk of losing out on federal funding "is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Commerce v. New York*, 588 U.S. 752, 767 (2019).

Second, the federal defendants' actions put Title IX on a collision course with the MHRA and the League's inclusive sports policy. The threat of federal preemption injures a state's sovereign interests. *See, e.g.*, *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 594 (6th Cir. 2024). That preemption threat exists here: Minnesota law and policy requires schools to allow transgender girls to play on sports teams that align with the gender identity. Compl. ¶¶ 14-22. The federal defendants claim that Title IX requires Minnesota to exclude them. *Id.* ¶¶ 44-47, 53-61.

Finally, Minnesota possesses quasi-sovereign interests in protecting its citizens from discrimination and in avoiding "federal pressure to change state law." *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015). Indeed, states have a "constitutionally protected interested in equal sovereignty," and they suffer an Article III injury when the federal government leaves states "with less regulatory authority." *Ohio v. EPA*, 98 F.4th 288, 307 (D.C. Cir. 2024), *cert denied*, 145 S. Ct. 994 (2025). Minnesota is suffering this kind of injury here. The federal defendants want to leave Minnesota "with less regulatory authority" over educational law and policy by demanding that Minnesota engage in discrimination that Minnesota law forbids. At the same time, the federal defendants are threatening Minnesota with severe funding cuts if Minnesota's Attorney General does not change his opinion on Minnesota law. These extraordinary incursions into Minnesota's sovereignty are cognizable and imminent injuries too.

### 2.      Minnesota's claims are ripe.

The federal defendants further argue that Minnesota's claims are not ripe because the claims are too contingent. Mem. 17-18. This ripeness argument fails for the same reasons as standing.

"Ripeness is a closely related doctrine of standing that originates from the same Article III limitation." *Religious Sisters of Mercy*, 55 F.4th at 607-08 (citation modified). It prevents the courts from embroiling themselves "in abstract disagreements." *Id.* (citation modified). Ripeness requires "fitness of the issues for judicial decision and [] hardship to the parties of withholding court consideration. *Id.* (citation modified). When a party alleges that a claim is not ripe because it is speculative or contingent on future events, standing and ripeness "'boil down to the same question.'" *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 157 n.5). Like standing, ripeness does not require a plaintiff to "await the consummation of threatened injury to obtain preventative relief." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979).

Because Minnesota has standing to challenge the Executive Orders and the DOJ Letters, Minnesota's claims are necessarily "ripe for judicial review." *Religious Sisters of Mercy*, 55 F.4th at 607-08. As explained above, Minnesota faces funding cuts, preemption, and federal intrusion into core areas of state sovereignty if Minnesota does not yield to the federal defendants' interpretation of Title IX. Minnesota need not wait for those threats to manifest before suing.

The federal defendants nonetheless argue that Minnesota's claims fail the fitness and hardship prongs of the ripeness inquiry. Fitness and hardship are weighed on a sliding

scale; each factor must be satisfied to "a minimal degree." *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013) (citation modified). Fitness depends "on whether a case would benefit from further factual development." *Id.* Hardship hinges on whether the plaintiff "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974) (internal quotations and citations omitted).

Here, no further factual development is necessary because there is a clear legal dispute over what Title IX means, and whether it preempts Minnesota law. *See Pub. Water Supply Dist. No. 10 of Cass Cnty. v. City of Peculiar*, 345 F.3d 570, 573 (8th Cir. 2003) ("The case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities."). Because the federal defendants' interpretation of Title IX conflicts with the MHRA—Minnesota's principal civil rights law—this case is fit. Similarly, hardship is satisfied because the conflict with the federal defendants creates massive financial risk and uncertainty for Minnesota. Minnesota need not "operate beneath the sword of Damocles until the threatened harm actually befalls" it before seeking judicial resolution.[6] *Iowa League*, 711 F.3d at 867.

---

[6] The federal defendants also assert that the case is not ripe because they have not "started the multi-step process of terminating funding under Title IX." Mem. 18. But this administration has rescinded federal funding for Title IX violations without following proper procedures. Compl. ¶¶ 63-71; *Maine*, 2025 WL 1088946, at *22-24. Title IX's multi-step process thus has no bearing on the imminency of the risk to Minnesota and its entities.

**B.      Sovereign Immunity Does Not Bar Minnesota's Separation of Powers, Tenth Amendment, and Title IX Claims (Counts 1-3).**

The federal defendants also argue that sovereign immunity bars Minnesota's "ultra vires" claims. Mem. 13-16. But Minnesota's constitutional and Title IX claims are not barred by sovereign immunity under two doctrines: (1) the statutory waiver of sovereign immunity in Section 702 of the APA for actions seeking nonmonetary relief; and (2) the sovereign-immunity exception for equitable claims against federal officers for exceeding the scope of their authority or acting unconstitutionally.

