## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **STATE OF MINNESOTA,** *by and through its Attorney General Keith Ellison*<br><br>            Plaintiff,<br><br>v.<br><br>**DONALD J. TRUMP,** *in his official capacity as President of the United States;* **UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI** *in her official capacity as Attorney General of the United States*<br><br>            Defendants. | Court File No. 25-CV-1608 (ECT/DLM)<br><br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT** |

This Court should dismiss Plaintiff's premature attempt to drag the Federal Defendants into court based on Plaintiff's flawed interpretation of Title IX's prohibition of discrimination "on the bases of sex." 20 U.S.C. § 1681. In its haste to sprint to the courthouse, Plaintiff forgot to bring standing, ripeness, and an authorized cause of action, and this Court accordingly lacks jurisdiction under Rule 12(b)(1). Even if this Court had jurisdiction, Plaintiff's claims all depend on its mistaken belief that Title IX's prohibition on sex discrimination extends to "gender identity," and accordingly this Court should dismiss them under Rule 12(b)(6).

I.    **THIS COURT LACKS SUBJECT MATTER JURISDICTION.**

   A. **PLAINTIFF LACKS STANDING AND ITS PURPORTED CLAIMS LACK RIPENESS.**

Defendant lacks standing and its claims lack ripeness because its claimed future injuries are speculative, and certainly not imminent. *See* U.S. Br. at 17-18. This Court should accordingly dismiss them for lack of jurisdiction under Rule 12(b)(1).

Plaintiff bases its speculative future injuries on its projected results of pending investigations, as well as its speculation of what the Department of Justice's actions may be after the completion of those investigations. In February 2025, the Department of Justice ("Department") sent the Bondi Letter, ECF No. 1-5, which noted the ongoing investigation of another agency. In April 2025, the Department initiated its own compliance review and sent the Dhillon Letter, ECF No. 1-6. The Complaint does not allege that either of these investigations has been completed or made a finding. And still, as of the filing of this Reply, the reviews remain ongoing.

Plaintiff chiefly alleges injury from the threat of potential future funding loss from the uncompleted reviews. *See* Compl. ¶ 9. Any future funding loss is speculative and certainly not "impending" because Title IX itself requires the Department to engage in a multi-step process to terminate any funding. It must first notify the funding recipient of a finding of a "failure to comply" with Title IX, and also "determine[] that compliance cannot be secured by voluntary means." 20 U.S.C. § 1682. As the reviews are ongoing,

the Letters make neither of these required findings.[1]  Moreover, to terminate funding the statute also separately requires an "express finding on the record, after opportunity for hearing, of a failure to comply."  *Id.*  And even after that administrative finding after a hearing, the agency must file a report with Congress explaining the grounds for the termination and wait 30 days after that report to terminate the funding.  *Id.*  The Complaint does not (and could not) allege that any of the above administrative actions in this multi-step process have started.  *See Reliable Automatic Sprinkler Co.* 324 F.3d at 731-32 (finding agency letter not final because "the agency has not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences").  Moreover, even putting aside the required findings and administrative hearing, the statute requires the Department to wait at least 30 days after a report to Congress to terminate funding.  No imminent threat of injury exists.

This Court should accordingly find lack of standing and ripeness.  Standing's imminency prerequisite requires that a "threatened injury must be *certainly impending*"; allegations "of *possible* future injury" are not sufficiently imminent.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  Similarly, Plaintiff's claims lack ripeness because they are "contingent [on] future events," including completed reviews and a multi-step administrative process to cut funding, "that may not occur as anticipated."  *Trump v. New York*, 592 U.S. 125,

---

[1]  While Plaintiff links its purported injury to potential funding loss, the United States notes that the failure to comply and voluntary means findings must occur before the United States can sue for injunctive relief under Title IX.

131 (2020) (citation omitted).  Plaintiff's claims lack ripeness for the same reasons it lacks standing:  Plaintiff is not "immediately in danger of sustaining some direct injury as the result of the challenged . . . official conduct."  *Hughes v.* City *of Cedar Rapids, Iowa*, 840 F.3d 987, 993 (8th Cir. 2016); *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022) (Standing and ripeness "often boil down to the same question." (citation omitted)).  Indeed, the ripeness doctrine "protects" against Plaintiff's attempt to subject the Department to premature "judicial interference until an administrative decision has been formalized and its effects felt in a concrete way."  *Sch. of the Ozarks, Inc*, 41 F.4th at 997-98 (citation omitted).

