# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **STATE OF MINNESOTA,** *by and through its Attorney General Keith Ellison* | Court File No. 25-CV-1608 (ECT/DLM) |
| Plaintiff, | |
| v. | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| **DONALD J. TRUMP,** *in his official capacity as President of the United States:* **UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI** *in her official capacity as Attorney General of the United States*; **UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON**, *in her official capacity as Secretary of Education*; **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR.**, *in his official capacity as Secretary of Health and Human Services* | |
| Defendants. | |

TABLE OF CONTENTS

I.    BACKGROUND ............................................................................. 4

II.   LEGAL STANDARD: MOTION TO DISMISS ..................................... 8

III.  ARGUMENT ................................................................................ 9

      A.    The Court Lacks Subject Matter Jurisdiction. ............................. 9

      1.    Plaintiff Lacks an Authorized Cause of Action. ........................ 9

      2.    Plaintiff's Claims are not Constitutionally Ripe for Review. ................. 18

      3.    Plaintiff Cannot Obtain Relief Directly Against the President. .............. 21

      B.    Plaintiff's Claims All Fail To State Plausible Claims. ........................... 22

      1.    The Title IX Claim Fails. ................................................... 22

      2.    The Separation of Powers Claim Fails. .................................... 28

      3.    The APA Claim Fails. ...................................................... 28

      4.    The Tenth Amendment Claim Fails. ....................................... 29

      5.    The Spending Clause Claim Fails. ........................................ 31

      6.    The Declaratory Judgment Act "Claim" Fails. ........................... 32

IV.   CONCLUSION ............................................................................ 32

Plaintiff severely "jumped the gun" in prematurely filing this lawsuit initially focused on the United States Department of Justice ("DOJ') in April 2025.  Plaintiff's First Amended Complaint, ECF No. 53, is still severely premature.  The First Amended Complaint's amendments focus on a September 30, 2025, letter by the United States Departments of Education ("DOE) and Health and Human Services ("HHS").  This DOE/HHS Letter, however, just gives these Agencies' initial findings of non-compliance with Title IX, 20 U.S.C. § 1681.  And the DOJ still has not issued findings.  The Agency Defendants[1] have thus just started Title IX's multi-step administrative process to rescind any federal funding, 20 U.S.C. § 1682, making this suit legally premature.  What's worse, Plaintiff is attempting to prematurely drag the Defendants into court based on its flawed interpretation of Title IX's prohibition of discrimination "on the bases of sex."  20 U.S.C. § 1681.

Consequently, this Court lacks subject matter jurisdiction over Plaintiff's still premature First Amended Complaint.  Fed. R. Civ. P. 12(b)(1).  Plaintiff lacks an authorized cause of action necessary to invoke this Court's subject matter jurisdiction because there is still nothing close to final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq.*  Nor can Plaintiff retitle its premature APA claim by invoking the term "ultra vires" and pointing to constitutional provisions as Plaintiff cannot meet the "extraordinary circumstances" necessary for a non-APA equity cause of action.  Additionally, Plaintiff's stated speculative risk of future injury is not

---

[1]  "Agency" means all Defendants except the President.

3

imminent and not constitutionally ripe for review.  This Court accordingly should dismiss the First Amended Complaint for lack of subject matter jurisdiction under Rule 12(b)(1).

Because this Court lacks subject matter jurisdiction, it should dismiss the Complaint without reaching whether its claims state legally plausible claims.  But even if this Court had jurisdiction, it should still dismiss the claims because they fail to state plausible claims as a matter of law under Rule 12(b)(6).  Plaintiff's claims all center on whether Title IX's prohibition of discrimination "on the basis of sex" includes discrimination based on gender identity.  It does not.  This Court should accordingly also dismiss the First Amended Complaint pursuant to Rule 12(b)(6).

## I.    BACKGROUND

In February 2025, the President issued Executive Order 14201, *Keeping Men out of Women's Sports*, 90 Fed. Reg. 9279 (February 11, 2025) ("Sports Executive Order"). 1st Amend. Compl. Ex. B, ECF No. 53-2.  This Executive Order particularly references Title IX, and that under Title IX "educational institutions receiving Federal funds cannot deny women an equal opportunity to participate in sports."  *Id.*  The Sports Order incorporates the definitions of "sex" from Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (January 30, 2025) ("Gender Executive Order").  *See* 1st Amend. Compl. Ex. A, ECF No. 53-1.  The Sports Executive Order accordingly reaffirmed that Title IX's use of term "sex" means biological sex and not gender identity. Sports Executive Order § 2 (incorporating Gender Executive Order § 2 definitions).

On February 12, 2025, the DOE announced an investigation of the Minnesota State High School League ("MSHSL") for potential violations of Title IX. 1st Amend. Compl. ¶ 55. After the notice, on February 14, 2025, the MSHSL sought a Minnesota Attorney General opinion on whether the Sports Executive Order preempts the Minesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.* 1st Amend. Compl. ¶¶ 56-57; *id.* at Ex. C, ECF No. 53-3.

On February 20, 2024, the Minnesota Attorney General issued an opinion that the Sports Executive Order does not have the force of law and therefore does not preempt the MHRA. 1st Amend. Compl. ¶ 58; *id.* at Ex. D, ECF No. 53-4. The opinion found complying with the Sports Executive Order "and prohibiting students from participation in extracurricular activities consistent with their gender identity would violate the MHRA." *Id.* The opinion did not opine on or consider whether the MHRA conflicts with Title IX.

