# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*, | |
| Plaintiff, | Case No.: 25-cv-01608 (ECT/DLM) |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, *in her official capacity as Attorney General of the United States*; UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR., *in his official capacity as Secretary of Health and Human Services* | |
| Defendants. | |

## OPPOSITION TO THE FEDERAL DEFENDANTS'
## MOTION TO DISMISS AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 4

BACKGROUND ............................................................................................................. 5

I.    Minnesota's Policies and Title IX. .................................................................. 5

II.   President Trump Targets Transgender Individuals. ....................................... 7

III.  The Federal Defendants Target Minnesota, Maine, and California. ............. 8

   A.   Federal Defendants' Initial Efforts to Implement the Sports Ban Order. ...... 8

   B.   Federal Agencies Can Either Follow a Multi-Step Administrative Process or Refer to DOJ. .............................................................................................. 10

   C.   In Minnesota, Federal Defendants Referred the Matter to DOJ After Finding Noncompliance. ............................................................................................. 12

      1.   Federal defendants "investigate" Minnesota and conclude it is violating Title IX. . 13

      2.   Federal defendants declare impasse and refer to DOJ. ............................. 14

IV.   Procedural History ......................................................................................... 16

LEGAL STANDARD ................................................................................................... 17

ARGUMENT ................................................................................................................ 17

I.    The Court Has Subject Matter Jurisdiction over Minnesota's Claims. ........ 17

   A.   Minnesota Has Standing and its Claims Are Ripe. ..................................... 18

      1.   The federal defendants are poised to take immediate action against Minnesota. ...... 18

      2.   Minnesota alleges imminent injury to its interests. .................................. 19

      3.   Minnesota's claims are ripe. ..................................................................... 21

   B.   The Court Has Jurisdiction Over Minnesota's Claims ................................. 22

      1.   The Court has jurisdiction over Minnesota's APA claim (Count 4) ......... 22

      2.   The Court has equitable authority to review Minnesota's constitutional and ultra vires claims (Counts 1-3 and 5). .............................................................. 25

      3.   Minnesota's requests for declaratory relief are appropriate ..................... 29

II.      Minnesota States Plausible Title IX, Constitutional, and APA Claims. ..................... 31

  A.   Minnesota Has Stated a Plausible Title IX Claim (Count 2). ....................................... 32

    1.   Title IX and the athletic regulations do not require the exclusion of transgender girls from girls' sports or facilities.................................................................................. 32

    2.   Federal defendants cannot rely on the Executive Orders as a basis for Title IX enforcement........................................................................................................... 35

  B.   Minnesota Has Stated a Plausible Separation of Powers Claim (Count 1)................... 36

  C.   Minnesota Has Stated a Plausible APA Claim (Count 4).............................................. 38

  D.   Minnesota Has Stated a Plausible Spending Clause Claim (Count 5).......................... 40

  E.   Minnesota Has Stated a Plausible Tenth Amendment Claim (Count 3)....................... 43

  F.   Minnesota Has Stated a Plausible Declaratory Judgment Claim (Count 6). ................ 44

CONCLUSION.................................................................................................................. 45

## INTRODUCTION

In September, federal defendants argued to this Court that Minnesota's claims were not ripe. Since then, two defendants have completed their sham investigations, concluded Minnesota is violating Title IX, and referred those matters to the U.S. Department of Justice (DOJ) for enforcement. In recent months, federal defendants have used those findings and referrals to threaten billions of dollars of education funding in Minnesota.

Despite the factual evolution in the case, federal defendants again seek to dismiss the Amended Complaint, still arguing Minnesota "jumped the gun." Their brief pretends that a "multi-step administrative process" will be forthcoming. Yet in both California and Maine, no administrative process followed the referral to DOJ of similar findings. Instead, DOJ immediately sued both states. Those simple facts demonstrate that this case is ripe and ready for judicial resolution. The fact that federal defendants apparently prefer to be the plaintiff in a case against Minnesota over Title IX (as opposed to bringing counterclaims in this action) does not factor into a Rule 12 analysis.

Federal defendants fail to show that this Court lacks jurisdiction or that Minnesota fails to state viable claims. With respect to jurisdiction, Minnesota easily meets the test for final agency action, and this Court has equitable authority to hear Minnesota's claims that the Executive Orders interpreting Title IX—and the funding threats associated with them—are unconstitutional and ultra vires. On the merits, neither Title IX nor its athletic regulations require Minnesota to categorically exclude transgender girls from girls' sports. *See Female Athletes United (FAU) v. Ellison*, 805 F. Supp. 3d 977, 1012 (D. Minn. 2025). The President cannot amend Title IX or its regulations by executive order. The Amended

Complaint plausibly alleges that the President's attempt to do so violates the separation of powers, Title IX, the Spending Clause, the Tenth Amendment, and the APA.

The federal defendants' motion to dismiss should be denied.[1]

## BACKGROUND

### I.   MINNESOTA'S POLICIES AND TITLE IX.

For nearly a decade, Minnesota has allowed students to play on school sports teams that align with their gender identity. Am. Compl. ¶ 54. That policy is consistent with the Minnesota Human Rights Act (MHRA), which has prohibited discrimination based on gender identity in education for even longer. *Id.* ¶ 18; Minn. Stat. §§ 363A.03; 363A.13. In contrast, the federal government's interpretation of Title IX—and how it applies to gender-identity discrimination—has whipsawed between different Presidential administrations. Despite this back and forth, until January 20, 2025, the federal government agreed that Minnesota's law aligned with Title IX. Am. Compl. ¶¶ 28, 34-36.

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). From 2014 to 2016, the U.S. Department of Education (DOE) said

---

[1] Unless otherwise noted, the term "federal defendants" refers to Donald J. Trump, in his official capacity as the President of the United States, DOJ, Pamela Bondi, in her official capacity as Attorney General of the United States, U.S. Department of Education (DOE), Linda McMahon, in her official capacity as Secretary of Education, U.S. Department of Health and Human Services (HHS), and Robert F. Kennedy Jr., in his official capacity as Secretary of HHS.

that Title IX's sex-discrimination prohibition applied to gender-identity discrimination.[2] In 2017, however, DOE and DOJ changed course. They rescinded prior guidance on gender-identity discrimination but took no position on the meaning of Title IX.[3] The federal agencies instead stressed that "there must be due regard for the primary role of the States and local school districts in establishing educational policy."[4]

Four years later, in 2021, defendant agencies concluded that Title IX prohibits discrimination against transgender individuals.[5] In April 2023, DOE published a notice of proposed rulemaking that would have amended the Title IX athletics regulations. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22860 (proposed Apr. 13, 2023). But in December 2024, DOE withdrew its proposed rulemaking, reiterating that "it will continue to apply the

---

[2]  U.S. Dep't of Educ., Off. for Civ. Rts., Questions and Answers on Title IX and Sexual Violence, at 12 (Apr. 29, 2014), https://www.ed.gov/media/document/questions-and-answers-title-ix-and-sexual-violence-33916.pdf; Letter from James A. Ferg-Cadima, Acting Deputy Ass't Sec. for Policy, U.S Dep't of Educ., to Emily T. Prince (Jan. 7, 2015), https://www.ed.gov/media/document/title-ix-prince-letter-35013.pdf; U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter (May 13, 2016), https://www.justice.gov/opa/file/850986/dl?inline.

[3]  U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter (Feb. 22, 2017), https://www.ed.gov/media/document/colleague-2017-title-ix-35085.pdf.

[4]  *Id.*

[5]  *E.g.*, Am. Compl. ¶ 36; 86 Fed. Reg. 32637 (June 22, 2021) (DOE); 86 Fed. Reg. 27984 (May 25, 2021) (HHS); Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., U.S. Dep't of Just., Civ. Rts. Div., Memorandum on Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), https://perma.cc/V79V-ZFQ3 (2021 DOJ guidance).

longstanding legal standards reflected in the athletics regulations." 89 Fed. Reg. 104936, 104937 (withdrawn Dec. 20, 2024).