**1.      Section 702 waives sovereign immunity for the constitutional and Title IX claims for nonmonetary relief.**

Section 702 of the APA contains a broad waiver of sovereign immunity for actions seeking nonmonetary relief against federal agencies and officers. It states:

> An action in the Court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

Section 702's broad sovereign-immunity waiver applies to "any action for nonmonetary relief brought against the United States." *Raz v. Lee*, 343 F.3d 936, 938 (8th Cir. 2003). The waiver does "not depend[] on application of the procedures and review standards of the APA." *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988). As a result, the waiver does not require "final agency action," as long as the plaintiff seeks nonmonetary relief on claims that arise independent of the APA. *See Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 199-200 (5th Cir. 2024);

16

accord *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 673 (6th Cir. 2013) (circuits are unanimous that a plaintiff seeking nonmonetary relief does not have to satisfy final-agency-action requirement); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 774-75 (7th Cir. 2011) (concluding same). The waiver thus applies to claims seeking nonmonetary relief that arise under the constitution or other sources of federal law. *Raz*, 343 F.3d at 938 (holding that Section 702 waived sovereign immunity for constitutional claims against FBI and FBI director); *Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1343 (Fed. Cir. 2011) (same for Patent Act claims against the United States Department of Agriculture).

Minnesota's constitutional and Title IX claims are in the heartland of Section 702's sovereign-immunity waiver. Minnesota alleges that the Executive Orders—and the actions the federal defendants have taken to implement those orders—violate the separation of powers, the Tenth Amendment, and Title IX itself. Compl. ¶¶ 73-98. Minnesota seeks declaratory and injunctive relief for the constitutional and Title IX violations—not monetary damages. *Id.* ¶¶ 84, 90, 98. Section 702 thus waives sovereign immunity for these claims.

### 2. Sovereign immunity does not bar claims seeking equitable relief against the federal defendants.

Statutory waivers (like Section 702) are not the only way around sovereign immunity. Since the Nation's founding, federal courts have "held that sovereign immunity does not apply when a plaintiff files suit seeking equitable relief against federal officials in their official capacities and alleging that those officials exceeded the scope of their

authority and/or acted unconstitutionally." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022); *accord State Highway Comm'r of Missouri v. Volpe*, 479 F.2d 1099, 1123 (8th Cir. 1973) (per curiam) (denying petition for rehearing en banc). Indeed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The shorthand for this sovereign-immunity exception is "nonstatutory review," *Strickland*, 32 F.4th at 363, or "the *Larson-Dugan* exception." *Pollack v. Hogan*, 703 F.3d 117, 119-21 (D.C. Cir. 2012).[7]

The exception turns on the principle that suits against federal officers acting beyond their authority or in violation of the Constitution is "*ultra vires* action . . . beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 120. Because the officer takes action that the sovereign has not allowed him to do, sovereign immunity does not apply because "it never attached in the first place." *Chamber of Comm. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).

The exception applies to executive orders issued by the President and actions by his subordinates to implement them. Indeed, the Supreme Court has repeatedly recognized that the President's actions can "be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 790-91 (1992). And federal courts have likewise recognized that they "have

---

[7] *Larson-Dugan* refers to two Supreme Court cases that explain some principles underlying the doctrine. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 693 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963).

power to compel subordinate executive officials to disobey illegal Presidential commands." *Reich*, 74 F.3d at 1327 (citation modified). Taken together, these precedents establish that sovereign immunity does not bar equitable claims for relief against the federal government—as long as the claims allege that the President and his subordinate officers acted unconstitutionally or beyond their statutory powers. *See, e.g.*, *Murphy Co. v. Biden*, 65 F.4th 1122, 1128- 30 (9th Cir. 2023); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 425-26 (D. Md. 2025); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1260 (W.D. Wa. 2025).

Minnesota's constitutional claims for equitable relief satisfy this sovereign-immunity exception. Claim 1 alleges that the Executive Orders, and DOJ's actions implementing them, violate the separation-of-powers principles, and it seeks equitable relief to stop unconstitutional conduct. Compl. ¶¶ 73-84. The Supreme Court has squarely held that a plaintiff may seek equitable relief against the federal government to enforce separation-of-powers principles—just like "every other constitutional claim." *Free Enter. Fund. v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cases). Meanwhile, Claim 3 alleges that the Executive Orders, and DOJ's actions implementing them, violate the Tenth Amendment, and Minnesota again seeks equitable relief to stop this unconstitutional conduct. Compl. ¶¶ 91-98. As with the separation of powers, the Supreme Court has considered claims for equitable relief against the federal government to enforce the Tenth Amendment. *New York v. United States*, 505 U.S. 144, 154 (1992) (declaratory relief). The constitutional claims thus fall within this sovereign-immunity exception.