In its Opposition, Plaintiff primarily claims (at 12) "imminent" injury from threats to grants.  As above, the multi-step process to terminate funding makes this purported future injury nowhere close to imminent.  Moreover, the Department's last action, the Dhillon Letter (at 3) ends by pointing to potentially "seek[ing] judicial resolution," indicating that more steps exist in the process before funding could reasonably be expected to be terminated.

Plaintiff also claims (at 13) that the Defendants' actions put Title IX on a collision course with state law.  But Plaintiff does not allege in its Complaint or Opposition that this purported future collision is "imminent."  Nor could it, as again the Department has not completed its compliance review or taken any material action beyond sending two letters months ago.  In addition, that a state law potentially conflicts with federal law is not unusual.  But that does not automatically satisfy standing's imminence requirement.

Last, Plaintiff claims (at 13) injury from protecting its citizens from discrimination and avoiding federal pressure to change state law.  As for protecting citizens, Minnesota "does not have standing as *parens patriae* to bring an action against the Federal Government."  *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) (citations omitted).  As for claimed pressure to change state law, Plaintiff's two supporting cases are inapposite because they deal with administrative agency rules, rather than as here the potential future enforcement of a statute.  Defendants cite *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), which dealt with whether a Department of Homeland Security memorandum on deferred action on enforcing immigration laws was an administrative rule that should have gone through APA notice and comment.  *See id.* at 146, 163, 170.  And the court specifically limited its holding to the case's particular facts. *Id.* at 154-55.  Plaintiff's second case, *Ohio v. EPA*, 98 F.4th 288 (D.C. Cir. 2024), similarly dealt with a change in an EPA administrative rule, and dealt with the rule's effect of leaving Ohio with less regulatory authority than California.  *See id.* at 298-99, *rev'd and remanded sub nom. Diamond Alternative Energy v. EPA*, 145 S. Ct. 2121 (2025).  Plaintiff here complains about the future loss of funding from its potential violation of a 50-year-old statute that applies equally to all funding recipients.  This is a far cry from new administrative rules and potentially uneven effects on different states.

This Court accordingly should find that Plaintiff lacks standing and ripeness and dismiss the suit under Rule 12(b)(1).

### B.  PLAINTIFF LACKS AN AUTHORIZED CAUSE OF ACTION.

"To seek judicial review, a party ordinarily needs a statutory cause of action expressly provided by Congress."  *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *18 (D.C. Cir. Aug. 15, 2025).  Plaintiff lacks an authorized cause of action because, among other things, Plaintiff:  (1) cannot invoke the APA because there is no final agency action; and (2) does not meet the exceptional circumstances necessary to assert its non-APA "ultra vires" equity claims.  *See* U.S. Br. at 8-17.[2]  This Court should accordingly dismiss Plaintiff's claims for lack of jurisdiction under Rule 12(b)(1).

### 1.  Plaintiff lacks a cause of action for its APA claim because there's no final agency action.

The APA authorizes a cause of action to challenge "final agency action."  5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 175 (1997).  Final agency action requires that the action:  (1) "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 177-78 (citations and quotation marks omitted).

Plaintiff's APA claim challenges the Bondi and Dhillon Letters.  These Letters are not final action because they are part of an ongoing reviews and thus are not "the consummation of the agency's decisionmaking process."  *See* U.S. Br. at 4-6, 10-13.  The

---

[2]  While the Defendants' Brief included references to sovereign immunity, those came under the larger heading and overarching point that that Plaintiff lacks an authorized cause of action to maintain its suit and this Court lacks jurisdiction.  This Court can dismiss the case on that more straightforward ground.

letters themselves show their "interlocutory nature," including that "if" an investigation eventually shows violations the "the Department of Justice stands ready to take all appropriate action to enforce federal law" but that the Department "hope[d] that it does not come to this." *E.g.*, Bondi Letter at 1-2, U.S. Br. at 4-6.

Plaintiff's Opposition urges (at 22-24) that because the Letters state the Department's position on what Title IX prohibits and relay potential legal consequences they are final agency action. But an "an agency does not inflict [legal] injury 'merely by expressing its view of the law.'" *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. United States Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001) ("The Commission has not inflicted any injury upon AT&T merely by expressing its view of the law—a view that has force only to the extent the agency can persuade a court to the same conclusion.")).