On February 25, 2025, United States Attorney General Bondi sent the Minnesota Attorney General and the MSHSL a letter providing notice that the DOJ intended to hold states that violate federal law accountable. Compl. ¶ 59, *id.* at Ex. E. ("Bondi Letter"), ECF No. 53-5. The Bondi Letter referenced the Minnesota Attorney General's opinion, and relayed that "[r]equiring girls to compete against boys in sports and athletic events violates Title IX." Bondi Letter at 1. The Letter reiterated that DOE "has begun a Title IX investigation into the" MSHSL, and if that "investigation shows that relevant Minnesota entities are indeed denying girls an equal opportunity to participate in sports and athletic events by requiring them to compete against boys, the Department of Justice

stands ready to take all appropriate action to enforce federal law." *Id.* Attorney General Bondi ended by noting her "hope that it does not come to this. The Department of Justice does not want to have to sue states or state entities, or to seek termination of their federal funds. We only want states and state entities to comply with the law." *Id.* at 2.

On April 8, 2025, United States Assistant Attorney General Dhillon sent the Minnesota Attorney General a notice letter. 1st Amend. Compl. ¶ 62, *id.* at Ex. F ("Dhillon Letter"), ECF No. 53-6. The Dhillon Letter provided notice that the DOJ was "commencing a compliance review" pursuant to Title IX, and requested a clarification of the Minnesota Attorney General's opinion. Dhillon Letter at 1. The Letter noted that the DOJ remained "gravely concerned with [the] opinion," but that the opinion "did not expressly mention Title IX." *Id.* at 1-2. The notice specifically asked that the Minnesota Attorney General "clarify that [the] opinion does not require Minnesota schools to require man and boys to compete in women and girl's sports." *Id.* at 2. The Dhillon Letter noted that a failure to respond by April 15, 2025, would be taken as a confirmation, which would "leave the Department with no choice to seek judicial resolution." *Id.* The DOJ granted the Minnesota Attorney General a requested extension to April 22, 2025. Email from N. Christmas, USDOJ, to J. Keller, MNAG, April 11, 2024, 1st Amend. Compl. Ex. G, ECF No. 53-7.

Rather than respond to the Dhillon Letter, Plaintiff apparently used the extension to draft and file the original Complaint on April 22, 2024, despite the DOJ's ongoing Title IX compliance review. The original Complaint focused on the DOJ and alleged four claims, with three alleging ultra vires executive action, and one alleging an APA

violation.  Compl. ¶¶ 73-104; *cf.* 1st Amend. Compl. ¶¶ 93-126 (repeating claims).  The original Defendants moved to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim.  *See* Defs' Br. Mot. to Dismiss, ECF No. 20.  This Court heard argument on that motion on September 8, 2025.  *See* Minute Entry, ECF No. 32.

On September 30. 2025, DOE and HHS issued a letter of initial findings that the Minnesota Department of Education and MSHSL were out of compliance with Title IX.  1st Amend. Compl. ¶ 81; *id.* at Ex. J, ECF No. 53-10.  That DOE/HHS Letter specifically relayed that it "does not constitute final agency action," and "is not a formal statement of policy."  DOE/HHS Letter at p. 60, ECF No. 53-10.  The Letter included a proposed resolution agreement to help facilitate voluntary compliance.  *Id.*

While the motion to dismiss the original Complaint was still pending, this Court granted Plaintiff leave to file the First Amended Complaint, which Plaintiff filed on December 2, 2025.  The First Amended Complaint adds DOE and HHS (and agency leaders) as Defendants, and a Spending Clause claim and Declaratory Judgment Act claim.

Like the original Complaint, Claim 1 alleges ultra vires executive action in violation of the Constitution's "separation of powers," and that the "Constitution does not authorize the Federal Defendants to amend Title IX by Executive Order."  1st Amend. Compl. ¶ 101, *see generally id.* ¶¶ 93-104.  Claim 2 alleges ultra vires executive action in violation of Title IX, alleging that under "Title IX, discrimination 'on the basis of sex' covers discrimination against individuals because of their gender identity."  *Id.* ¶ 107, *see*

7

*generally id.* ¶¶ 105-10.  Claim 3 alleges ultra vires executive action in violation of the

Tenth Amendment, alleging that the Defendants are commandeering and coercing the

Minnesota Attorney General into changing his legal opinion.  *Id.* ¶ 96; *see generally id.*

¶¶ 111-18.  Claim 4 alleges that the Agency Letters violate the APA as alleged final

agency action that conflicts with Title IX.  *Id.* ¶ 120; *see generally id.* ¶¶ 119-26.

The First Amended Complaint adds Claim 5, alleging Defendants' actions to

ensure compliance with Title IX violate the Spending Clause.  *Id.* ¶¶ 127-33.  It also adds

Claim 6, which asks this Court to declare that "Minnesota's Law and Policy" do not

violate Title IX pursuant to the "Declaratory Judgement Act."  *Id.* ¶¶ 134-36.