## II.    PRESIDENT TRUMP TARGETS TRANSGENDER INDIVIDUALS.

The federal government's position on Title IX changed when President Trump was sworn into office, and he began to wield his executive power to target transgender individuals. Am. Compl. ¶¶ 41-49. Within a week of his inauguration, President Trump issued Executive Order 14168 (the Gender Ideology Order). Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025); Am. Compl. ¶ 41-42, Ex. A. The Gender Ideology Order declared that it is "the policy of the United States to recognize two sexes, male and female," which are "not changeable and are grounded in fundamental and incontrovertible reality." Am. Compl. ¶ 42. It then defined the "two sexes" by referencing the size of the reproductive cells produced "at conception." *Id.* These definitions are not supported by science and deny the existence of both intersex and transgender individuals. *Id.* ¶¶ 43-45. Still, the Gender Ideology Order demanded that all federal agencies implement the definitions in policies, regulations, forms, communications, and every other aspect of their work. *Id.* ¶ 46. Section 3(g) of the Order further asserted that "[f]ederal funds shall not be used to promote gender ideology," and it required all federal agencies to "assess grant conditions and grantee preferences and ensure that grant funds do not promote gender ideology." *Id.* ¶ 47.

More executive orders followed. President Trump banned transgender individuals from serving in the U.S. military. *Id.* ¶ 48. He also cut federal funds to medical providers who offer gender-affirming care to transgender youth. *Id.* ¶ 49. Sports were next. On February 5, 2025, President Trump issued Executive Order 14201, entitled "Keeping Men

Out of Women's Sports." Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025) (the Sports Ban Order); Am. Compl. ¶¶ 50-53, Ex. B. The Sports Ban Order incorporates the definitions from the Gender Ideology Order and inaccurately refers to transgender girls and women as "men." *Id.* It declares that allowing transgender girls to compete in women's sports "denies women and girls the equal opportunity to participate and excel in competitive sports," and directs federal agencies to "rescind all funds from educational programs" that allow transgender girls and women to play on sports teams for girls and women, regardless of age, testosterone levels, or the level of athletic competition. *Id.* ¶ 53.[6]

## III.  THE FEDERAL DEFENDANTS TARGET MINNESOTA, MAINE, AND CALIFORNIA.

### A.    Federal Defendants' Initial Efforts to Implement the Sports Ban Order.

The federal government immediately began implementing the Sports Ban Order against Minnesota and other states with inclusive sports policies. On February 12, 2025, DOE announced an investigation into the Minnesota State High School Sports League (the League) after it opted to follow Minnesota law and continue to allow students to participate on teams consistent with their gender identities. *Id.* ¶¶ 54-55. In response to that investigation, the League sought a legal opinion from Attorney General Ellison on whether the Sports Ban Order preempts the MHRA. *Id.* ¶¶ 56-57. Attorney General Ellison concluded that the Sports Ban Order lacks the force of law and does not preempt the MHRA. *Id.* ¶ 58, Ex. D. Attorney General Ellison's opinion is binding on Minnesota schools unless a court rules otherwise. *Id.*; Minn. Stat. § 8.07.

---

[6]  This memorandum refers to the challenged portions of the Gender Ideology Order and the Sports Ban Order collectively as "the Executive Orders."

Five days later, on February 25, 2026, U.S. Attorney General Pam Bondi and DOJ responded with a threat. *Id.* ¶ 59. Bondi's letter to Attorney General Ellison and the League's Director, Erich Martens, was unequivocal: "Minnesota should be on notice" because DOJ "stands ready" to enforce Title IX. *Id.* ¶¶ 59-61, Ex. E. Bondi did not suggest that DOJ—or any other federal agency—was deliberating on whether or how to change the prior administration's interpretation of Title IX or the Title IX regulations. She simply stated that the President had directed DOJ and DOE to prioritize enforcement actions against federal funding recipients that "deny girls an equal opportunity to participate in sports and athletic events by requiring them to compete against boys." [7] *Id.*

Minnesota was not alone in drawing DOJ's ire. Maine and California received letters at the same time.[8] *Id.* ¶ 83. Then, in March and early April, the federal government took extraordinary enforcement measures against Maine. On April 2, 2025, the U.S. Department of Agriculture (USDA) froze several federal funding streams due to Maine's alleged Title IX violations—including funds allocated to feed Maine schoolchildren. Am. Compl. ¶¶ 85-87; *accord Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 212-13 (Apr. 11, 2025). The federal government froze Maine's funds without notice and without following statutory procedures. Am. Compl. ¶¶ 85-87; *Maine*,

---

[7] Minnesota understands the reference to "boys" in that statement to be an inaccurate and offensive reference to transgender girls—not a reference to co-ed sports. Co-ed sports are consistent with Title IX and the MHRA, and they are offered in a variety of contexts in Minnesota schools.

[8] Press Release, U.S. Dep't of Just., *Attorney General Bondi Urges States to Comply with Federal Law by Keeping Men Out of Women's Sports* (Feb. 25, 2025), https://perma.cc/3HKU-MPRG.

778 F. Supp. 3d at 229. Maine was forced to seek an emergency temporary restraining order to keep funds flowing. Am. Compl. ¶ 86.

While the dispute in Maine heated up, DOJ increased the pressure on Minnesota by threatening reprisals within its control—DOJ grants and lawsuits. On April 8, 2025, the head of DOJ's Civil Rights Division, Harmeet Dhillon, sent another letter to Attorney General Ellison. Am. Compl. ¶¶ 62-64, Ex. F.[9] DOJ said it was commencing a compliance review of "Minnesota entities." *Id.* The justification was Attorney General Ellison's legal opinion, which "seemingly *requires* Minnesota schools to disregard the federal government's interpretation of Title IX described in President Trump's Executive Order." *Id.* DOJ gave Attorney General Ellison one week to "clarify" his opinion. *Id.* at Ex. F. If he did not—or if he failed to respond—DOJ would have "no choice but to seek judicial resolution." *Id.* DOJ also threatened to cut funding from Minnesota schools. *Id.* Minnesota requested a short extension and a clarification regarding the specific grants that DOJ was threatening. Am. Compl. ¶ 66. DOJ explained that the funds at issue were grants issued and controlled by DOJ itself. Am. Compl., Ex G.

## B. Federal Agencies Can Either Follow a Multi-Step Administrative Process or Refer to DOJ.

To pursue a Title IX enforcement action, federal agencies must follow the procedures outlined in 20 U.S.C. § 1682. Section 1682 directs federal agencies to implement regulations that, among other things, establish procedures for effectuating compliance with Title IX's nondiscrimination mandate. Those procedures must allow

---

[9] This memorandum refers to the Bondi and Dhillon Letters as "the DOJ Letters."

agencies to either (a) terminate grants to recipients "as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply," or (b) take action "by any other means authorized by law." *Id.*

Each of the relevant federal agencies (DOJ, HHS, and DOE) adopted and incorporated their Title VI enforcement regulations for the Title IX context. *See* 28 C.F.R. § 54.605 (DOJ); 45 C.F.R. § 86.71 (HHS); 34 C.F.R. § 106.81 (DOE). And each agency's Title VI enforcement regulations are substantially the same, including a regulation entitled "Procedure for effecting compliance." *See* 28 C.F.R. § 42.108 (DOJ); 45 C.F.R. § 80.8 (HHS); 34 C.F.R. § 100.8 (DOE). Those regulations detail the two available paths to effect compliance: (1) agencies may terminate funding after following certain procedures or (2) agencies may refer the matter to DOJ for enforcement. Under the first path, the agency must inform the recipient of noncompliance and determine that compliance cannot be secured by voluntary means, provide a hearing and secure a finding of noncompliance, file a written report to Congress, and wait 30 days before terminating funding. *See* 28 C.F.R. § 42.108(c) (DOJ); 45 C.F.R. § 80.8(c) (HHS); 34 C.F.R. § 100.8(c) (DOE). Under the second path, an agency can refer the matter to DOJ for enforcement after determining that compliance cannot be secured by voluntary means, and waiting at least 10 days after notifying the recipient of noncompliance and the impending action.[10] *See* 28 C.F.R. § 42.108(d) (DOJ); 45 C.F.R. § 80.8(d) (HHS); 34 C.F.R. § 100.8(d) (DOE). In other words, once a federal agency has provided notice of noncompliance to the recipient and

---

[10] The DOJ regulation also requires approval by the Attorney General for both options. 8 C.F.R. § 42.108(c)-(d).

determined that voluntary compliance is unavailable, it can choose whether to follow the administrative hearing process to terminate funds or to simply refer the action to DOJ.