So too for Claim 2. Claim 2 alleges that the Executive Orders, and the DOJ's actions implementing them, conflict with Title IX itself because Title IX does not categorically prohibit transgender girls from competing on sports teams aligned with their gender identity. Compl. ¶¶ 85-90. In other words, Claim 2 alleges that the Executive Orders conflict with federal law, and therefore federal defendants have exceeded their authority by requiring Title IX funding recipients to discriminate based on gender identity. *Id.* Sovereign immunity does not bar a claim that the executive's actions "conflict with statutory law." *PFLAG, Inc.*, 769 F. Supp. 3d at 427, 441-42. "[C]ourts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'" *Id.* (quoting *Reich*, 74 F.3d at 1328).

The only case that the federal defendants rely on does not contradict these principles and precedents. Mem. 14. In *Nuclear Regulatory Commission v. Texas*, the Supreme Court held that Texas and a private business could not obtain review of a nuclear-waste licensing decision because they were not parties to the licensing proceedings. 145 S. Ct. 1762 (2025). The Supreme Court explained that the Hobbs Act, which governs judicial review of nuclear licensing decisions, only allows a "'party'" to appeal. *Id.* at 1769-70 (quoting 28 U.S.C. § 2344 (citation modified)). The Supreme Court then concluded that non-parties to the licensing proceedings could not "bring claims of ultra vires agency action." *Id.* at 1775.

But *Nuclear Regulatory Commission* said nothing about the *Larson-Dugan* exception to sovereign immunity. *Id.* at 1775-76. The Court relied on another precedent, *Leedom v. Kyne*, which permits judicial review of agency action when a statute *precludes*

20

judicial review. 358 U.S. 184, 187-88 (1958); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (describing *Kyne* exception). In that scenario—a challenge to agency action that is expressly precluded from judicial review by statute—ultra vires review is rarely available. *See Nuclear Regulatory Comm'n*, 145 S. Ct. at 1765 (noting that *Kyne* exception is limited because it "could become an easy end-run around the limitations of the Hobbs Act and other judicial review statutes").

But that is *not* the scenario the Court confronts here. Minnesota alleges constitutional and statutory claims that fall within the *Larson-Dugan* exception—a "long-established line of precedent establishing that parties can seek to enjoin federal officials in their official capacity from exceeding the scope of their authority or acting unconstitutionally." *Strickland*, 32 F.4th at 365 (citation modified). *Nuclear Regulatory Commission* did not sweep away this precedent, and the federal defendants' suggestion that it did is extraordinary.

### C.    The Court Has Jurisdiction over Minnesota's APA Claim (Count 4).

The federal defendants next argue that the Court lacks jurisdiction over the APA claim because there is no final agency action. Mem. 10-13. But the Complaint properly challenges the federal defendants' interpretation of Title IX, which is not only final but has direct and sweeping consequences in Minnesota now.

The starting point for the analysis is the APA, which provides for judicial review of "final agency action." 5 U.S.C. § 704. The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The word "action" is meant to "cover

comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

Final agency action requires two conditions. "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted). "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which legal consequences will flow." *Id.* In assessing these two requirements, courts take a "'pragmatic' approach." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). Final agency actions are not limited to "formal" actions. *See, e.g.*, *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("[T]he absence of a formal statement of the agency's position, as here, is not dispositive.").

Minnesota's allegations satisfy this flexible standard. First, Minnesota challenges the DOJ's new interpretation of Title IX as requiring discrimination against transgender athletes. Minnesota alleges that the DOJ Letters are final agency action because they "reflect the agency's final position on the requirements of Title IX, *i.e.*, that Title IX does not allow the recipients of federal funds to allow transgender women and girls to participate in sports that align with their gender identity." Compl. ¶ 100.

Through the Letters, the DOJ has clearly articulated its interpretation of Title IX as requiring discrimination against transgender athletes. Bondi confirmed this position in her opening salvo to Minnesota: "Let me be clear. Requiring girls to compete against boys in sports and athletic events violates Title IX of the Educational Amendments Act of 1972."

Compl. Ex. E. Dhillon affirmed this position in her letter, asserting that Attorney General Ellison's opinion "absurdly interprets Minnesota law to require schools to permit men and boys to compete in women and girls' sports, [which is] is contrary to Title IX, not to mention common sense." Compl. Ex. F. There is nothing "tentative" or "interlocutory" about the DOJ's adoption of this (unsupported) interpretation of Title IX. *Cf. Texas v. Cardona*, 743 F. Supp. 3d 824, 842–43 (N.D. Tex. 2024) (stating that "the overarching view that Title IX prohibits discrimination on the basis of sexual orientation and gender identity reflects the Department's 'settled agency position'" and therefore is final agency action).[8]