The United States' brief (at 11-12) cited multiple cases finding agency "warning letters," such as the Bondi and Dhillon Letters here, are not final agency action. *See, e.g., Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (finding "[a]gencies routinely use such letters to warn regulated entities of potential violations before saddling them with expensive and demanding enforcement actions").

Plaintiff's response (at 24) to this "warning letters" case law confusingly attempts to frame the pre-enforcement investigations here as post-investigation "enforcement actions." But the Title IX compliance review and investigation here are pre-enforcement. As above, Title IX multi-step process requires that no enforcement "action shall be taken" before notice of a finding of a "failure to comply" and a determination "that compliance

cannot be secured by voluntary means."  20 U.S.C. § 1682.  Only then can the Department begin to take enforcement action by filing a lawsuit or initiating the multi-step administrative enforcement process for terminating funding.  As the investigations are ongoing, the Department has not made a violation finding or ruled out voluntary compliance.  *See Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943-44 (D.C. Cir. 2012) (finding warning letters not final agency action because they were part of FDA's regulatory procedure to attempt to get "voluntary and prompt corrective action *before* it initiates an enforcement action"); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (finding agency letter announcing "preliminary determination" and requesting "voluntary corrective" measures not final, as "the agency has not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences").[3]

The point of Title IX's required voluntary compliance determination is to alleviate premature or unnecessary enforcement actions, such as the Department filing a lawsuit.  *See supra* note 1.  Plaintiff's position goes the opposite direction:  if the Department sends letters attempting to secure voluntary compliance, the recipient can immediately sue.  Plaintiff's position would effectively allow any investigated entity to frustrate and attempt to block any Executive Branch investigation or simple review at its inception.

―――――――――――――

[3] Plaintiff also cites (at 23-24) *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 998 (8th Cir. 2015), *aff'd,* 578 U.S. 590 (2016), but that inapposite case involved an agency's decision entitled a "Jurisdictional Determination" where the agency had relayed it was a "final Corps permit decision" "which meant . . . administrative remedies were exhausted."  *Id.* at 999.

Indeed, Plaintiff's apparent position is that the Department can be sued any time it sends a letter with a legal position, which would drown both the Department and the judiciary in unnecessary and premature suits. The APA protects against this by requiring "final agency action," and this Court should find Plaintiff lacks an authorized APA cause of action.

### 2.  Plaintiff lacks a cause of action for its non-statutory "ultra vires" claims.

Plaintiff bases its purported cause of action authority for its non-APA claims not on any express statutory grant but rather on this Court's general equity powers. *See* Pl. Opp. at 11, 17-21. Plaintiff, however, cannot meet the exceptional circumstances necessary to invoke ultra vires equity review of purported statutory violations. Nor can Plaintiff get around this hurdle for statutory violations by attempting to reframe them as constitutional violations.

As the United States' brief explained, the Supreme Court's recent decision in *Nuclear Regul. Comm'n v. Texas,* 605 U.S. 665 (2025), reaffirmed the extremely limited nature of ultra vires claims asserting a statutory violation, calling them a "Hail Mary pass," and not available if, among other things, a statutory review scheme such as the APA provides the plaintiff with a meaningful and adequate opportunity for judicial review or if a statutory review scheme forecloses all other forms of judicial review. *Id.* at 681-82 (citations and quotation marks omitted); *see* U.S. Br. at 13-16.

Plaintiff attempts (at 20-21) to distinguish *Nuclear Regul. Comm'n* by summing it up as applying a limit only when "a statute *precludes* judicial review." This ignores the that the limit applies when a statutory review scheme like the APA here provides an

opportunity for judicial review.  605 U.S. at 681-82; *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *18 (D.C. Cir. Aug. 15, 2025) (confirming "extremely limited" in scope of "Hail Mary" ultra vires claims asserting a statutory violation, including requirements that "the agency made an extreme legal error," and "there is no alternative means for the plaintiff to seek judicial review," and ultimately finding APA provided review avenue (citations omitted)); *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *12 (D.C. Cir. Aug. 28, 2025) (confirming "painstakingly delineated procedural boundaries" for ultra vires claim attacking statutory violations, including that "there is no alternative procedure for review of the statutory claim" and also "extreme" legal error" (citations omitted)).[4]  Perhaps Plaintiff would like the opportunity to sue before a final agency decision under the APA, but its desire to sue prematurely does not lend itself to an authorized ultra vires cause of action.