## II.    LEGAL STANDARD: MOTION TO DISMISS

Rule 12(b)(1) authorizes motions to dismiss for "lack of subject matter

jurisdiction," which includes the constitutional requirement that plaintiffs establish an

Article III live case or controversy, *Agred Found. v. United States Army Corps of

Engineers*, 3 F.4th 1069, 1073 (8th Cir. 2021).  The plaintiff seeking to invoke a court's

subject matter jurisdiction bears the burden of showing jurisdiction.  *Schubert v. Auto

Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011).

Rule 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief

can be granted.  To survive a Rule 12(b)(6) motion, a complaint must contain "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  The court must "accept as true the facts alleged, but not legal

conclusions or threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements."  *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016).  As such, the

8

court need not accept any wholly conclusory allegations or legal conclusions that a plaintiff draws from the facts pleaded.  *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).  The well-pleaded facts must establish more than a "mere possibility of misconduct."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The complaint must allege enough facts to plausibly establish each material element and "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

On a Rule 12(b)(6) motion, courts should disregard matters outside the complaint, but may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions."  *Hughes v. City of Cedar Rapids, Iowa*, 840 F.3d 987, 998 (8th Cir. 2016) (citations omitted).

## III.    ARGUMENT

### A. THE COURT LACKS SUBJECT MATTER JURISDICTION.

#### 1.  Plaintiff Lacks an Authorized Cause of Action.

To invoke subject matter jurisdiction, a party ordinarily needs a statutory cause of action authorized by Congress.  *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680-83 (2025); *Glob. Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025).  Plaintiff lacks an authorized cause of action because Plaintiff:  (1) cannot invoke the APA because there is no final agency action; (2) does not meet the exceptional circumstances necessary to assert its non-APA equity claims; and (3) does not have a necessary underlying claim to support its purported Declaratory Judgment Act claim.  This Court should accordingly dismiss Plaintiff's claims for lack of jurisdiction under Rule 12(b)(1).

### a. *Plaintiff lacks a cause of action for its APA claim because there's still no final agency action.*

Claim 4 alleges that the Agency Letters violate the APA.  The APA authorizes a cause of action to challenge "final agency action."  5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 175 (1997).  Final agency action requires that the action:  (1) "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 177-78 (citations omitted).

The DOE/HHS Letter is not final agency action because it just marks an initial finding to help resolve compliance concerns through "informal means."  *See, e.g.*, 34 C.F.R. §§ 100.7 & 100.8; *see also* 34 C.F.R. § 106.81 (incorporating Title VI procedures for Title IX).  This is just the first step in Title IX's lengthy multi-step administrative process to terminate federal funding.  Title IX additionally requires an agency to "determine that compliance cannot be secured by voluntary means."  20 U.S.C. § 1682. The First Amended Complaint does not allege that DOE, HHS, or the DOJ has made this necessary determination.  Moreover, to terminate funding the statute also separately requires an "express finding on the record, after opportunity for hearing, of a failure to comply."  *Id.*  And even after that administrative finding after a hearing, the agency must file a written report with Congress explaining the termination grounds and wait 30 days to terminate funding.  *Id.*; *see also* 1st Amend. Compl. ¶ 31 (acknowledging requirement).

The First Amended Complaint does not allege that any of the above administrative actions beyond the initial DOE/HHS findings in this multi-step process have occurred. Courts have found that initial Title IX findings and similar letters attempting to induce voluntary compliance are not final agency action.  *See, e.g.*, *Pearl River Union Free Sch. Dist. v. Duncan*, 56 F. Supp. 3d 339, 382 (S.D.N.Y. 2014) (finding Title IX letter not final agency action); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943-44 (D.C. Cir. 2012) (finding warning letters not final agency action because they were part of regulatory procedure to attempt to get "voluntary and prompt corrective action *before* it initiates an enforcement action"); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (finding agency letter announcing "preliminary determination" and requesting "voluntary corrective" measures not final, as "the agency has not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences").[2]

The DOJ Letters do not even make initial findings, and its compliance review remains ongoing.  Courts routinely find that investigative warning letters like the DOJ's here are not final agency action.  *See, e.g., Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) ("Agencies routinely use such letters to warn regulated entities of potential violations before saddling them with expensive and demanding

---

[2]  *See also Minnesota Sch. Bd. Ass'n Ins. Tr. v. EEOC*, 184 F. Supp. 2d 899, 909-10 (D. Minn. 2001) (finding EEOC's reasonable cause determination not final agency action); *accord Borg-Warner Protective Services Corp. v. EEOC*, 245 F.3d 831, 835-36 (D.C. Cir. 2001).

enforcement actions"); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (noting that "practical consequences, such as the threat of having to defend in an administrative hearing should the agency actually decide to pursue enforcement, are insufficient to bring an agency's conduct under [the court's] purview"); *Schering–Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 505 (7th Cir. 2009) (finding FDA's letters advising company that product was misbranded, which could cause FDA to rescind approval, "not final agency action").

Despite this, Plaintiff simply claims the all the Letters are "final agency action" because they "reflect the agency's final position on the requirements of Title IX" and "bind the agency to a legal view that will create significant legal consequences for Minnesota schools." 1st Amend. Compl. ¶ 120. But final agency action requires a legal injury to rights or obligations, and "an agency does not inflict [legal] injury 'merely by expressing its view of the law.'" *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. United States Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001) ("The Commission has not inflicted any injury upon AT&T merely by expressing its view of the law—a view that has force only to the extent the agency can persuade a court to the same conclusion."))).