In Maine and California, federal defendants chose the second, shorter path. In Maine, on March 28, 2025 and April 11, 2025 respectively, HHS and DOE referred the matter to DOJ after sending a notice of noncompliance and a voluntary resolution agreement, which Maine refused to sign. Compl. ¶¶ 140-52, *United States v. Maine Dept. of Ed.*, 25-cv-00173 (D. Me. Apr. 16, 2025). Five days later, on April 16, 2025, DOJ sued Maine, alleging that its inclusive sports policy violated Title IX. Am. Compl. ¶ 88. DOJ sought declaratory and injunctive relief plus money damages. *Id.* In California, DOE sent a notice of noncompliance and a voluntary resolution agreement on June 25, 2025, which California refused to sign on July 7, 2025. Am. Comp. ¶¶ 90-91. DOE immediately referred the matter to DOJ, which sued two days later. *United States v. Cal. Interscholastic Fed'n*, Case No. 8:25-cv-01485 (C.D. Cal. July 9, 2025). DOJ alleged that California's policy of allowing transgender girls to compete in girls' sports violated Title IX, and, as in Maine, DOJ seeks sweeping relief, including damages. *Id.*

### C.    In Minnesota, Federal Defendants Referred the Matter to DOJ After Finding Noncompliance.

Federal defendants have chosen the second path in Minnesota too. After Minnesota initiated this lawsuit, federal defendants continued to vigorously enforce their interpretation of Title IX set forth in the Executive Orders, and DOE and HHS ultimately issued a finding of noncompliance and referred the matter to DOJ.

### 1. Federal defendants "investigate" Minnesota and conclude it is violating Title IX.

DOE and HHS initiated investigations and concluded Minnesota was violating Title IX because it allows transgender girls to participate on sports teams and access facilities that align with their gender identity. On June 3, 2025, DOE's Office for Civil Rights sent a letter to the Minnesota Department of Education (MDE) stating that it had initiated an investigation into MDE. Am. Comp. ¶ 68, Ex. H. Similarly, on June 26, HHS's Office for Civil Rights sent a letter to MDE stating that it too was initiating a Title IX compliance review. Am. Comp. ¶ 70, Ex. I.

Neither DOE nor HHS contacted MDE during their investigations. Am. Comp. ¶¶ 71-72. They made no requests for information, did not request any interviews, and did not send any updates or other correspondence. *Id.* Neither DOE nor HHS allowed MDE an opportunity to provide any input during the alleged investigations. *Id.*

Yet, on September 30, 2025, DOE and HHS jointly announced that they had concluded their investigation into MDE and issued a Letter of Findings (Findings). *Id.* ¶ 73. The Findings adopt the definitions and policies set forth in the Executive Orders, and state that federal funding recipients must not only comply with Title IX but also these Orders. *Id.* ¶¶ 74-76; Ex. J at 9-10, 15, 18, 22-23. The Findings conclude that the League's and MDE's inclusive policies allowing transgender students to participate in sports and use restrooms and locker rooms according to their gender identities violate Title IX. *Id.* ¶ 74; Ex. J. The Findings also stated that DOE has allocated nearly $3 billion to MDE, "of which approximately $551 million remains available for drawdown by MDE." *Id.* DOE and HHS

sent a Resolution Agreement, demanding that MDE and the League adopt the federal defendants' interpretation of Title IX as requiring discrimination against transgender students. *Id.* ¶ 77. And, DOE published a press release on the Findings, which said that MDE had 10 days to sign the agreement or "risk imminent enforcement action." *Id.* ¶ 78. These steps mirrored the actions taken by DOE and HHS in both Maine and California before they referred the matters to DOJ.

### 2. Federal defendants declare impasse and refer to DOJ.

Shortly after DOE and HHS issued their Findings, most of the federal government shut down, causing DOJ's cases against Maine and California to be stayed,[11] as well as staying Minnesota's case against the federal defendants. During this time, on October 10, 2025, MDE responded to the Findings, writing DOE and HHS to express disappointment that (a) MDE had no opportunity to provide input into the investigation, (b) that the Findings included sensitive information about minors, and (c) that it threatened imminent cuts to MDE's federal funding without mention of the multi-step administrative process required to make those cuts. Bies Decl. ¶ 3, Ex. A.[12] On December 9, 2025, the regional director of DOE responded to MDE's letter on behalf of DOE and HHS, telling

---

[11]  Because each case was stayed through November 20, 2025, neither has progressed significantly. The Maine case remains in discovery, *Maine Dept. of Ed.*, 25-cv-00173-JCN, Docket and the court has taken California's motion to dismiss under advisement, *Cal. Interscholastic Fed'n*, 8:25-cv-01485, Docket.

[12]  The Court can take judicial notice of the attachments to the Bies Declaration under Fed. R. Evid. 201(b).

MDE that it had to agree to the resolution agreement by December 15. Bies Decl. ¶ 4, Ex. B.

Minnesota rejected the proposed resolution. Bies Decl. ¶ 5, Ex. C. In doing so, Minnesota stated that it had just added HHS and DOE as defendants in this lawsuit challenging the federal defendants' novel interpretation of Title IX, and that it was prepared to seek emergency relief if the federal defendants cut funds without the appropriate process. *Id.*

DOE responded on December 22, 2025, with a letter to MDE and the League (the Impasse Letter) noting that MDE had declined to enter the Resolution Agreement and the League had not responded at all. Bies Decl. ¶ 6, Ex. D. The Impasse Letter concluded by urging MDE and MSHSL to reconsider the proposed resolution because, after 10 calendar days DOE would "issue a Letter of Impeding Enforcement Action." The referenced enforcement action "may include the initiation of an administrative process . . . or other means authorized by law including referral to [DOJ]." *Id.*

Minnesota did not respond, and, true to its word, DOE sent a "Letter of Impending Enforcement Action" on January 12, 2026. Bies Decl. ¶ 7, Ex. E. This letter included another 10-day window in which MDE and the League could capitulate, saying that if "MDE and [the League] fail to enter into a resolution agreement with OCR within 10 calendar days from issuance of this letter, OCR may refer this matter to [DOJ] for potential enforcement." *Id.*

Minnesota did not enter into the agreement, and so, on January 26, 2026, DOE sent MDE a notice of referral (the Referral). Bies Decl. ¶ 8, Ex. F. At the same time, DOE

informed DOJ that it was referring the matter for enforcement. Bies Decl. ¶ 9, Ex. G. And, in case there was any doubt that DOE and HHS planned to use the judicial process to terminate Minnesota's federal education funding, the agencies announced the Referral in a press release, saying "[t]oday's letter notifies Minnesota that ED and HHS will refer the matter to DOJ for proceedings, which could result in termination of Minnesota's Federal funding from ED and HHS." Press Release, DOE, *U.S. Departments of Education and Health and Human Services Refer Minnesota Case to U.S. Department of Justice for Title IX Non-Compliance* (Jan. 26, 2026), https://perma.cc/JMG3-92YZ.

## IV. PROCEDURAL HISTORY.

Minnesota decided not to wait for DOJ to make good on its April 2025 threats to cut funding. Minnesota filed the current lawsuit to protect its inclusive policy and the rights of all student-athletes. ECF 1. The Complaint alleged that the Executive Orders, plus DOJ's actions to enforce the Orders, violate the separation of powers, Title IX, the Tenth Amendment, and the APA. ECF 1 ¶¶ 77-104. The original federal defendants moved to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim. ECF 20. This Court heard argument on that motion on September 8, 2025. ECF 32.

Shortly after federal defendants issued the Findings and while the motion to dismiss the original Complaint was still pending, this Court granted Minnesota leave to file the Amended Complaint. Minnesota filed the Amended Complaint on December 2, 2025. The Amended Complaint added new allegations to encompass the above-described events that occurred after the original Complaint was filed. ECF 53. The Amended Complaint also

added DOE and HHS as defendants and Spending Clause and Declaratory Judgment Act claims. *Id.*

## LEGAL STANDARD

The federal defendants move to dismiss under both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). The same standard governs facial challenges to subject matter jurisdiction under Rule 12(b)(1) and motions to dismiss for failure to state a claim under Rule 12(b)(6). *Wong v. Minnesota Dep't of Hum. Servs.*, 820 F.3d 922, 927 (8th Cir. 2016). For both, the court must construe the complaint in the light most favorable to the nonmoving party; assume the factual allegations in the complaint are true; and then assess whether the facts (a) establish subject matter jurisdiction, and (b) state plausible claims for relief. *Id.* In evaluating a motion to dismiss, courts may consider materials that are part of the public record or subject to judicial notice. *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 & n.3 (8th Cir. 2012).