Second, the DOJ's interpretation of Title IX will have significant legal consequences for Minnesota. Compl. ¶ 100. This is because the DOJ's interpretation of Title IX conflicts with the MHRA, which requires that athletes be allowed to compete in alignment with their gender identity. The DOJ Letters demand that Attorney General Ellison rescind his opinion interpreting the MHRA to prohibit discrimination, and they threaten legal action and funding cuts should he fail to do so. Bondi specifically opened her letter by noting that the DOJ had sued two states that allegedly "defied federal immigration laws" and stated the DOJ "stand[s] ready to sue states and state entities that defy federal antidiscrimination laws." Compl. Ex. E. Dhillon closed her letter by stating that the DOJ would seek "judicial resolution" should Attorney General Ellison fail to rescind his opinion. Compl. Ex. F. In other words, the DOJ's letters both determine legal obligations *and* state that legal

---

[8] The federal defendants absurdly attempt to cast Dhillon's threat to sue Minnesota if Attorney General Ellison did not capitulate to the demand to change his legal opinion as a "request[] of further information." Mem. 11.

consequences will follow. *See Hawkes Co., v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 1000–01 (8th Cir. 2015) (holding that agency demand of compliance or risk threat of legal action satisfies the second *Bennett* factor). Minnesota thus plausibly alleges that the DOJ's interpretation is final agency action under the APA.

Defendants ignore Minnesota's allegations and instead attempt to reframe Minnesota's APA claim as challenging "ongoing investigations." Mem. 11-12. But the DOJ has not just threatened potential investigations. It has initiated several investigations into Minnesota entities, which render the cases the DOJ relies on unavailing. *Compare* Compl. ¶¶ 60–61 *with Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (holding Department's warning letter was not final action because it only warned "of potential violations *before* saddling them with expensive and demanding enforcement actions" (emphasis added)), and *Holistic Candlers and Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (holding that no legal consequences flowed from warning letters because they said that failure to comply "*may* result in regulatory action being initiated" (emphasis in original)).

In short, the DOJ has made "a definitive statement" of its interpretation of Title IX, determining Minnesota's rights and obligations and resulting in legal consequences. *Bell v. New Jersey*, 461 U.S. 773, 779-80 (1983 (stating that if an agency has issued a "definitive statement of its position, determining the rights and obligations of the parties," the agency's action is final notwithstanding "[t]he possibility of further proceedings in the agency"); *see also Cardona*, 743 F. Supp. 3d at 861 (finding guidance documents were final agency action because they "advance a clear enforcement ideology" under Title IX).

The DOJ's interpretation of Title IX constitutes final agency action, "despite the possibility of further proceedings in the agency." *Bell*, 461 U.S. at 779.

### D. Minnesota seeks declaratory—not injunctive—relief against the President.

The federal defendants also argue that Minnesota cannot obtain any direct relief against the President for issuing the Executive Orders because courts have no authority to second guess his discretionary acts. Mem. 16. But federal courts have long granted declaratory relief against Presidents. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (affirming declaratory judgment against President Clinton); *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (granting declaratory relief against President Nixon); *Slaughter v. Trump*, No. CV 25-909, 2025 WL 1984396, at *16 (D.D.C. July 17, 2025).[9] Moreover, at this early stage of the case, courts have often denied similar motions to dismiss requests for declaratory relief against Presidents. *See, e.g.*, *Kingdom v. Trump*, No. 1:25-CV-691-RCL, 2025 WL 1568238, at *16 (D.D.C. June 3, 2025) (declining to dismiss President Trump); *Missouri v. Biden*, 662 F. Supp. 3d 626, 680–83 (W.D. La. 2023) (denying motion to dismiss request for declaratory relief against President Biden).

The Court should do the same here. Minnesota seeks declaratory relief against President Trump, and declaratory and injunctive relief against the other federal defendants.

---

[9] Minnesota acknowledges that caselaw from the D.C. Circuit on declaratory relief against the President is mixed. *See, e.g.*, *McCray v. Biden*, 574 F. Supp. 3d 1, 10-11 (D.D.C. 2021) (discussing cases that declined to grant declaratory relief against a president). Minnesota is unaware of any similar Eighth Circuit precedent that would foreclose declaratory relief.

Because this Court has authority to grant declaratory relief against President Trump, it should deny the federal defendants' motion to dismiss the President as a defendant.

## II.    MINNESOTA HAS STATED PLAUSIBLE CONSTITUTIONAL, TITLE IX, AND APA CLAIMS.

The federal defendants devote most of their merits briefing to Minnesota's Title IX claim, arguing that all of Minnesota's claims "essentially center on whether Title IX's prohibition of discrimination 'on the basis of sex' includes discrimination based on gender identity." Mem. 20. The federal defendants overstate the argument: Minnesota has stated plausible constitutional and APA violations that do not depend on Title IX's scope. Still, Minnesota starts with its Title IX claim because that is where the federal defendants focus their briefing, and because if Minnesota has stated a plausible Title IX claim, the federal defendants appear to concede that Minnesota's remaining claims are plausible too.