The United States' brief also explained that *Dalton v. Specter*, 511 U.S. 462 (1994), prevents Plaintiff from reframing its ultra vires claims attacking purported statutory violations into constitutional claims, such as separation of powers.  511 U.S. at 473-74; *see* U.S. Br. at 26-27.  Plaintiff attempts (at 33-35) to limit *Dalton* to applying only when the statute commits the challenged action to the discretion of the agency.  But this misreads *Dalton*, which had multiple holdings.  *Dalton* held that claims "alleging that the President has exceeded his statutory authority are not 'constitutional' claims," that the

---

[4]  Plaintiff also cannot establish the ultra vires requirement that the Department's natural reading of Title IX as not extending to gender identity is an "extreme" legal error. *See infra* Part II.

claim was therefore "a statutory one," and that ultra vires review of that statutory claim was not available because the statute granted discretion to the President. 511 U.S. at 473-77; *see Glob. Health Council*, 2025 WL 2326021, at *8 (explaining *Dalton* had multiple holdings, including that "that statutory claims cannot be transformed into constitutional ones," and *Dalton* is not limited to when "a statute entrusts a discrete specific decision to the President"), *see also id.* at *6-9 (generally explaining *Dalton*'s extensive reach); *Nat'l Treasury Emps. Union*, 2025 WL 2371608, at *20 (explaining that *Dalton*'s holding on discretion did not narrow the Court's other conclusion that "implied equitable review for constitutional claims is unavailable where the plaintiff argues that statutory violations by executive officials implicate the separation of powers"); *see also id.* at. 19-20 (generally explaining *Dalton*'s extensive reach).

Plaintiff accordingly lacks an authorized cause of action for its non-APA claims because it cannot meet the exceptional requirements necessary to invoke ultra vires equity review of purported statutory violations, and *Dalton* prevents Plaintiff from recasting them as constitutional violations. Because of this lack of an equity cause of action, and the lack of an APA cause of action explained above, this Court should dismiss all Plaintiff's claims for lack of jurisdiction under Rule 12(b)(1).

## II.   PLAINTIFF FAILS TO STATE PLAUSIBLE CLAIMS.

Because this Court lacks subject matter jurisdiction under Rule 12(b)(1), this Court should dismiss the Federal Defendants without reaching whether the Complaint substantively states plausible claims on which relief should be granted. But even if this

Court had subject matter jurisdiction, the Court should still dismiss the claims because they fail to state claims under Rule 12(b)(6).

All four claims center and depend on whether Title IX's prohibition of discrimination "on the basis of sex" includes discrimination based on gender identity. *See, e.g.*, Compl. ¶¶ 86, 102.  It does not.[5]  Plaintiff's claims fail because Title IX protects against discrimination based on sex, not "transgender status" or "gender identity."  *See* U.S. Br. at 20-25; *see also Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4-5 (11th Cir. Aug. 22, 2024) (collecting cases).

### 1. Text

When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what the term has always meant:  biological sex.  *See Adams v. Sch. Bd. Of St. Johns County*, 57 F.4th 791, 812-13 (11th Cir. 2022) (consulting nine contemporary dictionaries for definitions); *see also id.* at 812-15 (finding Title IX refers to biological sex).  And Title IX's statutory text uses the term consistent with biological sex, referring to a binary classification based on biological differences.  20 U.S.C. § 1681(a)(8) (referring to "one sex" and "the other sex"); *Id.* § 1686 (referring to the "different sexes"); *Id.* § 1681(a)(2) (referring to "both sexes").

---

[5]  Plaintiff incorrectly claims (*e.g.*, at 27) that the United States' natural reading of Title IX as applying to biological sex rather than gender identity is a break from some longstanding position.  *See, e.g.*, U.S. Statement of Interest, *Soule v Connecticut Association of Schools*, No. 3:20cv201 (D. Conn. March 25, 2020), ECF No. 76.

Plaintiff responds (at 27) with two dictionary cites which purportedly include broader definitions in addition to their more specific references to "a male and female organism" and "reproduction functions." *See A.C.. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023), *cert. denied* 144 S. Ct. 683 (2024). But even if this somehow cast doubt on the greater weight of many other contemporaneous dictionaries, the statute itself refers to sex as binary, which directly conflicts with the non-binary, spectrum concept of "gender identity." Plaintiff cannot plausibly argue that when Congress enacted Title IX in 1972, Congress intended its use of the word "sex" to mean "gender identity" instead of biological sex.[6]