Moreover, Plaintiff completely ignores that Title IX requires a formal APA process with a hearing to terminate funding. 20 U.S.C. § 1682; *see also* 34 C.F.R. §§ 100.8(c) & 100.9, 34 C.F.R. pt. 101; 20 U.S.C. § 1234 *et seq.* Agencies cannot be bound to initial findings or the later required APA hearing and formal findings would be meaningless. Given this later formal hearing and findings, the initial findings cannot "mark the

consummation of the agency's decisionmaking process," 520 U.S. at 177-78, and are not final agency action.

Because of the lack of final agency action, Plaintiff lacks a cause of action under the APA and this Court should accordingly dismiss Claim 4.

### b. Plaintiff lacks a cause of action for its non-APA ultra vires and Spending Clause claims.

The First Amended Complaint attempts to assert several non-APA causes of action based on this Court's limited general equity powers rather than any authorized statutory grant. These causes of action are the "ultra vires" Claims 1-3 and the similar Spending Clause Claim 5. Despite Plaintiff's attempts to reframe them as ultra vires or constitutional violations, they all in substance really allege violations of the Title IX statute. This Court should find that Plaintiff cannot meet the extraordinary circumstances necessary to assert these equity claims seeking review of a statutory violation of Title IX. Plaintiff accordingly cannot sidestep the APA and its final agency action requirement to invoke general equity jurisdiction.

The Supreme Court's recent *Nuclear Regul. Comm'n v. Texas,* 605 U.S. 665 (2025), reaffirmed the extremely limited nature of ultra vires claims asserting a statutory violation, calling them a "Hail Mary pass," and not available if, among other things, a statutory review scheme such as the APA provides the plaintiff with a meaningful and adequate opportunity for judicial review or if a statutory review scheme forecloses all other forms of judicial review. *Id.* at 681-83 (citations omitted).

The *Nuclear Regul. Comm'n* Court recounted that "[b]efore enactment of the APA, those challenging agency action often lacked a statutory cause of action" and courts thus recognized a "a right to equitable relief where an agency's action was ultra vires." *Id.* at 680.  The Court rejected the argument that "the APA did not displace pre-existing nonstatutory ultra vires review." *Id.* at 680-81.  "Because ultra vires review could become an easy end-run around the limitations of" "judicial-review statutes" like the APA, the Court explained that non-statutory ultra vires review was "strictly limited." *Id.* The "narrow" exception for ultra vires claims "does not apply simply because an agency has arguably reached 'a conclusion which does not comport with the law.'" *Id.* (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)).  "Rather, it applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*'" in a statute.  *Id.* (quoting *Railway Clerks v. Association for Benefit of Non-contract Employees*, 380 U.S. 650, 660, (1965)).

Importantly, the Court further found that "[u]ltra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'" *Id.* (quoting *Board of Governors, FRS v. MCorp Financial, Inc.*, 502 U.S. 32, 43 (1991)).

The APA already provides a statutory review scheme for the types of ultra vires claims Plaintiff asserts here.  The APA's statutory granted ultra vires provision provides for review of agency action that is "(B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).  But the APA's ultra vires provision applies only to

14

"final agency action." 5 U.S.C. § 704. The APA provides "the adequate opportunity for judicial review," 605 U.S. at 681, if the Agency Defendants here ever reach final agency action, 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").

Moreover, the Defendants actions here are not close to the meeting the extremely "narrow" exception for a non-statutory ultra vires claim that *Nuclear Regul. Comm'n* Court reiterated. As explained below, all Plaintiff's claims take issue with the Defendants' recognition that Title IX's prohibition of discrimination "on the basis of sex" means biological sex, not gender identity. *See* 20 U.S.C. § 1681; *infra* Part III.B. That Plaintiff urges a mistaken, contrary interpretation that Title IX applies to "gender identity" does not make the Defendants' actions "entirely 'in excess of its delegated powers and contrary to a *specific prohibition*'" in a statute. 605 U.S. at 681 (quoting *Railway Clerks*, 380 U.S. at 660). Title IX even specifically "authorize[s] and direct[s]" agencies "to effectuate [its] provisions." 20 U.S.C. § 1682. While no final agency action exists here, Plaintiff's argument at best is that "an agency has arguably reached 'a conclusion which does not comport with the law,'" which the Supreme Court found insufficient. *Nuclear Regul. Comm'n,* 605 U.S. at 681 (quoting *Boire*, 376 U.S. at 481). Plaintiff's claims thus do not meet the "extraordinary circumstances" necessary for a non-APA ultra vires claim. *Boire*, 376 U.S. at 479-80.

Nor can Plaintiff reframe its claims attacking purported Title IX statutory violations into constitutional claims, such as separation of powers or the Spending

Clause.  In *Dalton v. Specter*, 511 U.S. 462 (1994), the Supreme Court held that claims "alleging that the President has exceeded his statutory authority are not 'constitutional' claims," that the claim was therefore "a statutory one," and that ultra vires review of that statutory claim was not available because the statute granted discretion to the President. 511 U.S. at 473-77; *see also Glob. Health Council v. Trump*, 153 F.4th 1, 15-17 (D.C. Cir. 2025) (explaining *Dalton*'s extensive reach).