## ARGUMENT

## I. THE COURT HAS SUBJECT MATTER JURISDICTION OVER MINNESOTA'S CLAIMS.

The federal defendants assert a variety of procedural defenses to Minnesota's claims. None have merit. First, Minnesota has standing and the claims alleged in the Amended Complaint are ripe because the federal defendants are threatening imminent, grave harm to Minnesota's interests. Second, the Court has jurisdiction to hear Minnesota's APA, constitutional and ultra vires, and Declaratory Judgment Act claims.

## A.    Minnesota Has Standing and Its Claims Are Ripe.

The federal defendants argue that Minnesota's claims are not ripe and that Minnesota lacks standing to pursue them. ECF 62 at 18-21. But these arguments are both premised on the false claim that the federal defendants have "barely started down Title IX's lengthy multi-step administrative process to rescind any federal funding." ECF 62 at 19. As discussed above, federal defendants have referred the alleged Title IX violations to DOJ for imminent enforcement, just as they did in Maine and California. *Supra* 10-16. Minnesota's claims are therefore fit for adjudication and judicial redress now.

### 1.    The federal defendants are poised to take immediate action against Minnesota.

Federal agencies seeking to enforce Title IX's requirements have two options: (1) follow the multi-step administrative process cited ad nauseum in federal defendant's memorandum of law[13]; or (2) refer the matter to DOJ for enforcement (which federal defendants conveniently ignore in their brief). *Supra* 10-12. To take option two, all the agency needs to do before suing is to notify the targeted recipient of the claimed noncompliance and determine that voluntary compliance is impossible. *Id.*

Here, federal defendants have taken all the necessary steps to bring an enforcement action—other than actually filing a complaint. DOE and HHS have made findings, ruled out voluntary compliance, declared impasse, and referred to DOJ for enforcement. *Supra* 12-16. In Maine and California, those referrals were followed almost immediately with a lawsuit—in Maine it was five days, in California it was two. *Supra* 10-12. DOJ's

---

[13]  *See* ECF 62 at 3, 10-11, 19-20.

bald assertion that these threats are not imminent because "DOE and HHS have made just initial findings, and the DOJ has not even made findings" rings hollow. ECF 62 at 19. Indeed, DOJ does not need to make findings to act on the referrals, but even if it did, DOJ has already made up its mind. Attorney General Bondi has already informed Minnesota that DOJ "stands ready to take all appropriate action to enforce federal law" if DOE's investigation determines that the state's inclusive policies were denying girls an equal opportunity to participate in sports. Am. Compl. ¶¶ 59-61 and Ex. E. Minnesota faces an imminent federal lawsuit seeking funding cuts or other monetary damages if Minnesota does not change state law and yield to the federal defendants' novel interpretation of Title IX. Federal defendants ignore these facts in arguing that Minnesota's injury is not sufficiently "imminent" or ripe.

### 2.    Minnesota alleges imminent injury to its interests.

With respect to standing, federal defendants argue only that Minnesota has not suffered an injury in fact because "potential future funding cuts and related legal interpretations are too speculative." ECF 62 at 20.

Minnesota's alleged injuries are not speculative. In a pre-enforcement challenge, a plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). A plaintiff need only allege that the injury is "certainly impending." *Id.* "[O]ne does not have to await the consummation of the threatened injury to obtain preventive relief." *Id.* A plaintiff who alleges a threat of enforcement that "is not imaginary or wholly speculative" has standing. *St. Paul Area Chamber of Com. v.*

*Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (the imminence requirement is met "if the threatened injury is certainly impending or there is a substantial risk that the harm will occur" (citation omitted)).

Minnesota alleges imminent injuries to its interests. First, the Executive Orders, the DOJ Letters, the Findings, Impasse Letter, and Referral all directly threaten federal education funding in Minnesota. Am. Compl. ¶¶ 41-53, 59-66, 74-76; Bies Decl. Exs. D & F. The risk of losing out on federal funding "is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019).

Second, the federal defendants' actions put Title IX on a collision course with the MHRA and the League's inclusive sports policy. The threat of federal preemption injures a state's sovereign interests. *See, e.g.*, *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 594-95 (6th Cir. 2024). That preemption threat is certainly impending: Minnesota law and policy require schools to allow transgender girls to play on sports teams that align with their gender identity. Am. Compl. ¶¶ 18-27. The federal defendants claim that Title IX requires federal funding recipients to exclude transgender girls from sports teams that align with their gender identity. *Id.* ¶¶ 50-53, 59-64, 73-76. Similarly, the federal defendants are threatening Minnesota with severe funding cuts if Minnesota's Attorney General does not change his opinion on Minnesota law. *Id.* ¶¶ 62-64.

### 3.    Minnesota's claims are ripe.

Because Minnesota has standing to challenge the federal defendants' actions, Minnesota's claims are necessarily "ripe for judicial review."[14] *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 608 (8th Cir. 2022). The federal defendants nonetheless argue that Minnesota's claims fail the fitness and hardship prongs of the ripeness inquiry. ECF 62 at 19-21. Fitness and hardship are weighed on a sliding scale; each factor must be satisfied to "a minimal degree." *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013) (citation modified). Fitness depends "on whether a case would benefit from further factual development." *Id.* Hardship hinges on whether the plaintiff "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974) (internal quotations and citations omitted).

Here, no further factual development is necessary because there is a clear legal dispute over what Title IX means, and whether it preempts Minnesota law. *See Pub. Water Supply Dist. No. 10 of Cass Cnty. v. City of Peculiar*, 345 F.3d 570, 573 (8th Cir. 2003) ("The case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities."). Because the federal defendants' interpretation of Title IX conflicts with the MHRA—Minnesota's principal civil rights law—this case is fit. Similarly, hardship is satisfied because the conflict with the federal defendants creates

---

[14]   When a party alleges that a claim is not ripe because it is speculative or contingent on future events, standing and ripeness "boil down to the same question." *Religious Sisters of Mercy*, 55 F.4th at 608 (quoting *Susan B. Anthony List*, 573 U.S. at 157 n.5).

massive financial risk and uncertainty for Minnesota. Minnesota need not "operate beneath the sword of Damocles until the threatened harm actually befalls" it before seeking judicial resolution. *Iowa League*, 711 F.3d at 867.

### B.    The Court Has Jurisdiction Over Minnesota's Claims.

The federal defendants next argue that Minnesota lacks authorized causes of actions for its claims. ECF 62 at 9-17. First, federal defendants assert that Minnesota fails to state claims under the APA because there has been no final agency action. Second, federal defendants attempt to recast Minnesota's ultra vires and constitutional claims as statutory claims and contend that statutory ultra vires review is unavailable. Third, federal defendants assert that Minnesota cannot bring a standalone claim for declaratory relief. Federal defendants are wrong on all fronts. The Court has jurisdiction over Minnesota's APA, constitutional and ultra vires, and Declaratory Judgment Act claims.

### 1.    The Court has jurisdiction over Minnesota's APA claim (Count 4).

The federal defendants argue that there has been no final agency action. ECF 62 at 10-14. But the Amended Complaint properly challenged the Findings, which are a final determination of Minnesota's noncompliance with Title IX that has direct and sweeping consequences.

Final agency action requires two conditions. "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted). "[S]econd, the action must be one by which 'rights or obligations have

been determined,' or from which 'legal consequences will flow.'" *Id.* at 178. In assessing these two requirements, courts take a "pragmatic approach." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

Minnesota's Amended Complaint sufficiently alleges that the Findings are final agency action. As to the first prong, the Findings mark the "consummation" of the federal government's decisionmaking process. Indeed, the Findings declare that Minnesota's policies violate Title IX and direct the State to immediately comply. Am. Compl. ¶¶ 73-78. There is nothing "tentative" or "interlocutory" about the agencies' (unsupported) interpretation of Title IX. *Cf. Texas v. Cardona*, 743 F. Supp. 3d 824, 842-43 (N.D. Tex. 2024) (stating that "the overarching view that Title IX prohibits discrimination on the basis of sexual orientation and gender identity reflects the Department's 'settled agency position'" and therefore is final agency action).

Likewise, the Findings are an agency action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78. The Findings announce the federal defendants' new position that Minnesota's decadelong policy of transgender inclusion in school sports violates Title IX, necessarily "alter[ing] the legal regime to which [Minnesota] is subject." *Cf. Oregon Nat. Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977, 986-87 (9th Cir. 2006); *see also* Am. Compl. ¶¶ 36, 73-75. And since Minnesota did not enter into voluntary compliance, Minnesota faces an imminent enforcement action by DOJ seeking money damages. *Supra* 10-16. Thus, the Findings are final agency action from which legal consequences continue to flow. *See, e.g.*, *Sackett v. EPA*, 566 U.S. 120, 126 (2012) ("legal consequences flow[ed]" where letter

allowed agency to seek additional penalties if the party did not comply); *Hawkes Co., v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 1000–01 (8th Cir. 2015) (holding that agency demand of compliance or risk threat of legal action satisfies the second *Bennett* factor); *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 410, 412-13 (D.C. Cir. 2011) (finding final agency action where agency letter said ceasing alleged violation would shield party from future enforcement action).