Minnesota has plausibly alleged that Title IX does not require funding recipients to categorically bar transgender girls from playing on sports teams that align with their gender identity. The Department of Justice *itself* took the position—for years—that "the best reading of Title IX's prohibition on discrimination 'on the basis of sex' is that it includes discrimination on the basis of gender identity." Farrell Decl. Ex. A at 2.[10] The political winds have shifted, and the DOJ—at the President's direction—has reversed course. But Minnesota's interpretation of Title IX is not only plausible—it is correct. Similarly,

---

[10]    The DOJ's memorandum is cited in Paragraph 30 of the Complaint. The electronic version appears to have been removed from the DOJ's website, but it remains available on govinfo.gov (https://perma.cc/V79V-ZFQ3). Minnesota has attached a copy to the Farrell Declaration as Exhibit A.

Minnesota's constitutional and APA-based claims plausibly allege that the federal defendants' efforts to ban transgender girls from girls' sports in Minnesota violate the separation of powers, the Tenth Amendment, and the APA.

### A.    Minnesota Has Stated a Plausible Title IX Claim (Count 2).

Title IX prohibits discrimination "on the basis of sex" in education programs that receive federal financial assistance. 20 U.S.C. § 1681. The federal defendants argue that Minnesota has not stated a plausible Title IX claim because the statute cannot encompass discrimination based on gender identity. Mem. 20-26. But as the Department of Justice put it in 2021, "the text of Title IX, Supreme Court caselaw, and developing jurisprudence" confirm that Title IX antidiscrimination prohibition "includes discrimination on the basis of gender identity." Farrell Decl. Ex. A at 2. Minnesota's interpretation of Title IX is also consistent with the text of Title IX and Supreme Court precedent, and Minnesota's Title IX claim should thus proceed.

*Text.* Title IX does not define "sex" in a way that requires transgender girls to be excluded from sports. The federal defendants concede that Title IX does not define "sex." Mem. 20. And "[t]here is insufficient evidence to support the assumption that sex can mean only biological sex." *A.C. by M.C. v. Metro Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024). Contemporary dictionaries are "inconclusive," with several defining the term in both narrow and broad ways. *Id.* (citing narrow and broad definitions of "sex" in *Black's Law Dictionary* (4th ed. 1968) & *Webster's New World Dictionary* (2d ed. 1972)). Nor does a narrow definition of sex account for "the complexity" of human sexuality. *Id.* For example, intersex individuals are

often born with variations in their sex characteristics that do not map onto a strict sex binary. *Id.*; *see also* Compl. ¶ 38.

Because sex is such a complex term, the better reading of Title IX is that the term "sex" is not limited to "biological sex," and it is broad enough to encompass "gender identity." *A.C.*, 75 F.4th at 770; *see also id.* at 775 (Easterbrook, J., concurring) ("Sex is such a complex subject that any invocation of plain meaning is apt to misfire."). Minnesota's textual analysis is, at minimum, plausible.

***Regulatory History.*** Title IX's regulations do not undermine the plausibility of Minnesota's claim. The federal defendants argue that the regulations, which were adopted after Title IX was enacted, confirm that the statute refers to "biological sex." Mem. 22-23 & n.5. But like Title IX itself, the regulations do not define "sex," nor do they employ the term "biological." Moreover, the federal defendants conspicuously ignore the substance of the sports-specific regulations, which establish a general rule that *prohibits* sex-separated sports teams. 34 C.F.R. § 106.41(a). To be sure, the regulations *allow* schools to "operate or sponsor separate teams for members of each sex." *Id.* § 106.41(b). But schools may only do so "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.*

At most, the regulations show that Title IX allows schools—in defined circumstances—to divide sports into boys' teams and girls' teams, or provide certain kinds of sex-separated facilities. "But just because Title IX authorizes sex-segregated [teams or restrooms] does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity." *Parents for*

*Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020). On the contrary, Title IX's regulations give schools the flexibility to allow students to access educational benefits (like sports and restrooms) consistent with their gender identity. *Id.*

**Bostock.** Most importantly, even if Title IX *does* refer to "biological sex," as the federal defendants claim, Title IX may still prohibit discrimination against individual student-athletes based on their gender identity or transgender status. The Supreme Court's decision in *Bostock v. Clayton County* shows why. 590 U.S. 644 (2020). There, the Supreme Court considered whether an employer violated Title VII of the Civil Rights Act of 1964 if that employer fired someone for being homosexual or transgender. *Id.* at 649-51. Title VII—in functionally identical language to Title IX—prohibits discrimination "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). The employers argued that the term "sex"—as it was used in 1964 when Title VII was enacted—was limited to biological sex, so employers could fire homosexual or transgender employees without violating Title VII. *Bostock*, 590 U.S. at 655. The Supreme Court rejected that argument. The relevant question was not the meaning of the term "sex," "but what Title VII says about it." *Id.* at 656. And Title VII says that an employer cannot fire someone for being homosexual or transgender "because it's impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660.