### 2. Historical Context

Contemporaneous post-enactment history confirms Title IX refers to biological sex and does not include discrimination based on "gender identity." Title IX Regulations passed at the direction of Congress right after it enacted Title IX in 1972 refer to sex as binary, including the athletics regulation that references "separate teams for members of each sex." 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. § 106.41(b); *see* U.S. Br. at 22-23 & n.5 (recounting regulations).[7] Moreover, Congress

---

[6] Plaintiff also does not fully quote (at 28) Judge Easterbrook's concurrence, which more fully reads: "Sex is such a complex subject that any invocation of plain meaning is apt to misfire. I think, however, that *Adams* [*v. Sch. Bd. Of St. Johns County*, 57 F.4th 791 (11th Cir. 2022)] is closer to the mark in concluding that "sex" in Title IX has a genetic sense, given that word's normal usage when the statute was enacted." 75 F.4th at 775 (Easterbrook, J., concurring).

[7] Notably, in denying a stay of orders striking down a Title IX rule that attempted to change Title IX to include gender identity, the Supreme Court stated that "all Members

has subsequently passed discrimination statutes that specifically include "gender identity" as separate from and in addition to "sex."  U.S. Br. at 23-25.

Plaintiff (at 28-29) skips over all this history supporting that Title IX's reference to "sex" does not mean "gender identity," and instead misdirects to an argument that the Title IX regulations permit but do not require sex-separated sports.  This is an irrelevant sideshow, as Plaintiff cannot dispute that Minnesota already separates some educational sports by male and female.  *See also* 34 C.F.R. 106.41(c)(1) (requiring education programs to "provide equal athletic opportunity").

### 3.  *Bostock*

Plaintiff incorrectly claims (at 29-30) that *Bostock v. Clayton County*, 590 U.S. 644 (2020), morphs Title IX's prohibition on sex discrimination to also include gender identity.  As the United States' Brief explained, *Bostock* does not extend beyond Title VII and particularly has no relevance to Title IX here.  *See, e.g.*, *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1229 (11th Cir. 2023) ("Because *Bostock* therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instant case."); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring) (finding,

---

of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to . . . the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and *gender identity*."  *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024) (emphasis added).

(as *Bostock's* author), that reading *Bostock* to control the meaning of a constitutional provision is "implausible").

And recently, the Supreme Court and Eighth Circuit both passed on the opportunity to extend *Bostock* and gender identity to the Equal Protection Clause. *United States v. Skrmetti*, 145 S. Ct. 1816, 1834 (2025) ("We have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context."); *id.* at 27 (Barrett, J. concurring) ("[T]ransgender status implicates several other areas of legitimate regulatory policy—ranging from access to restrooms to eligibility for boys' and girls' sports teams . . . legislatures have many valid reasons to make policy in these areas."); *Brandt v. Griffin*, No. 23-2681, 2025 WL 2317546, at *4 (8th Cir. Aug. 12, 2025) (declining to apply *Bostock* in Equal Protection case similar to *Skrmetti*).

Title IX's statutory and regulatory carve outs for permissible sex-separation reinforce *Bostock*'s inapplicability. For example, as above, the statute provides a carve out allowing the "maintaining [of] separate living facilities for the different sexes." 20 U.S.C. § 1686. If *Bostock* applied, this carve out "would be rendered meaningless." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 813 (11th Cir. 2022). A person "would be able to live in both living facilities associated with their biological sex and living facilities associated with their gender identity or transgender status." *Id.*

Moreover, even if somehow applicable, *Bostock* still would not help Plaintiff because it dealt with employment where sex is not relevant. *Bostock* requires a similarly situated analysis: "[D]iscrimination" means "treating [an] individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. In other words, *Bostock* stressed

15

that to determine whether a policy "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated." *Id.* In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. Unlike in *Bostock*, males and females are not similarly situated when it comes to sports; sex is relevant. Otherwise, Plaintiff would have no non-discriminatory basis to separate athletic teams by sex in the first place.

Given that all Plaintiff's claims depend on Plaintiff's flawed interpretation of Title IX as extending to gender identity, this Court should dismiss them under Rule 12(b)(6).

## CONCLUSION

This Court should dismiss all Plaintiff's claims against all the Federal Defendants.


Respectfully submitted,

 */s/ Matthew J. Donnelly*
MATTHEW J. DONNELLY
Attorney
Attorney ID Number 1186694CA
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: (202) 616-2788
Email: matthew.donnelly3@usdoj.gov


Counsel for the Defendants

Dated: September 2, 2025