Plaintiff accordingly lacks an authorized cause of action for its non-APA claims because it cannot meet the exceptional requirements necessary to invoke ultra vires equity review of purported Title IX statutory violations, and *Dalton* prevents Plaintiff from recasting them as constitutional violations.  Because of this lack of an equity cause of action, and lack of an APA cause of action explained above, this Court should dismiss Plaintiff's claims for lack of jurisdiction under Rule 12(b)(1).

### c.  *The Declaratory Judgment Act authorizes a remedy, not an independent cause of action.*

The First Amended Complaint's "Claim 6" asks this Court to declare that "Minnesota's Law and Policy" do not violate Title IX.  1st Amend. Compl. ¶¶ 134-36. Plaintiff brings this claim solely pursuant to the "Declaratory Judgment Act."  This purported claim depends entirely on whether Plaintiff has some other viable cause of action, and thus falls with the rest of its claims.

The Declaratory Judgment Act, 28 U.S.C. § 2201, does not create an independent cause of action; it simply authorizes a possible remedy for an existing, underling cause of action.  *See Alera Grp. Agency, LLC v. Delta Dental of Minnesota*, No. CV 24-252

16

(PAM/DLM), 2024 WL 2091992, at *2 (D. Minn. May 9, 2024) ("A claim for declaratory or injunctive relief is not an independent cause of action but is rather a request for relief."); *Wolff v. Bank of N.Y. Mellon*, 997 F. Supp. 2d 964, 979 (D. Minn. 2014) ("A declaratory judgment is a remedy, not a cause of action."); *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) ("[T]he Declaratory Judgment Act . . . does not provide an independent basis for federal jurisdiction."); *First Fed. Sav. & Loan Ass'n of Harrison, Ark. v. Anderson*, 681 F.2d 528, 533 (8th Cir. 1982) ("It is well settled that the declaratory judgment statute is strictly remedial in nature and does not provide a separate basis for subject matter jurisdiction."); *Grygelko v. Amerihome Mortg. Co.*, No. 25-CV-3883 (JMB/DTS), 2025 WL 2992383, at *2 (D. Minn. Oct. 16, 2025), ("[R]eliance on the federal declaratory judgment act, without more, is insufficient to establish federal question jurisdiction."); *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (The availability of relief under the Declaratory Judgment Act "presupposes the existence of a judicially remediable right.").

Plaintiff's Declaratory Judgment Act claim accordingly cannot stand on its own, but can only seek a possible remedy for another underlining cause of action. The claim thus fails because as explained above Plaintiff does not have another viable underlying cause of action. *See, e.g.*, *Howe v. Barr Eng'g Co.*, No. 17-CV-3019 (JNE/LIB), 2017 WL 7202130, at *7 (D. Minn. Dec. 6, 2017) (The Count "seeking declaratory relief survives only by the success and failure of Plaintiff's underlying ERISA fiduciary duties claim, and the Court will not evaluate its merits as an independent cause of action."); *Azam v. City of Columbia Heights*, No. CV 14-1044 (JRT/BRT), 2016 WL 424966, at *12

(D. Minn. Feb. 3, 2016) ("Because [plaintiff's] underlying constitutional claims will be dismissed, his claim for injunctive and declaratory relief will be dismissed as well."); *J.W. DeWit Farms. v. Minnesota Cultivated Wild Rice*, 393 F. Supp. 2d 847, 852 (D. Minn. 2005) ("Because the Court has already determined that Plaintiffs' § 1983 claim fails, the Court dismisses Plaintiffs' claim for declaratory relief for lack of jurisdiction.); *Essling's Homes Plus, Inc. v. City of St. Paul*, 356 F. Supp. 2d 971, 984 (D. Minn. 2004) ("A successful action for declaratory judgment requires a viable underlying cause of action.").

Even if the Declaratory Judgment Act authorized its own independent cause of action, the claim would need to satisfy Constitution's case or controversy requirement *See* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction . . ."). As explained in Part III.A.2 *infra*, Plaintiff fails the actual controversy requirements of standing and ripeness.

### 2. Plaintiff's Claims are not Constitutionally Ripe for Review.

Beyond not challenging final agency action, Plaintiff's asserted claims of speculative future injuries are not ripe. This Court should accordingly dismiss Plaintiff's claims for lack of jurisdiction under Rule 12(b)(1).

The Constitution limits the judiciary's power to hearing only actual "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1; *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "The ripeness doctrine flows both from the Article III 'cases' and 'controversies' limitations and also from prudential considerations for refusing to exercise jurisdiction." *Pub. Water Supply Dist. No. 10 of Cass Cnty., Mo. v. City of*

*Peculiar, Mo.*, 345 F.3d 570, 572 (8th Cir. 2003) (citation omitted).  The ripeness doctrine serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Sch. of the Ozarks v. Biden*, 41 F.4th 992, 997-98 (8th Cir. 2022) (citation omitted); *accord National Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003)

The ripeness analysis concerns two factors:  fitness and hardship.  *Texas v. United States*, 523 U.S. 296, 301 (1998); *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 993 (8th Cir. 2016).  A claim lacks "fitness" when it depends on "contingent future events that may not occur as anticipated."  *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas*, 523 U.S. at 300).  As above, DOE and HHS have made just initial findings, and the DOJ has not even made findings.  Defendants have thus barely started down Title IX's lengthy multi-step administrative process to rescind any federal funding.  Plaintiff's claims accordingly are not ripe because they are "contingent [on] future events that may not occur as anticipated."  *Id.*

For similar reasons, Plaintiffs' claims also fail the ripeness "hardship" requirement.  In evaluating hardship, courts look to whether the "plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct."  *Hughes*, 840 F.3d at 993.  The threatened injury must be "certainly impending" to be ripe.  *See Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 958-59 (8th Cir. 2001).  Here, given Title IX's multi-step process, Plaintiff is not

"immediately in danger" and threatened injury is not close to "certainly impending." Even Plaintiff's Amended Complaint acknowledges that at the end of this multi-step process, Title IX requires the Agency Defendants to wait at least 30 days after a report to Congress to terminate funding.  1st Amend. Compl. ¶ 31.