The federal defendants assert there has been no final agency action because the Findings are just the first step in Title IX's lengthy multi-step administrative process to terminate federal funding. ECF 62 at 10-11. But this is a red herring. As discussed, federal defendants chose to forego that multi-step administrative process. *Supra* 10-16. Federal defendants referred the matter to DOJ for enforcement instead. *Id.* The cases cited by the federal defendants where agencies announced a preliminary determination and requested voluntary corrective action are distinguishable. ECF 62 at. 11; *see, e.g.*, *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944-45 (D.C. Cir. 2012) (finding no final agency action where the agency asked for additional information to make a final determination, and warned that violations "*may* lead to enforcement action"); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (finding no final agency action where agency officials made a "preliminary determination" and "requested . . . voluntary corrective action"); *Pearl River Union Free Sch. Dist. v. Duncan*, 56 F. Supp. 3d 339, 381 (S.D.N.Y. 2014) (finding no final agency action where plaintiff had voluntarily entered into the Resolution Agreement).

Federal defendants' claim that DOJ's compliance review remains ongoing is similarly unavailing. ECF 62 at 11-12. DOJ has already made up its mind. *Supra* 8-9, 19. Where an agency has issued a "definitive statement of its position, determining the rights and obligations of the parties," the "possibility of further proceedings in the agency" does not render the action less final. *Bell v. New Jersey*, 461 U.S. 773, 779-80 (1983).

### 2. The Court has equitable authority to review Minnesota's constitutional and ultra vires claims (Counts 1-3 and 5).

Federal defendants claim that Minnesota's constitutional and ultra vires claims are in fact statutory claims that are foreclosed by the Supreme Court's decisions in *Dalton v. Specter*, 511 U.S. 462 (1994) and *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) (*NRC*). ECF 62 at 13-16. But federal defendants misconstrue Minnesota's claims. Minnesota's constitutional and ultra vires claims are premised on the theory that federal defendants lack constitutional and statutory authority to amend Title IX by Executive Order—not that they failed to follow Title IX's procedural requirements or otherwise exceeded their Title IX authority. Courts have long recognized the ability of plaintiffs to bring these sorts of claims against the Executive.

The Supreme Court has held that plaintiffs may seek equitable relief for constitutional violations even without an express statutory cause of action. *Free Enter. Fund. v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 & n.22 (D.C. Cir. 2006). Indeed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to

England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Courts have allowed plaintiffs to bring a non-statutory cause of action against the Executive where plaintiffs have alleged that the President and his subordinate officers acted unconstitutionally or beyond their statutory powers. *See, e.g.*, *Murphy Co. v. Biden*, 65 F.4th 1122, 1128-30 (9th Cir. 2023); *League of United Latin Am. Citizens (LULAC) v. Exec. Off. of President*, No. CV 25-0946 (CKK), 2025 WL 3042704, at \*24 (D.D.C. Oct. 31, 2025) (collecting cases).

Here, the Court has jurisdiction over Minnesota's constitutional and ultra vires claims, which allege that federal defendants acted unconstitutionally and without authority. Counts 1 and 2 allege that the President sought to amend Title IX by Executive Order and directed federal defendants to terminate funding from states like Minnesota that do not categorically prohibit transgender athletes from playing on sports teams or using facilities that align with their gender identity. Am. Compl. ¶¶ 93-110. Because no constitutional or statutory provision allows the President to amend Title IX by Executive Order, federal defendants have acted without authority, thus usurping Congress's exclusive power to legislate and Congress's power of the purse. *Id.* Counts 3 and 5 allege that federal defendants are unconstitutionally pressuring Minnesota to adopt the President's policy preferences or risk devastating funding cuts in violation of the Spending Clause and Tenth Amendment. Am. Compl. ¶¶ 111-18, 127-33. Minnesota's claims fall within a "long-established line of precedent establishing that parties can seek to enjoin federal officials in their official capacity from exceeding the scope of their authority or acting unconstitutionally." *Strickland v. United States*, 32 F.4th 311, 363, 365 (4th Cir. 2022).

Federal defendants assert that the Supreme Court's decision in *Dalton* forecloses Minnesota's ability to bring these claims. ECF 62 at 15-16. But *Dalton* stands for the limited proposition that where the President wields statutory authority, but arguably acts in excess of it, that statutory violation is not "ipso facto" a constitutional violation. *Id.* at 472-74. In *Dalton*, the Court rejected a claim that the President's closure of a naval base was "in excess of his statutory authority" because he had violated certain procedural requirements in the governing statute. *Id.* at 471. The Supreme Court held that this claim was really a statutory claim and not the kind of constitutional, separation-of-powers claim for which there is an equitable cause of action. *Id.* at 476-77.

*Dalton* made clear, however, that certain executive actions do give rise to actionable constitutional claims, including when the President "act[s] in violation of the Constitution," *id.* at 474, or acts in the "*absence* of *any* statutory authority," *id.* at 473. The Court distinguished the exceeds-authority claim in *Dalton* from the claim in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the President seized steel mills without any statutory authority. *Dalton*, 511 U.S. at 473. Here, unlike *Dalton*, Minnesota has not alleged that federal defendants failed to follow the proper procedure under Title IX;[15] rather, Minnesota has alleged that federal defendants have acted without authority.[16]

---

[15] For this reason, *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) is also inapposite. There, the divided panel characterized the "dispute" as "fundamentally statutory because the alleged constitutional violation is predicated on the underlying alleged statutory violations." *Id.* at 15 & n.11. The plaintiffs alleged that the federal defendants had violated the procedures of various statutes. *See id.* at 9-11.

[16] The Gender Ideology Order claims to derive authority from "section 7301 of title 5." Am. Compl., Ex. A. "However, this statute simply provides that '[t]he President may (Footnote Continues on Following Page)

That makes this case like *Youngstown*, the archetypal separation-of-powers case, and courts have construed *Dalton* to permit such claims.[17] *See, e.g.*, *Murphy Co.*, 65 F.4th at 1128-30; *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2026 WL 145874, at *8-10 (N.D. Cal. Jan. 20, 2026); *City of Chicago v. United States Dep't of Just.*, No. 25 C 13863, 2026 WL 114294, at *5 (N.D. Ill. Jan. 15, 2026); *LULAC*, 2025 WL 3042704, at *24-25.

In mischaracterizing Minnesota's claims as statutory ones, federal defendants also mistakenly assert that Minnesota must meet the strict requirements of statutory ultra vires claims. *See, e.g.*, *LULAC*, 2025 WL 3042704, at *24 ("[C]ontrolling precedent affords broader latitude to a plaintiff seeking equitable relief from a *constitutional* violation, rather than a statutory one."). Federal defendants rely heavily on the Supreme Court's decision in *NRC* but *NRC* is distinguishable. There, the Court rejected plaintiff's ultra vires claim because: (1) plaintiffs attempted to "dress up a typical statutory-authority argument as an ultra vires claim"; and (2) plaintiffs had a guaranteed "alternative path to judicial review." *NRC*, 605 U.S. at 682. Here, as discussed, Minnesota is not dressing up a "typical statutory-

---

prescribe regulations for the conduct of employees in the executive branch,' and generally bestows on the President the 'discretion-laden power' to regulate the federal workplace." *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 557 n.20 (D. Md. 2025) (internal citations omitted). This provision "cannot provide the basis for the sweeping directive" to amend the requirements of Title IX and "withhold Congressionally allocated funds" to the states. *Id.*

[17]    *Dalton* says nothing about Tenth Amendment and Spending Clause claims and federal defendants cite no case where courts have extended *Dalton* to preclude such claims.

authority argument" as an ultra vires claim.[18] *Supra* 26; *Washington v. Trump*, No. 2:25-CV-00602-JHC, 2026 WL 73866, at *22 (W.D. Wash. Jan. 9, 2026). And Defendants also cite no "alternative path to judicial review" that would allow Minnesota to challenge the President's Executive Orders because parties cannot sue the President under the APA. ECF 62 at 14-15; *see Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). It thus cannot be said that the APA, nor any other statutory review scheme, provides Plaintiffs with "a meaningful and adequate opportunity" for judicial review of the challenged Executive Orders. *Washington v. Trump*, 2026 WL 73866, at *22; *California v. Trump*, 805 F. Supp. 3d 387, 404 (D. Mass. 2025).