The federal defendants relegate their discussion of *Bostock* to a single footnote, arguing that it "does not extend beyond Title VII and particularly has no relevance to Title IX." Mem. 25 n.6. Not in the Eighth Circuit: "'the Supreme Court's interpretation of Title VII properly informs [the court's] examination of Title IX.'" *Du Bois v. Bd. of Regents of*

*Univ. of Minn.*, 987 F.3d 1199, 1203 (8th Cir. 2021) (quoting *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011)); *accord Parents Defending Education v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 670 (8th Cir. 2023) (Kelly, J., concurring) (noting "federal anti-discrimination statutes prohibit discrimination on the basis of gender identity," and that "[c]ourts have found that this includes Title IX"). Under *Bostock*, Title IX (like Title VII) prohibits discriminating against an individual based on that person's gender identity or transgender status. *See* 590 U.S. at 662.

*Bostock* also disposes of the federal defendants' claim about Congress' and the public's expectations in the early 1970s. *Bostock* explains that the assumptions of Congress' drafters shed little light on the statutory meaning of the term "sex." Few in 1964 would have expected Title VII's prohibition on sex discrimination to apply to homosexual or transgender individuals. But whether those specific applications were "anticipated by Congress is irrelevant" because "applying protective laws to groups that were politically unpopular at the time of the law's passage" is often "unexpected." *Id.* at 677.[11]

**Other Caselaw.** Other Title IX precedents underscore the plausibility of Minnesota's claim. The federal defendants highlight a smattering of preliminary-injunction decisions that adopted a narrow (and incorrect) interpretation of Title IX. Mem. 25. But the federal defendants neglect to mention many decisions holding that schools violate Title

---

[11] *United States v. Skrmetti* does not affect the import of *Bostock*. 145 S. Ct. 1816 (2025). *Skrmetti* involved an equal protection challenge to Tennessee's ban on gender-affirming care. The Supreme Court held that *Bostock*'s reasoning did not apply because Tennessee's law discriminated based on age and medical treatment—not sex. *Id.* at 1834. The Court reserved the question of how *Bostock* applies in other contexts. *Id.*

IX or the Constitution when they exclude transgender students from educational benefits—like sports or restrooms—because of the students' gender identity. *See, e.g.*, *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024), *cert. granted*, __ S. Ct. __, 2025 WL 1829164 (July 3, 2025) (sports under Title IX); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021) (restrooms under Title IX and equal protection); *A.C.*, 75 F.4th at 764, *cert. denied*, 144 S. Ct. 683 (2024) (restrooms and locker rooms under Title IX and equal protection); *Tirrell v. Edelblut*, 748 F. Supp. 3d 19 (D.N.H. 2024) (sports under Title IX and equal protection); *Doe v. Hanover Cnty. Sch. Bd.*, No. 3:24cv493, 2024 WL 3850810 (E.D. Va. Aug. 16, 2024) (sports under Title IX and equal protection).

Moreover, the federal defendants have adopted an aggressive interpretation of Title IX: they claim that Title IX *requires* schools to exclude all transgender girls from girls' sports. Compl. Exs. E, F. That view is more than the text of Title IX can bear—as even courts who take a narrow view of Title IX have observed. The Sixth Circuit, for example, (incorrectly) said that Title IX *allows* schools to separate athletics and restrooms "in accordance with one's biological sex without accommodating gender identity." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 610 (6th Cir. 2024). But it also acknowledged that Title IX does "not require" schools to do so, and that schools "could also separate programs and facilities by gender identity." *Id.* at 611.

The Complaint plausibly challenges the federal defendants' categorical and extreme position to the contrary. The Department of Justice got it right in 2021: the best reading of

Title IX is that it prohibits discrimination based on gender identity. Minnesota's Title IX claim can proceed.[12]

### B.    Minnesota Has Stated a Plausible Separation-of-Powers Claim (Count 1).

The President's power to issue an Executive Order must derive "from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Minnesota plausibly alleges that the Executive Orders, plus the DOJ's actions, violate core separation-of-powers principles because they exceed the bounds of Article II and infringe on Congress's authority under Article I.

The separation-of-powers doctrine is a central tenet of our Constitution and is "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020). Article I of the Constitution allows only Congress to make law. U.S. Const. art. I, § 1. In exercising its Article I powers, Congress controls the public purse. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). This power is one of "Congress's most important authorities," *Biden v. Nebraska*, 600 U.S. 477, 505 (2023), because "Congress's power to spend is directly linked to its power to legislate." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

---

[12] The federal defendants also parrot an argument from *Bostock*'s dissents, arguing that other federal statutes show that Congress knows how to prohibit gender-identity discrimination "when it wishes to do so." Mem. 25; *see also Bostock*, 590 U.S. at 791–92 (Kavanaugh, J., dissenting). Once again, *Bostock* rejected this same line of reasoning. 590 U.S. at 670 (post-enactment legislative history is irrelevant because "[t]here's no authoritative evidence explaining why later Congresses adopted other laws referencing sexual orientation but didn't amend this one").