Beyond lack of ripeness, Plaintiff also fails to establish the "closely related" requirement of constitutional "standing."  *Sch. of the Ozarks*, 41 F.4th at 997; *Kennedy v. Ferguson*, 679 F.3d 998, 1001 (8th Cir. 2012).  To have standing, the plaintiff must plausibly allege an injury in fact that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

Here, Plaintiff's purported injury is that the Agency Letters and the Executive Orders allegedly "threaten[ ] Minnesota schools with the loss of DOJ, DOE, and HHS grants and other vital federal funds" and "coercing" the Minnesota Attorney General through "federal funding cuts," and misinterpreting "Title IX to preempt all contrary Minnesota law."  1st Amend. Compl. ¶ 9.[3]  Because of Title IX's mult-step process, any purported injuries from potential future funding cuts and related legal interpretations are too speculative and fail standing's imminency requirement.  Imminency requires that a "threatened injury must be *certainly impending* to constitute injury in fact"; allegations

---

[3]  The Complaint's only mention of "harm" appears in Paragraph 9; the word "injury" (or iterations) appears nowhere.

"of *possible* future injury" are not sufficiently imminent. *Clapper*, 568 U.S. at 409; *see also All. for Hippocratic Med.*, 602 U.S. at 381. The claims here thus are too "conjectural" or "hypothetical," *Lujan*, 504 U.S. at 560-61, and this Court accordingly should dismiss them for lack of standing.

This Court accordingly should dismiss Plaintiff's claims for lack subject matter jurisdiction.

### 3. Plaintiff Cannot Obtain Relief Directly Against the President.

Plaintiff cannot obtain relief directly against the President for issuing the Executive Orders. Courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *see also Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 (D.C. Cir. Feb. 15, 2025) ("[T]he President enjoys absolute immunity from injunctive actions." (citing *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992))). As the Supreme Court explained in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), under the Constitution "the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character." *Id.* at 165-66. The Supreme Court's refusal to police the President's discretionary acts is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to

21

declaratory relief." (citations omitted)).  Plaintiff accordingly cannot obtain any relief directly against the President.

**B. PLAINTIFF'S CLAIMS ALL FAIL TO STATE PLAUSIBLE CLAIMS.**

Because this Court lacks subject matter jurisdiction, this Court should dismiss the case without reaching whether the First Amended Complaint's claims state legally plausible claims.  But even if this Court had jurisdiction, the Court should still dismiss all claims because they fail to state claims as a matter of law under Rule 12(b)(6).

All claims essentially center on whether Title IX's prohibition of discrimination "on the basis of sex" includes discrimination based on gender identity.  *See, e.g.*, 1st Amend. Compl. ¶¶ 107, 122.  It does not.  As explained below, this Court should dismiss all the claims under Rule 12(b)(6) because Title IX protects against discrimination based on sex, not "gender identity."

**1. The Title IX Claim Fails.**

Claim 2 asserts that the Letters and Executive Orders conflict with Title IX because under "Title IX, discrimination 'on the basis of sex' covers discrimination against individuals because of their gender identity."  Compl. ¶ 107.  This claim fails because Title IX protects against discrimination based on "sex," not "gender identity."

***a. Title IX's Text***

Title IX requires that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Because the statute does not define "sex," the term

should "be interpreted as taking [its] ordinary, contemporary, common meaning." *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted).  When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what the term has always meant: biological sex.  *See Adams v. Sch. Bd. Of St. Johns County*, 57 F.4th 791, 812-13 (11th Cir. 2022) (consulting nine contemporary dictionaries for definitions); *see also id.* at 812-15 (finding Title IX refers to biological sex).  And Title IX's statutory text uses the term consistent with biological sex, referring to a binary classification based on biological differences.  For instance, right after the general prohibition in 20 U.S.C. § 1681(a), the statute expressly provides that this "section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of the *other sex*."  20 U.S.C. § 1681(a)(8) (emphasis added).  The statute elsewhere also clarifies that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."  20 U.S.C. § 1686.  Similarly, the statute provides a grace period for an "institution which admits only students of *one sex* to being an institution which admits students of *both sexes*."  20 U.S.C. § 1681(a)(2) (emphasis added).  These provisions could not sensibly function if the term "sex" includes "gender identity," which, unlike "sex," is a spectrum and may not be limited to two categories.

### b. Title IX's Historical Context

Historical context further confirms that Congress used the word "sex" in its ordinary biological sense and that Congress's bar on sex discrimination still allowed separating biological males and females in sports. "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities, which was documented in hearings held in 1970 by the House Special Subcommittee on Education." *McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *see also North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523 n.13 (1982). Against that backdrop, members of Congress voting on Title IX and any politically engaged citizen would have understood the statute as directed at eliminating discrimination in education based on biological sex—*i.e.*, unequal treatment of men and women—consistent with the term's ordinary meaning.