For these reasons, Minnesota has nonstatutory, equitable causes of action for its constitutional and ultra vires claims.

### 3. Minnesota's requests for declaratory relief are appropriate.

Federal defendants assert that Minnesota cannot bring a standalone Declaratory Judgement Act claim (Count 6). ECF 62 at 16. But as described above, Minnesota has asserted five other valid constitutional and APA claims, which each provide an "independent, underlying cause of action." *Eggenberger v. W. Albany Twp.*,

---

[18]    Even if the Court agrees with federal defendants' characterization of Minnesota's claims, Minnesota has met the requirements for statutory ultra vires review. Minnesota has alleged that federal defendants are acting "contrary to a *specific prohibition*"—Title IX's prohibition against sex discrimination—by requiring recipients of federal funds to categorically ban all transgender women and girls from participating in sports and using restrooms and locker rooms that align with their gender identity. *NRC*, 605 U.S. at 681 (quoting *Railway Clerks v. Association for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)); *see PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 567-70 (D. Md. 2025) (finding that the challenged Executive Orders were "ultra vires in that they conflict with statutory law").

90 F. Supp. 3d 860, 863 (D. Minn. 2015), aff'd, 820 F.3d 938 (8th Cir. 2016) (quoting *Alliance for Metro. Stability v. Metro. Council*, 671 N.W.2d 905, 916 (Minn. App. 2003). And parties may bring a standalone claim pursuant to the Declaratory Judgment Act so long as the claim clears the case-or-controversy bar established in Article III. *See* S*choenthal v. Raoul*, 150 F.4th 889, 901 (7th Cir. 2025) ("Nearly a century of case law establishes that Plaintiffs can bring a standalone claim pursuant to the procedures in the Declaratory Judgment Act when the claim satisfies Article III's case-or-controversy requirement.") (internal citation omitted).

The federal defendants next argue that Minnesota cannot obtain any direct relief against the President for issuing the Executive Orders because courts have no authority to second guess his discretionary acts. ECF 62 at 21. But federal courts have long granted declaratory relief against Presidents. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (affirming declaratory judgment against President Clinton); *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (granting declaratory relief against President Nixon); *Slaughter v. Trump*, 791 F. Supp. 3d 1, 24 (D.D.C. 2025). Moreover, at this early stage of the case, courts have often denied similar motions to dismiss requests for declaratory relief against Presidents. *See, e.g.*, *Kingdom v. Trump*, No. 1:25-CV-691-RCL, 2025 WL 1568238, at *16 (D.D.C. June 3, 2025) (declining to dismiss President Trump); *Missouri v. Biden*, 662 F. Supp. 3d 626, 680–83 (W.D. La. 2023) (denying motion to dismiss request for declaratory relief against President Biden).

The Court should do the same here. Minnesota seeks declaratory relief against President Trump, and declaratory and injunctive relief against the other federal defendants.

Because this Court has authority to grant declaratory relief against President Trump, it should deny the federal defendants' motion to dismiss the President as a defendant.

## II.    MINNESOTA STATES PLAUSIBLE TITLE IX, CONSTITUTIONAL, AND APA CLAIMS.

The federal defendants devote most of their merits briefing to Minnesota's Title IX claim, arguing that all of Minnesota's claims "essentially center on whether Title IX's prohibition of discrimination 'on the basis of sex' includes discrimination based on gender identity." ECF 62 at 22. The federal defendants overstate the argument: Minnesota has stated plausible constitutional and APA violations even if Title IX refers to "biological sex." Still, Minnesota starts with its Title IX claim because that is where the federal defendants focus their briefing, and because if Minnesota has stated a plausible Title IX claim, the federal defendants appear to concede that Minnesota's remaining claims are plausible too.

But even if the Court adopts federal defendants' definition of sex, Minnesota has plausibly alleged that Title IX does not require funding recipients to categorically bar transgender girls from playing on sports teams that align with their gender identity. DOJ *itself* took the position for years that "the best reading of Title IX's prohibition on discrimination 'on the basis of sex' is that it includes discrimination on the basis of gender identity." 2021 DOJ guidance, *supra* n.5, at 2. The political winds have shifted, and federal defendants—at the President's direction—have reversed course. But Minnesota's interpretation of Title IX is not only plausible—it is correct.

A.    **Minnesota Has Stated a Plausible Title IX Claim (Count 2).**

1.    **Title IX and the athletic regulations do not require the exclusion of transgender girls from girls' sports or facilities.**

Title IX prohibits discrimination "on the basis of sex" in education programs that receive federal financial assistance. 20 U.S.C. § 1681. The federal defendants argue that Minnesota has not stated a plausible Title IX claim because the statute cannot encompass discrimination based on gender identity. ECF 62 at 22-27. But federal defendants concede that Title IX does not define "sex." ECF 62 at 22.

Because sex is such a complex term, the better reading of Title IX is that the term "sex" is not limited to "biological sex," and it is broad enough to encompass "gender identity." *A.C. by M.C. v. Metro Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023), cert. denied, 144 S. Ct. 683 (2024); *see also id.* at 775 (Easterbrook, J., concurring) ("Sex is such a complex subject that any invocation of plain meaning is apt to misfire."). Minnesota's textual analysis is, at a minimum, plausible.[19]

Still, even if Title IX's use of the term "sex" refers only to biological sex, the Court should still deny federal defendants' motion to dismiss because Title IX's prohibition against sex discrimination includes gender-identity discrimination. In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court concluded that sex discrimination under Title VII includes gender-identity discrimination. *Id.* at 651-52. In 2021, DOJ issued guidance that Title IX similarly prohibits discrimination on the basis of gender identity

---

[19] Minnesota incorporates its previous arguments that Title IX's prohibition on discrimination on the basis of sex encompasses discrimination based on gender identity. *See* ECF 27 at 27-32.

after analyzing "the text of Title IX, Supreme Court caselaw, and developing jurisprudence." 2021 DOJ guidance, *supra* n.5, at 2. The Eighth Circuit too has acknowledged that interpretations of Title VII "properly inform[] our examination of Title IX," and has noted that the phrase "because of sex" in Title VII and "on the basis of sex" in Title IX are "treated interchangeably." *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011).

Additionally, there is nothing in the regulations or caselaw that supports the federal defendants' extreme Title IX interpretation: Title IX *requires* schools to exclude all transgender girls from girls' sports.[20] *FAU*, 805 F. Supp. 3d at 1008 (explaining that "the statute does not require a funding recipient to operate or sponsor separate athletic teams based on sex"). Thus, Title IX does not prohibit Minnesota or other states from adopting trans-inclusive policies.

Federal defendants' theory—that Minnesota is violating Title IX because it allows transgender women and girls to participate in sports or use restrooms or locker rooms that align with their gender identity—is at odds with the text of the Title IX athletics regulations.[21] The regulations "make[] mixed-sex athletic teams the default." *Id.* at 1012;

---

[20] The United States has taken no position on that question before the Supreme Court, and, in fact, asked the Court to "make clear that its opinion in [*B.P.J.* and *Hecox*] does not address that question." Br. of Amicus Curiae United States at 21 n.2, *West Virginia v. B.P.J.* (No. 24-43) (Sept. 19, 2025), https://perma.cc/38CN-CDD6.

[21] Following Title IX's enactment, Congress passed the Javits amendment, directing DOE's predecessor to promulgate regulations on Title IX's application to athletics. Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). Federal defendants agree that these contemporaneous regulations "are strong evidence of Title IX's original public meaning." ECF 62 at 24-25.

34 C.F.R. § 106.41(a) ("[N]o recipient shall provide any such athletics separately on such basis."). The regulations do *allow* recipients to operate sex separated teams under certain conditions. For example, schools "*may* operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b) (emphasis added). But the regulation does not "require a recipient . . . to maintain sex-separation across every team or sport." *FAU*, 805 F. Supp. 3d at 1008 (observing that a school could sponsor "sex-separated track-and-field teams" and a "mixed-sex golf team").