The President has no such power over federal spending. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The President thus lacks the authority to "thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1232. Even if the President has policy objections to Congressional spending, "'the President does not have unilateral authority to refuse to spend [] funds.'" *Id.* (quoting *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)). Instead, the President has a duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, a duty that "necessarily extends to appropriations." *City & Cnty. of San Francisco*, 897 F.3d at 1234. The President's failure to spend Congressionally-appropriated funds—or to impose new conditions on those funds—is an "abdication of the President's constitutional role." *Id.*

The Complaint plausibly alleges that the President has abdicated his constitutional role and violated separation-of-powers principles. The Gender Ideology Order relies on "the authority vested in . . . [the] President by the Constitution" for the authority to terminate federal grants that are "used to promote gender ideology." Compl. Ex. A at 1-2. The same is true of the Sports Ban Order, which instructs federal agencies to rescind funding to educational programs that do not ban all transgender girls from competing on girls' sports teams. Compl. Ex. B at 1. But the President has no constitutional authority to place such conditions on federal funds. Compl. ¶¶ 73-84. Likewise, if the President is relying on Title IX to justify funding rescissions, the Complaint alleges that Title IX does *not* condition federal funds on banning transgender girls from girls' sports. *Id.* ¶ 81. The Complaint thus plausibly alleges that the President's attempt to impose this funding

condition exceeds his Article II powers and infringes on Congress's spending authority under Article I.

The federal defendants' brief argument to the contrary is unpersuasive. The federal defendants rely on *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994), claiming that "[t]he purported misapplication of [Title IX] does not establish a separate constitutional claim." Mem. 27. But *Dalton* does not apply here. *Dalton* involved a claim that the President violated a statute that expressly vested him with the discretion to approve or disapprove the closure of military bases. 511 U.S. at 464-65. The Court "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable," but found that "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." *Id.* at 474.

Minnesota states a separation-of-powers claim within this framework. The statute at issue in *Dalton* expressly gave the President discretion to approve or disapprove the base-closure decisions. *Id.* at 476. Title IX, by contrast, does not authorize the President to terminate federal grants for "promoting gender ideology." Compl. ¶¶ 73-84. Nor does Title IX authorize the President to rescind federal funds from education programs unless they ban transgender girls from girls' sports. *Id.* The President is thus acting *without* statutory authority—and, in doing so, violating the separation of powers.

In near identical circumstances, federal courts nationwide have enjoined this President's Executive Orders—and the actions his subordinates have taken to implement those Orders—as separation-of-powers violations. *See, e.g.*, *PFLAG, Inc.*, 769 F. Supp. 3d

at 432-41 (holding that the Gender Ideology Order and related Executive Order on healthcare likely violated the separation of powers); *Washington*, 768 F. Supp. 3d at 1261-63 (same); *City & Cnty. of San Francisco v. Trump*, No. 25-CV-013250-WHO, 2025 WL 1282637, at*27-29 (N.D. Cal. May 3, 2025) (same for Executive Orders imposing funding restrictions on so-called "sanctuary jurisdictions"). Minnesota has thus stated a plausible claim that the President's attempt to condition Title IX funds on gender-identity discrimination violates the separation of powers.

### C.    Minnesota Has Stated a Plausible APA Claim (Count 4).

Minnesota has also plausibly alleged an APA claim. First, as earlier discussed, the DOJ has clearly articulated its position that Title IX *requires* discrimination against transgender athletes, and that is final agency action. *See supra* § I.C. Both Letters demonstrate that there is nothing tentative or interlocutory about the DOJ's position. *Bennett*, 520 U.S. at 178; *see also Cardona*, 743 F. Supp. 3d at 842-43 (stating that "the overarching view that Title IX prohibits discrimination on the basis of sexual orientation and gender identity reflects the Department's 'settled agency position'" and therefore is final agency action). Plus, Minnesota alleges that DOJ's adoption of this interpretation determines legal obligations and creates significant legal consequences for Minnesota law, Minnesota schools, and their funding. *Bennett*, 520 U.S. at 178; *Hawkes Co.*, 782 F.3d at 1000-01 (finding that agency demand of compliance or risk threat of legal action satisfies the second *Bennett* factor).

Second, and contrary to the federal defendants' assertions, Minnesota's interpretation of Title IX is consistent with both text and precedent. *See supra* § II.A.