Contemporaneous post-enactment history confirms Title IX refers to biological sex and does not include discrimination based on "gender identity." Shortly after enacting Title IX in 1972, Congress passed the Javits Amendment that directed the DOE's predecessor to create regulations "implementing . . . [T]itle IX," which "shall include" regulations on "intercollegiate athletic activities." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including sports. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[4] Those contemporaneous regulations, nearly

---

[4] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex

24

all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time."). Moreover, that evidence is particularly strong here because Congress got the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982).

Congress's actions in the more than 50 years following Title IX's enactment further confirm that "sex" in this statute does not encompass "gender identity." In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate from sex discrimination. For example,

---

where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."). These contemporaneous and longstanding agency interpretations also confirm that Title IX refers to biological sex.

when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender, sexual orientation, gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphasis added).

Congress accordingly used the Hate Crimes Prevention Act to amend or create several statutory provisions that prohibited or otherwise specifically addressed discrimination based on "gender identity," in addition to discrimination based on "sex" or "gender." *See* 18 U.S.C. § 249(a)(2)(A) & (c)(4); 34 U.S.C. § 30503(a)(1)(C); *id.* § 30506(2).

Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and gender identity. *See* 34 U.S.C. § 12291(b)(13)(A) (2013), *as amended by* Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), *sexual orientation,* or disability" (emphases added)).

These post-Title IX enactments illustrate that Congress knows how to prohibit discrimination based on "gender identity" when it wishes to do so. *DHS v. MacLean*, 574 U.S. 383, 394 (2015). "If Congress had meant to prohibit . . . transgender discrimination" in Title IX, "surely the most straightforward way to do so would have been to say so—to add . . . 'transgender status' or 'gender identity' to the list of classifications protected

26

under" Title IX.  *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 338 (5th Cir. 2019) (Ho, J., concurring) (addressing Title VII).  Congress did not do so.

Finally, dismissal here aligns with the many courts that have concluded that Title IX allows separating the sexes and that Title IX does not include discrimination based on "gender identity."  *See, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2-3 (6th Cir. July 17, 2024); *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4-5 (11th Cir. Aug. 22, 2024) (collecting cases).[5]

This Court accordingly should dismiss Plaintiff's Title IX claim under Rule 12(b)(6).

---

[5]  The Supreme Court's *Bostock v. Clayton County*, 590 U.S. 644 (2020), does not extend beyond Title VII and particularly has no relevance to Title IX here.  *See, e.g.*, *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1229 (11th Cir. 2023) ("Because *Bostock* therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instant case."); *United States v. Skrmetti*, 605 U.S. 495, 520 (2025) ("We have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context."); *id.* at 553 (Barrett, J. concurring) ("[T]ransgender status implicates several other areas of legitimate regulatory policy—ranging from access to restrooms to eligibility for boys' and girls' sports teams . . . legislatures have many valid reasons to make policy in these areas.").

Regardless, even if *Bostock* applied, it makes clear that it requires a similarly situated analysis:  "[D]iscrimination" means "treating [an] individual worse than others who are similarly situated."  590 U.S. at 657.  In other words, *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated."  *Id.*  In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions."  *Id.* at 660.  Unlike in *Bostock*, males and females are not similarly situated when it comes to sports; sex is relevant to such decisions.

## 2.  The Separation of Powers Claim Fails.

Claim 1 asserts that the Letters and Executive Orders violate the separation of powers because the "Constitution does not authorize the Federal Defendants to amend Title IX [and the] Federal Defendants cannot invoke an erroneous interpretation of Title IX to terminate or withhold federal grants."  1st Amend. Compl ¶ 101.  This claim is essentially just a reiteration of Plaintiff's Title IX claim.  Indeed, Title IX itself places a condition on federal funds, so the lawfulness of the Executive Branch's application of Title IX is coextensive with its ability to withhold funds based on that application.  And as explained above, the purported misapplication of the statute does not establish a separate constitutional claim.  *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994) (noting that claims that executive "exceeded his statutory authority are not 'constitutional' claims, subject to judicial review").  Otherwise a plaintiff could turn every purported executive branch violation of a statute into a constitutional claim.

Accordingly, Plaintiff's separation of powers claim fails for the same reasons as its Title IX claim and should be dismissed under Rule 12(b)(6).

## 3.  The APA Claim Fails.

Claim 4 asserts that the Agency Letters violate the APA as "final agency action" that is contrary to law and "in excess of statutory authority."  1st Amend. Compl. ¶¶ 120-22.  This claim fails because, as explained above in Part III.A(1)(a), the Letters are not "final agency action" because the letters mark at best just the first step in Title IX's lengthy multi-step administrative process before an agency can opt to rescind any federal

funding.  The Letters thus are not "the consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); 5 U.S.C. § 704.

Moreover, Plaintiff's APA claim would still fail even if the Letters constituted reviewable final agency action.  Like Plaintiff's other claims, the APA claim centers on the Plaintiff's misconstruction of Title IX.  It alleges that the "Letters are not in accordance with law and in excess of statutory authority because" "Title IX prohibits discrimination 'on the basis of sex,' which covers discrimination against individuals because of their gender identity."  1st Amend. Compl. ¶ 122.  Like the Title IX and separation of powers claims above, this APA claim fails because Title IX protects against discrimination based on sex, not "transgender status" or "gender identity."