The regulations simply do not support federal defendants' extreme position that Title IX mandates sex-separated teams and requires discrimination against transgender athletes. Indeed, the regulations require sex-separated teams to provide try-outs for members of the opposite sex but only in certain circumstances. § 106.41(b). And subsection (c) requires schools to provide "equal athletic opportunity," but does not require schools to use sex-separated teams as the exclusive means of doing so. § 106.41(c). At most, the regulations show that Title IX allows schools—in defined circumstances—to divide sports into boys' teams and girls' teams, or to provide certain kinds of sex-separated facilities. Thus, the regulations do not mandate sex-separated teams at all, and in the circumstances in which sex-separated teams are permitted, the regulations give schools the flexibility to allow students to access educational benefits (like sports and restrooms) consistent with their gender identity. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020).

Minnesota has taken advantage of this flexibility by adopting an inclusive policy towards transgender athletes. *See Tennessee*, 104 F.4th at 610-11 (acknowledging that Title

34

IX allows schools to "separate programs and facilities by gender identity"); *Barr*, 949 F.3d at 1217, 1227 (same); *Williams v. Sch. Dist. Of Bethlehem*, 998 F.2d 168, 171 (3d Cir. 1993) (stating that the Title IX framework allows "flexibility to the [institution] to organize its athletic program as it wishes, so long as the goal of equal athletic opportunity is met"). Minnesota's inclusive policy is not a per se violation of Title IX as federal defendants contend. *See FAU*, 805 F. Supp. 3d at 1012 (explaining that Title IX's athletic regulations "cannot reasonably be understood to say that a mixed-sex team or mixed-sex league per se denies effective accommodation or equal treatment"). Rather, it ensures both effective accommodation and equal treatment for all athletes, including transgender girls.

### 2. Federal defendants cannot rely on the Executive Orders as a basis for Title IX enforcement.

Count 2 alleges that federal defendants do not have the authority to override Title IX and force Minnesota to categorically ban all transgender women and girls from participating in sports and using facilities that align with their gender identity. Am. Compl. ¶¶ 105-110. As discussed above, the policies set forth in the Executive Orders are nowhere to be found in Title IX or its regulations. And the Executive cannot amend Title IX by Executive Order or by simply stating that federal funding recipients must comply with Title IX and these Orders. *Supra* 6-9, 12-16; *Infra* 36-38; *see, e.g.*, *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

For these reasons, the Amended Complaint has plausibly alleged that federal defendants lack authority under Title IX to demand that Minnesota either rescind its policy or lose federal funding. Minnesota's Title IX claim can proceed.

### B.    Minnesota Has Stated a Plausible Separation of Powers Claim (Count 1).

The President's power to issue an executive order must derive "from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Minnesota plausibly alleges that the Executive Orders, plus the agency defendants' actions, violate core separation-of-powers principles because they exceed the bounds of Article II and infringe on Congress's authority under Article I.

The separation-of-powers doctrine is a central tenet of our Constitution and is "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020). Article I of the Constitution allows only Congress to make law. U.S. Const. art. I, § 1. In exercising its Article I powers, Congress controls the public purse. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). This power is one of "Congress's most important authorities," *Biden v. Nebraska*, 600 U.S. 477, 505 (2023), because "Congress's power to spend is directly linked to its power to legislate." *City & Cnty. of San Francisco*, 897 F.3d at 1231.

The President has no such power over federal spending. *Clinton*, 524 U.S. at 438. The President thus lacks the authority to "thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1232. Even if the President has policy objections to Congressional spending, "'the President does not have unilateral authority to refuse to spend [] funds.'" *Id.* (quoting *In re Aiken Cnty.*,

725 F.3d 255, 261 n.1 (D.C. Cir. 2013)). Instead, the President has a duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, a duty that "necessarily extends to appropriations." *City & Cnty. of San Francisco*, 897 F.3d at 1234. The President's failure to spend Congressionally-appropriated funds—or to impose new conditions on those funds—is an "abdication of the President's constitutional role." *Id.*

The Amended Complaint plausibly alleges that the President has abdicated his constitutional role and violated separation-of-powers principles. The Gender Ideology Order relies on "the authority vested in . . . [the] President by the Constitution" for the authority to terminate federal grants that are "used to promote gender ideology." Am. Compl. Ex. A at 1-2. The same is true of the Sports Ban Order, which instructs federal agencies to rescind funding to educational programs that do not ban all transgender girls from competing on girls' sports teams. Am. Compl. Ex. B at 1. But the President has no constitutional authority to place such conditions on federal funds. Am. Compl. ¶¶ 93-104. Likewise, if the President is relying on Title IX to justify funding rescissions, the Amended Complaint alleges that Title IX does *not* condition federal funds on banning transgender girls from girls' sports. *Id.* ¶ 97. The Amended Complaint thus plausibly alleges that the President lacks authority to impose this funding condition and federal defendants' attempt to do so infringes on Congress's spending authority under Article I.

The federal defendants' argument to the contrary is unpersuasive. The federal defendants rely on *Dalton*, 511 U.S. at 473-74, claiming that "[t]he purported misapplication of [Title IX] does not establish a separate constitutional claim." ECF 62 at 28. But as discussed, *Dalton* does not apply here. *Supra* 26-28. Title IX does not authorize

the President to terminate federal grants for "promoting gender ideology." Am. Compl. ¶¶ 93-104. Nor does Title IX authorize the President to rescind federal funds from education programs unless they ban transgender girls from girls' sports. *Id.* The President is acting *without* statutory authority—and, in doing so, violating the separation of powers.

In near identical circumstances, federal courts nationwide have enjoined this President's Executive Orders—and the actions his subordinates have taken to implement those Orders—as separation-of-powers violations. *See, e.g.*, *PFLAG, Inc.*, 769 F. Supp. 3d at 432-41 (holding that the Gender Ideology Order and related Executive Order on healthcare likely violated the separation of powers); *Washington*, 768 F. Supp. 3d at 1261-63 (same); *City & Cnty. of San Francisco v. Trump*, No. 25-CV-013250-WHO, 2025 WL 1282637, at*27-29 (N.D. Cal. May 3, 2025) (same for Executive Orders imposing funding restrictions on so-called "sanctuary jurisdictions"). Minnesota has thus stated a plausible claim that the President's attempt to condition Title IX funds on gender-identity discrimination violates the separation of powers.

### C. Minnesota Has Stated a Plausible APA Claim (Count 4).

Minnesota has also plausibly alleged an APA claim. First, as earlier discussed, the federal agencies (DOJ, DOE, and HHS) have clearly articulated their positions that Title IX *requires* discrimination against transgender athletes, and that is final agency action. *Supra* 22-25.

Second, there is nothing in the text or implementing regulations that support federal agencies' extreme interpretation of Title IX as *requiring* discrimination against transgender girls. *See supra* § II.A.1. The federal agencies have previously interpreted Title IX in the

38

exact opposite manner, as *prohibiting* discrimination based on gender identity. *Supra* 5-6. Minnesota has plausibly alleged that this change in position—without any explanation or formal rulemaking—violates the APA. Am. Compl. ¶¶ 119-26.

First, agencies must articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). They must not "entirely fail[] to consider an important aspect of the problem." *Id.* at 43. And, when changing positions, agencies also "must show that there are good reasons for the new policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and consider any "serious reliance interests" engendered by the status quo, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

The Letters and Findings have not offered any reasoned explanation as to why the Executive Orders should govern the interpretation of Title IX.[22] Am. Compl. Ex. F. at 2-3; Ex. J. at 9-10. And the federal agencies cannot simply adopt the Gender Ideology Order's denial that transgender and intersex individuals exist, contrary to established medical and scientific consensus. *Compare* 90 Fed. Reg. at 8615 (claiming that transgender identity is "false") *with Hecox v. Little*, 104 F. 4th 1061, 1068-69, 1076-77 & n.9 (9th Cir. 2024) (discussing medically recognized existence of transgender and intersex individuals). Additionally, the Letters and Findings do not even acknowledge the change in policy—let alone explain the reasons for the change—and do not consider the "serious reliance interests" of the states with inclusive policies or students who have been allowed to play

---

[22] The Gender Ideology Order likewise offers no empirical support for its positions. 90 Fed. Reg. at 8615.

on school sports teams that align with their gender identity for more than a decade. Because the agencies failed to provide a reasoned explanation for this policy change, they cannot now enforce Title IX on the basis of these Executive Orders.