Title IX does not define "sex," let alone in the narrow way that the federal defendants assert. Appellate courts have noted that the term is broad enough to encompass gender identity (*see A.C.*, 75 F.4th at 770), and the DOJ itself had interpreted Title IX to prohibit discrimination based on gender identity (*see* Farrell Decl. Ex. A at 2). Therefore, interpreting Title IX's prohibition on sex-based discrimination as encompassing more than "biological sex" is plausible. The DOJ's change in position—without any explanation—exceeded its statutory authority and is arbitrary and capricious in violation of the APA.

### D. Minnesota Has Stated a Plausible Tenth Amendment Claim (Count 3).

The Tenth Amendment protects states from the federal government encroaching on their "residuary and inviolable sovereignty." *Printz v. United States*, 521 U.S. 898, 919 (1997) (internal quotation omitted). It prevents the federal government from bullying states into adopting federal policy as their own. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) (holding that the Constitution does not give the federal government the authority to require states to regulate by direct command or indirect coercion). Minnesota plausibly alleges that the DOJ Letters violate the Tenth Amendment because they attempt to strongarm Attorney General Ellison into adopting the Sports Ban Order's novel interpretation of Title IX and declaring that it preempts longstanding Minnesota law to the contrary—*i.e.*, adopting federal policy as Minnesota's own.

The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Supreme Court has interpreted the Tenth

Amendment to impose two limitations on the federal government: anti-commandeering and anti-coercion. Under the anticommandeering rule, "'[t]he Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) (quoting *Printz*, 521 U.S. at 935). And, under the anti-coercion rule, the federal government may not use financial coercion to achieve indirectly what it cannot do directly—require a state "to adopt a federal regulatory system as its own." *Sebelius*, 567 U.S. at 578.

These rules play an important role in our constitutional system. They preserve a "healthy balance of power between the States and the Federal Government [reducing] the risk of tyranny and abuse from either front," promote political accountability so that "[v]oters who like or dislike the effects of the regulation know who to credit or blame," and prevent the federal government from burdening states with the costs of federal regulations. *Murphy*, 584 U.S. at 473-74.

The DOJ Letters threaten the balance of power between Minnesota and the federal government because they encroach on, and attempt to commandeer, some of the core powers of the Minnesota Attorney General. In Minnesota's constitutional structure, the Attorney General is the "chief law officer of the state." *State v. Robinson*, 112 N.W. 269, 272 (1907). As such, the Minnesota Attorney General is tasked with defending Minnesota's "[p]aramount" retained sovereign power "to enact and enforce any laws that do not conflict with federal law." *Cf. Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022). Minnesota law therefore empowers the Attorney General to, "in the absence of

some express legislative restriction to the contrary, exercise all such power and authority as public interests may from time to time require." *Robinson*, 101 Minn. at 272. This power and authority include conducting "all such suits and proceedings as [the Attorney General] deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights." *Id.* It also includes authoring written opinions on questions of law asked by state and local government entities. Minn. Stat. §§ 8.05, 8.07. When an opinion concerns an issue related to public schools, it is "decisive until the question involved shall be decided otherwise by a court of competent jurisdiction." Minn. Stat. § 8.07.

The DOJ Letters issued a plain threat: change your longstanding interpretation of Minnesota's civil rights law to match the novel (and incorrect) interpretation of Title IX contained in the Sports Ban Order or DOJ will terminate Minnesota's federal funds. *See* Compl. Ex. E, Ex. F. That is not mere coercion; it is extortion.

It is of no relevance that Title IX itself is a valid, non-coercive exercise of the Congress's spending clause authority, as federal defendants argue, Mem. 28-29, because "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. Even worse for the federal defendants, the DOJ Letters push Minnesota to adopt a federal policy that directly conflicts with Minnesota law. Minnesota plausibly alleges that these tactics violated anti-commandeering and anti-coercion principles in violation of the Tenth Amendment.

## CONCLUSION

The federal defendants' motion to dismiss should be denied. The Court has subject matter jurisdiction, and Minnesota has alleged plausibly constitutional, statutory, and APA violations.

Dated: August 7, 2025                    Respectfully submitted,

                                         KEITH ELLISON
                                         Attorney General
                                         State of Minnesota

                                         /s/ **Pete Farrell**
                                         LIZ KRAMER (#0325089)
                                         Solicitor General
                                         PETER J. FARRELL (#0393071)
                                         Deputy Solicitor General
                                         ANNA VEIT-CARTER (#0392518)
                                         MAURA ALLEN (#0504790)
                                         Assistant Attorneys General

                                         445 Minnesota Street, Suite 600
                                         St. Paul, Minnesota 55101-2131
                                         (651) 757-1010 (Voice)
                                         (651) 282-5832 (Fax)
                                         liz.kramer@ag.state.mn.us
                                         peter.farrell@ag.state.mn.us
                                         anna.veit-carter@ag.state.mn.us
                                         maura.allen@ag.state.mn.us

                                         *Attorneys for Plaintiff State of Minnesota*