This Court accordingly should dismiss Plaintiff's APA claim under Rule 12(b)(6).

### 4.  The Tenth Amendment Claim Fails.

Claim 3 asserts that the Agency Letters and Executive Orders violate the Tenth Amendment.  This fanciful claim alleges that the "Federal Defendants are conditioning the receipt of federal funds on a change in the Minnesota Attorney General's State Opinion on the meaning of Minnesota law."  1st Amend. Compl. ¶ 116.  And based on that allegation the Defendants are "commandeer[ing]" the Minnesota Attorney General and "coerc[ing]" him into changing his opinion on state law by exerting economic pressure."  *Id.*  The Defendants, however, are not trying to unconstitutionally commandeer or coerce the Minnesota Attorney General or any state actor.  Rather the Defendants are attempting to ensure federal funding recipients comply with Title IX and

that Minnesota educational programs do not use federal funds to discriminate on the bases of sex.

First, just based on timing, the Executive Orders cannot unconstitutionally commandeer or coerce the Minnesota Attorney General to change his opinion because the Executive Orders preceded that opinion, and the opinion particularly responded to those Executive Orders.

Second, the Letters are aimed at facilitating and ensuring compliance with Title IX. If Plaintiff means that Title IX itself violates the Tenth Amendment, that argument fails. Title IX does not commandeer because it applies to both state and private education programs that receive federal money. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 475-76 (2018) ("The anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage."). And Title IX also does not commandeer because it is a Spending Clause statute. The Spending Clause empowers Congress "to pay the Debts and provide for the . . . general Welfare of the United States," U.S. Const. Art. I, § 8, cl. 1, and inherent that power is "the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l,* 570 U.S. 205, 213 (2013). Title IX also does not unconstitutionally economically coerce because the coercion doctrine does not apply where Congress "condition[s] the receipt of funds on the States' complying with restrictions *on the use of those funds*, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *NFIB v. Sebelius*, 567 U.S. 519, 580 (2012) (emphasis added).

The Agency Letters are consistent with Title IX's constitutionally permissible Spending Clause restrictions.  Overall, they attempt to ensure Minnesota federal funding recipients comply with Title IX and not discriminate on the bases of sex.  They do not require the Minnesota Attorney General to change his opinion because the Minnesota Attorney General opined only on whether state law conflicted with the Executive Orders, and conspicuously left out whether state law conflicted with Title IX.

This Court accordingly should find no unconstitutional commandeering or coercion and dismiss the Tenth Amendment claim under Rule 12(b)(6).

### 5.  The Spending Clause Claim Fails.

Claim 5 asserts that the Agency Letters and Executive Orders violate the Constitution's Spending Clause because they condition federal funds on Plaintiff prohibiting "students from participating in athletic programs or using restrooms or locker rooms in accordance with their gender identity."  1st Amend. Compl. ¶ 130.  And these conditions allegedly conflict with Title IX's "text" and "purpose," induce discrimination, and are unconstitutionally coercive.  *Id.*

This Claim is essentially just a reiteration of Plaintiff's Title IX claim.  Plaintiff does not allege the Title IX statute, which itself places conditions on federal funding, violates the Spending Clause.  Instead, Plaintiff alleges Defendants' actions (or "conditions") conflict with Plaintiff's misinterpretation of Title IX.  The Claim accordingly fails because the alleged "conditions" are simply Defendants ensuring that funding recipients comply with Title IX's condition that educational programs do not use federal funds to discriminate on the bases of sex.  And even if Defendants' actions

31

conflicted with Title IX, the purported misapplication of the statute does not establish a separate constitutional claim. *See Dalton v. Specter*, 511 U.S. 462, 473-74 (1994).

Accordingly, Plaintiff's Spending Clause claim fails for the same reasons as its Title IX claim and should be dismissed under Rule 12(b)(6).

### 6. The Declaratory Judgment Act "Claim" Fails.

In "Claim 6," Plaintiff asks this Court to declare that "Minnesota's Law and Policy" do not violate Title IX. 1st Amend. Compl. ¶¶ 134-36. Plaintiff brings this claim solely pursuant to the "Declaratory Judgment Act." As explained above, the Declaratory Judgment Act does not authorize a "claim" but rather a remedy for some other underlying viable cause of action. This purported Claim 6 depends entirely on whether Plaintiff has some other viable cause of action, and thus falls with the rest of its claims.

Additionally, Claim 6 does not even clearly assert what law the Defendants are allegedly violating. The claim does point to Title IX, alleging that the Defendants "have threatened to take enforcement action" that is inconsistent with Plaintiff's interpretation of Title IX. *See id.* ¶¶ 136-38. Accordingly, even if Plaintiff could assert this as a freestanding claim, it would fail for the same reasons as its Title IX claim. This Court should therefore dismiss it under Rule 12(b)(6).

### IV.    CONCLUSION

This Court should dismiss all claims against all Defendants.

Respectfully submitted,

 /s/ Matthew J. Donnelly
MATTHEW J. DONNELLY
Attorney
Attorney ID Number 1186694CA
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530
Telephone: (202) 616-2788
Email: matthew.donnelly3@usdoj.gov

Counsel for the Defendants

Dated:  January 15, 2026