Second, the agencies rely on the Sports Ban Order to conclude that allowing transgender girls to participate in women's sports denies women and girls the equal opportunity to participate in competitive sports under Title IX. *See, e.g.*, Am. Compl. Ex. E at 2; Ex. F at 2-3; Ex. J at 15, 18. But as discussed above, Title IX's athletic regulations neither mandate sex-separated teams nor require discrimination against transgender athletes. [23] *Supra* 32-35. And DOE also has not undertaken notice-and-comment rulemaking to incorporate the Executive Orders into Title IX's implementing regulations. Thus, by adopting the Orders as a basis for Title IX enforcement, the federal agencies are effectively establishing a new rule, with corresponding obligations for funding recipients. An agency, however, cannot promulgate a rule with the "force and effect of law" without following APA's notice-and-comment requirements. *E.g. Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96-97 (2015). Accordingly, the federal agencies' conclusion—that Minnesota's policy is a per se violation of Title IX—is contrary to law.

### D.    Minnesota Has Stated a Plausible Spending Clause Claim (Count 5).

Rather than engage with Minnesota's Spending Clause claim, the federal defendants argue that this is "essentially just a reiteration of Plaintiff's Title IX Claim" and that it fails

---

[23]    In withdrawing its 2023 notice of proposed rulemaking, DOE reiterated in December 2024 that it "will continue to apply the longstanding legal standards reflected in the athletics regulations." 89 Fed. Reg. at 104937.

for the same (wrong) reasons. ECF 62 at 31. Not so. Minnesota plausibly alleges that the Executive Orders, which direct federal defendants to impose new Title IX conditions on Minnesota's federal education funding, and the actions taken by federal defendants to implement these conditions violate the Spending Clause. Am. Compl. ¶¶ 127-33.

Congress enacted Title IX under its Spending Clause power. U.S. Const. art. I, § 8 cl. 1; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005). Spending Clause legislation is "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). But a state cannot be held to conditions that it cannot ascertain or of which it had no notice. *Id.* In addition, federally imposed conditions on funds must relate to "the federal interest in particular national projects or programs," must not induce the States to engage in unconstitutional activity, and must not be so coercive as to become compulsory. *South Dakota v. Dole*, 483 U.S. 203, 207-211 (1987). These Spending Clause limitations apply equally to the Executive. *See, e.g.*, *Santa Clara v. Noem*, No. 25-CV-08330-WHO, 2025 WL 3251660, at *34 (N.D. Cal. Nov. 21, 2025); *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 322–23 (D.R.I. 2025).

Federal defendants seek to impose and enforce retroactive conditions on federal funding to schools. And these conditions exceed federal authority under the Spending Clause. For one, neither the text of Title IX nor the implementing regulations give clear notice to state officials that, by accepting federal education funding, they are obligated to categorically prohibit transgender girls and women from playing school sports. *See supra* 32-35; *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296

(2006) (evaluating Spending Clause statute from perspective of a state official deciding to accept federal funds and the obligations that come therewith). There is also no consensus in the caselaw that could either provide clear notice or prove that the text is capable of only one plausible reading. Indeed, courts around the country have reached a variety of conclusions regarding Title IX's application to transgender girls' and women's participation in girls' and women's sports, though no court has held that Title IX requires exclusion of transgender girls and women. *See, e.g., B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 565 (4th Cir. 2024), *cert. granted*, 146 S. Ct. 57 (2025) (Title IX requires inclusion of transgender athletes) [24]; *Tirrell v. Edelblut*, 748 F. Supp. 3d 19, 45 (D.N.H. 2024) (same); *Tennessee*, 104 F.4th at 610 (Title IX permits but does not require exclusion of transgender girls and women). And the flip-flopping regulatory guidance as presidential administrations change underscores the lack of clear notice. *Supra* 5-6. In fact, the Ninth Circuit recently held that schools that *exclude* transgender girls from girls' sports did not have clear notice about Title IX's requirements. *Roe v. Critchfield*, 137 F.4th 912, 928-31 (9th Cir. 2025).

Additionally, because Title IX applies to all federal educational funds, the sheer amount of funding that is being threatened based on the sudden imposition of new conditions on that funding means that states are not merely pressured to comply but

---

[24] Reading Title IX to require states to discriminate against transgender girls and women who want to play school sports also violates the Spending Clause because such a rule is unrelated to the federal interest in preventing sex-based discrimination and, in fact, requires states to violate those girls' and womens' constitutional rights. *See, e.g., B.P.J.*, 98 F.4th at 557, 562, 564 (finding that excluding at least some transgender girls from girls' sports may violate the Equal Protection Clause and Title IX).

compelled. *Cf. Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius,* 567 U.S. 519, 581, (2012) ("In this case, the financial 'inducement' Congress has chosen is much more than 'relatively mild encouragement'—it is a gun to the head."). Thus, Minnesota has stated a plausible Spending Clause claim.

### E.    Minnesota Has Stated a Plausible Tenth Amendment Claim (Count 3).

This violation of the Spending Clause simultaneously violates Minnesota's reserved sovereign powers under the Tenth Amendment. "Respecting [the] limitation" that a "State voluntarily and knowingly accepts" conditions on federal funds is "critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB*, 567 U.S. at 577 (quoting *Pennhurst*, 451 U.S. at 17). The Tenth Amendment protects states from the federal government encroaching on their "residuary and inviolable sovereignty." *Printz v. United States*, 521 U.S. 898, 919 (1997) (internal quotation omitted). And it prevents the federal government from bullying states into adopting federal policy as their own. *See NFIB*, 567 U.S. at 578.

Minnesota plausibly alleges that federal defendants are pressuring Minnesota to adopt the President's favored policy or risk devastating funding cuts. Am. Compl. ¶¶ 115-16. The DOJ Letters issued a plain threat: change your longstanding interpretation of Minnesota's civil rights law to match the novel (and incorrect) interpretation of Title IX in the Executive Orders or DOJ will terminate Minnesota's federal funds. *See id.* ¶¶ 59-64, Exs. E & F. DOE and HHS increased the pressure by initiating Title IX investigations into MDE, specifically noting the millions in federal funds from each agency that federal

defendants are threatening. *Id.* ¶¶ 73-76, Exs. H & I. They then issued their Findings, without giving MDE an opportunity to provide information or participate in the investigation and referred the matter to DOJ for enforcement. *Id.* ¶¶ 71-72, Ex. J; Bies Decl. Ex. D, F & G. That is not mere coercion; it is extortion.

It is of no relevance that Title IX itself is a valid, non-coercive exercise of the Congress's spending clause authority, as federal defendants argue, because "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. Federal defendants' actions are all designed to push Minnesota to adopt a federal policy that directly conflicts with Minnesota law. Thus, Minnesota plausibly alleges that these coercive tactics violate the Tenth Amendment. *See City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2026 WL 145874, at *14 (N.D. Cal. Jan. 20, 2026).

### F. Minnesota Has Stated a Plausible Declaratory Judgment Claim (Count 6).

The Declaratory Judgment Act authorizes courts to "declare the rights and other legal relations of any interested party seeking such declaration" so long as there is "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). Accordingly, the question is not whether there is some other cause of action underlying Minnesota's request or declaratory relief (and here Minnesota has pleaded five plausible causes of action), but "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech,*

*Inc.*, 549 U.S. 118, 127 (2007) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). In other words, the question is whether the case is justiciable. *U.S. Water Servs., Inc. v. ChemTreat, Inc.*, 794 F.3d 966, 971 (8th Cir. 2015) ("The phrase 'case of actual controversy' in § 2201 'refers to the type of Cases and Controversies that are justiciable under Article III.'" (internal citation omitted)).

As explained above, this case is justiciable because there is a substantial controversy over the meaning of Title IX and the resolution of that controversy may impact up to $2.9 billion in funding. Am. Compl. ¶¶ 76, 136-40. Indeed, "the very purpose of the Declaratory Judgment Act" is to ameliorate the coercive dilemma of whether to "abandon[] rights or risk[] prosecution." *MedImmune*, 549 U.S. at 128-29 (cleaned up). Minnesota, therefore, need not decide between succumbing to federal pressure to change its laws or losing its federal education funds before asking this Court to issue a declaration regarding the interplay between Title IX and the MHRA.

## CONCLUSION

The federal defendants' motion to dismiss should be denied.

Dated: February 26, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ **Katherine Bies**
LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
ANNA VEIT-CARTER (#0392518)
MAURA ALLEN (#0504790)

45

KATHERINE BIES (#0401675)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
anna.veit-carter@ag.state.mn.us
maura.allen@ag.state.mn.us
katherinebies@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

|#6281941-v3

46