# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **STATE OF MINNESOTA,** *by and through its Attorney General Keith Ellison*<br><br>Plaintiff,<br><br>v.<br><br>**DONALD J. TRUMP,** *in his official capacity as President of the United States;* **UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI** *in her official capacity as Attorney General of the United States;* **UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON**, *in her official capacity as Secretary of Education;* **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR.**, *in his official capacity as Secretary of Health and Human Services*<br><br>Defendants. | Court File No. 25-CV-1608 (ECT/DLM)<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

TABLE OF CONTENTS

I.  The Court Lacks Subject Matter Jurisdiction. ........................................................... 3

    A.  Plaintiff Lacks an Authorized Cause of Action. ........................................... 3

        1. Plaintiff lacks a cause of action for its APA claim. .................................... 3

        2. Plaintiff lacks a cause of action for its non-APA claims. .......................... 6

        3. The Declaratory Judgment Act authorizes a remedy, not an independent cause of action. ...................................................................................... 8

    B.  Plaintiff's Claims are not Constitutionally Ripe for Review. ...................... 9

II. Plaintiff Fails To State A Plausible Claim. .............................................................. 11

    A.  Biological Differences Justify Sex-Separated Athletics under Title IX ... 12

    B.  A Trans-Identifying Exception Breaks the Biological Justification ......... 14

CONCLUSION ................................................................................................................ 17

After two false starts, Plaintiff attempts yet again to recover by improperly trying to amend its First Amended Complaint ("Amended Complaint), ECF No. 53, with its Opposition to the Defendants' Motion to Dismiss, ECF No. 66.  This Court should reject this improper and prejudicial attempt to amend.

Regardless, the Amended Complaint itself, and even as amended by the Opposition, still should be dismissed.  Plaintiff still lacks an authorized cause of action and standing, and its claims lack ripeness.  This Court accordingly lacks jurisdiction under Rule 12(b)(1).

Even if this Court had jurisdiction, Plaintiff's claims all depend on its mistaken belief that Title IX's prohibition on sex discrimination extends to "gender identity," and that Title IX allows Minnesota to intentionally separate athletics by sex and then create an exception for trans-identifying males that ignores biology and discriminates against females.  This Court accordingly should dismiss Plaintiff's claims under Rule 12(b)(6).

I. **THE COURT LACKS SUBJECT MATTER JURISDICTION.**

   A. **Plaintiff Lacks an Authorized Cause of Action.**

      1. *Plaintiff lacks a cause of action for its APA claim.*

Claim 4 alleges the Agency Letters violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq*.  The APA authorizes a cause of action to challenge "final agency action."  5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 175 (1997).  Such action must:  (1) "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "be one by which rights or

obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (citations omitted).

The DOJ has not issued findings. Plaintiff thus focuses (at 22-25) on the DOE/HHS Letter, claiming it is the "'consummation' of the federal government's decisionmaking process." This ignores Title IX's multi-step process that later requires a full APA hearing to determine rights and potential consequences before taking any action on federal funding. 20 U.S.C. § 1682. If the Letter was final action with nothing left to decide, this APA hearing would be meaningless. *See* US. Br. at 10-13.

Plaintiff invokes (at 24) *Bell v New Jersey*, 461 U.S. 773 (1983), where the "possibility of further proceedings in the agency to determine the method of repayment" was a ministerial task after an order. *Id.* at 777-79. Unlike the Letter here, *Bell* concerned "orders" of an "Appeal Board," which the Department's "Secretary declined to review" such that, "after a period for comment, the orders became final." *Id.* at 777-79.

Plaintiff's reliance (at 23-24) on *Sackett v. E.P.A.*, 566 U.S. 120 (2012) and *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 998 (8th Cir. 2015), is similarly misplaced. *Sackett* dealt with an EPA administrative "compliance order," which was final because it was not subject to further agency review. *Id.* at 127. And legal consequences flowed because violations of the order subjected the violator to increased penalties in a subsequent enforcement action. *Id.* at 126. Here there is further agency review in the full APA hearing and no increased penalties. Similarly, *Hawkes* involved an agency's "Jurisdictional Determination" where the agency had relayed it was a "final Corps permit decision," "which meant . . . administrative remedies were exhausted." 782 F.3d at 999.

4

As to legal consequences, Defendants cited multiple cases finding warning letters and attempts at voluntary compliance were not final agency action. Defs.' Br. 11-12, ECF No. 62. Plaintiff appears to concede this (at 24), and instead improperly shifts to cite events not alleged in, and occurring after, the Amended Complaint. Plaintiff relays (at 23-24) that "Minnesota faces an imminent enforcement action by DOJ seeking money damages" and Defendants "chose to forego that multi-step administrative process." This Court should ignore these assertions because Plaintiff cannot amend its complaint with factual allegations in its Opposition. *Morgan Distrib. Co. v. Unidynamic Corp.,* 868 F.2d 992, 995 (8th Cir. 1989).

Even if Plaintiff could amend, there is still no final agency action. The DOJ retains discretion as to whether to file suit. And the referral to DOJ does not foreclose DOE and HHS from still also pursuing enforcement through the multi-step APA funding termination process. Moreover, the referral does not impose any new legal obligations. Even an eventual suit would still not impose any new legal obligations; it would just enforce the obligations that Title IX already requires. More importantly, no legal consequences will flow from the filing of any suit. Rather, legal consequences will flow only if a court determines Minnesota is violating Title IX. *See, e.g., Folsom v. U.S. Army Corps of Eng'rs*, No. 4:17-CV-3143, 2018 WL 2049839, at *5-7 (D. Neb. Apr. 23, 2018); *Minnesota Sch. Bd. Ass'n Ins. Tr. v. EEOC*, 184 F. Supp. 2d 899, 909-10 (D. Minn. 2001) (finding EEOC's reasonable cause determination not final agency action because "any Court action . . . would be open to *de novo* consideration by the Federal Court, as the EEOC's findings are not binding").

### 2. *Plaintiff lacks a cause of action for its non-APA claims.*

Plaintiff lacks an authorized cause of action for its non-APA claims because it cannot meet the exceptional requirements necessary to invoke equity review of purported Title IX statutory violations, and *Dalton v. Specter*, 511 U.S. 462 (1994), prevents Plaintiff from recasting them as constitutional violations. Defs.' Br. at 13-16.

Plaintiff attempts (at 25) to recast all these Title IX statutory claims into claims that Defendants lack authority to "amend Title IX by Executive Order." This is absurd recasting. Plaintiff cannot literally mean "amend" the statute. Plaintiff really means "interpret" Title IX, which is a statutory claim regarding implementation rather than a constitutional or ultra vires claim.

Indeed, the Amended Complaint makes this "amend Title IX" assertion in passing only twice, Amend. Compl. ¶¶ 95 & 101, but makes repeated allegations regarding Defendants' "interpretation" of Title IX, *id.* ¶¶ 9 ("purporting to 'interpret' Title IX"), 75 ("interpret Title IX as requiring"), 77 ("interpretation of Title IX as requiring"), 100 ("interpretation of Title IX described President Trump's Executive Order"), 101 ("invoke an erroneous interpretation of Title IX"), 130 ("Defendants' interpretation").

Plaintiff's Opposition likewise shows its claims center on the interpretation (rather than amendment) of Title IX. Pl.'s Opp. at 4 ("Minnesota's claims that the Executive Orders interpreting Title IX"), 5 ("interpretation of Title IX"), 9 ("interpretation of Title IX or the Title IX regulations"); 10 ("interpretation of Title IX described in President Trump's Executive Order") 12 ("continued to vigorously enforce their interpretation of Title IX set forth in the Executive Orders") 14 ("interpretation of Title IX"), 15 & 19

6

("novel interpretation of Title IX"), 21 ("interpretation of Title IX conflicts with the MHRA"), 23 ("(unsupported) interpretation of Title IX"), ("Minnesota's interpretation of Title IX"), 33 ("extreme Title IX interpretation"), 38 ("extreme interpretation of Title IX"), 39 ("interpretation of Title IX"), 43 ("novel (and incorrect) interpretation of Title IX in the Executive Orders").[1]

Plaintiff's claims accordingly are not constitutional but statutory, alleging the Defendants' "interpretation of Title IX" is contrary to the statute. And *Dalton* prevents Plaintiff from reframing this purported statutory violation into claims of constitutional violations. 511 U.S. at 473-77; *see also Glob. Health Council v. Trump*, 153 F.4th 1, 15-17 (D.C. Cir. 2025).

Plaintiff attempts (at 27-28) to sidestep *Dalton* by claiming Defendants are acting without any statutory authority. Plaintiff invokes *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952), which *Dalton* correctly explains "involved [the] conceded *absence* of *any* statutory authority," 511 U.S. at 473. Here, even according to Plaintiff, Defendants are relying on an "interpretation of Title IX."

Because *Dalton* prevents the recasting, Plaintiff is left throwing the "Hail Mary pass" of a statutory ultra vires equity claim. *Nuclear Regul. Comm'n v. Texas,* 605 U.S. 665, 681-83 (2025). Plaintiff's disagreement with Defendants' interpretation does meet this exceedingly tough standard, which requires agency "action entirely 'in excess of its

---

[1] The DOE/HHS Letter also relays that the Executive Orders "reaffirm" (rather than amend) "the meaning of 'sex' in Title IX." DOE/HHS Letter at p. 9, ECF No. 53-10.

delegated powers and contrary to a *specific prohibition*'" in a statute. *Id.* at 680-81 (citation omitted). And even if the interpretation did, a statutory ultra vires equity claim is still unavailable here because the APA provides Plaintiff "a meaningful and adequate opportunity for judicial review" if final agency action ever occurs. *Id.* Plaintiff complains (at 29) that the APA does not allow review of Executive Orders, but the APA could provide meaningful review of final agency action implementing the Executive Orders. *See Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."); *accord Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).[2]

### 3. *The Declaratory Judgment Act authorizes a remedy, not an independent cause of action.*

"Claim 6" asserts a standalone claim solely pursuant to the "Declaratory Judgment Act." But this purported claim depends entirely on whether Plaintiff has some other viable cause of action, and thus falls with the rest of its claims.

Defendants cited multiple in-Circuit cases holding that the Declaratory Judgment Act does not authorize a standalone claim like Claim 6, *e.g.*, *Alera Grp. Agency, LLC v. Delta Dental of Minnesota*, No. CV 24-252 (PAM/DLM), 2024 WL 2091992, at *2 (D. Minn. May 9, 2024), and accordingly dismissing such claims because of the failure of

---

[2] Plaintiff cannot obtain relief directly against the President for issuing the Executive Orders. Defs.' Br. at 21-22; *see also Newdow v. Roberts*, 603 F.3d 1002, 1012-13 (D.C. Cir. 2010).

other claims. *e.g.*, *Howe v. Barr Eng'g Co.*, No. 17-CV-3019 (JNE/LIB), 2017 WL 7202130, at *7 (D. Minn. Dec. 6, 2017) (The Count "seeking declaratory relief survives only by the success and failure of Plaintiff's underlying ERISA fiduciary duties claim, and the Court will not evaluate its merits as an independent cause of action."). Defs.' Br. at 16-18. Plaintiff does not explain why these cases do not apply and cites no in-Circuit case to the contrary.

### B. Plaintiff's Claims are not Constitutionally Ripe for Review.

Plaintiff's asserted claims of speculative future injuries are not ripe and Plaintiff lacks standing. Defs.' Br. at 18-21. Plaintiff's purported injury, as alleged in the Amended Complaint, comes from potential future funding cuts. *See* Amend. Compl. ¶ 9.

Plaintiff's claims lack ripeness because DOE and HHS have made just initial findings, and the DOJ has not even made findings. Defendants have thus barely started down Title IX's lengthy multi-step administrative process to rescind any federal funding and Plaintiff's unripe claims depend on "contingent future events that may not occur as anticipated." *Trump v. New York*, 592 U.S. 125, 131 (2020) (citation omitted). The threatened injury of funding cuts is not "certainly impending" and thus not ripe. *See Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 958-59 (8th Cir. 2001). The Amended Complaint also fails to establish constitutional standing, which also requires a threatened injury be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Plaintiff tries to establish ripeness and standing (at 18-22) by improperly attempting to amend its Amended Complaint with its Opposition. The Opposition almost

9

completely pivots away from the Amended Complaint's potential funding injury to an injury from a potential lawsuit.  The Opposition focuses on events—namely the DOE/HHS impasse on attempted voluntary compliance and referral to DOJ for possible judicial enforcement—that appear nowhere in the Amended Complaint and that occurred after Plaintiff filed it.

This is highly improper and prejudicial.[3]  Plaintiff cannot amend its complaint with factual allegations in its Opposition to a motion to dismiss.  *Morgan Distrib. Co. v. Unidynamic Corp.,* 868 F.2d 992, 995 (8th Cir. 1989); *Madgett L., LLC v. Pravati Cap., LLC*, 706 F. Supp. 3d 831, 838 (D. Minn. 2023).  Moreover, standing and ripeness are assessed at the time a complaint is filed.  *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 892 (8th Cir. 2024); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 814 (8th Cir. 2006) ("Jurisdictional issues such as standing and ripeness are determined at the time the lawsuit was filed"); *Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir. 2000) ("[S]standing is based on the facts as they existed at the time the lawsuit was filed."); *accord Female Athletes United v. Ellison*, 805 F. Supp. 3d 977, 996-97 (D. Minn. 2025).

Even if somehow proper, Plaintiff's switch from funding cuts to a new injury from a lawsuit shows that **"contingent future events [did] not occur as [Plaintiff] anticipated"** and still may not.  *Trump*, 592 U.S. at 131.  Plus, Plaintiff cannot claim imminent injury from a lawsuit.  Minnesota would be in court, which this (premature) lawsuit shows is

---

[3] Defendants suffer prejudice from having to respond to Plaintiff's repeated amendments to its premature complaints.

exactly where Minnesota desperately wants to be. And the court, after the judicial process, would assess any remedial measures for any Title IX violations.[4]

This Court accordingly should dismiss Plaintiff's claims for lack subject matter jurisdiction.

## II. PLAINTIFF FAILS TO STATE A PLAUSIBLE CLAIM.

Even if this Court had subject matter jurisdiction, Plaintiff fails to state any claim as a matter of law under Rule 12(b)(6). All claims center and depend on whether Title IX's prohibition of discrimination "on the basis of sex" includes discrimination based on gender identity. *See, e.g.*, Amend. Compl. ¶¶ 107, 122. It does not, and all Plaintiffs' claims accordingly fail. Defs.' Br. at 22-27 & n.5; *see also* Defs' Reply Br. at 11-16, ECF No. 29.

Plaintiff's Opposition barely disputes this and shifts to arguing (at 33-35) that even if Title IX refers to "sex," and not "gender identity," Title IX does not require Minnesota to prevent trans-identifying males from participating in sports designated for females. This argument focuses on Title IX not requiring sex-separated sports. And the argument fails because, even assuming Title IX does not require any sex separated sports, Minnesota is already intentionally separating many sports by sex. Having intentionally

---

[4] Plaintiff misstates (at 19) that a suit would pursue "funding cuts." The United States would not seek to terminate funding, but typically does assert a breach of contract claim to recover past funding. *See, e.g.*, Compl., *United States v. Maine Dep't of Educ.*, No. 25cv173 (D. Me. Apr. 16, 2025), ECF No. 1. Plaintiff also points (at 16) to a DOE press release that noted a suit "could result in termination" federal funding; but that refers to potential termination if a Minnesota is defying an injunction to stop violating Title IX.

11

separated by sex, Plaintiff cannot then provide a special exception for trans-identifying males that harms females. That's sex discrimination.

### A. Biological Differences Justify Sex-Separated Athletics under Title IX

Title IX permits separating competitive sports by sex only because the biological differences between the sexes naturally give males an unfair advantage. Because of this male advantage, the sexes are not similarly situated in athletics, and separating sports teams by sex is not "discrimination" prohibited under Title IX when such separation does not treat members of either sex worse than the other.

Title IX carries "the 'normal definition of discrimination,'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (citation omitted), which is treating individuals or groups that "are similarly situated differently without sufficient justification for the difference in treatment," *Ala. Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015) (citation omitted). Title IX thus prohibits practices that subject members of one sex to less favorable treatment than similarly situated members of the other sex. *Jackson*, 544 U.S. at 174.

Because the two sexes are usually similarly situated when it comes to educational programs, Title IX usually prohibits sex separation. For example, the statute prohibits separate male and female math classes because biological sex is irrelevant. Biological sex, however, is highly relevant to athletics. Separating sports by sex is not "discrimination" prohibited by Title IX because it treats similarly situated individuals equally by distinguishing the sexes based on relevant biological differences.

Supreme Court decisions have repeatedly confirmed that considering sex is not always discriminatory because the genuine biological differences between the sexes sometimes make them dissimilarly situated. *E.g.*, *United States v. Skrmetti*, 145 S. Ct. 1816, 1828 (2025); *see also id.* at 1878-79 (Sotomayor, J., dissenting) ("No one disputes that . . . there are 'biological differences between men and women'" and that "such physical differences" mean "sex is not altogether a proscribed classification." (citation omitted)). Based on these inherent differences, sex can "represent[] a legitimate, accurate proxy" to pursue permissible legislative ends, *Craig v. Boren*, 429 U.S. 190, 204 (1976), such as "provid[ing] for the special problems of women," *Weinberger v. Wiesenfeld*, 420 U.S. 636, 653 (1975); *see also United States v. Virginia*, 518 U.S. 515, 533-34 (1996) ("*VMI*") (Sex-based classifications may be used to compensate women for particular disabilities, promote equal opportunity, and "advance full development of the talent and capacities of our Nation's people." (citations omitted)).

More importantly, the Supreme Court has particularly recognized the inherent physical differences between the sexes in physical fitness and athletics. In *VMI*, the Court recognized an inherent male advantage when it found that admitting women to a previously all-male military academy "would undoubtedly require" that institution "to adjust aspects of the physical training programs." 518 U.S. at 550 n.19; *accord Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (finding FBI did not violate Title VII when using different physical fitness standards for agent candidates based on sex because "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs."). And lower courts have recognized for decades that "the distinct

13

differences in physical characteristics and capabilities between the sexes" permit sex-separated athletics under federal law. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement."), *abrogated on other grounds by Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 190 F.3d 705, 706 (6th Cir. 1999); *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) (finding "no question" that sex-separated athletics permissibly accommodate "real differences between the sexes"). And the long-standing Title IX regulation regarding athletics also specifically uses biology to justify separating sports that involve "competitive skill" or "contact." 34 C.F.R. § 106.41(b).[5]

Because males have an unfair physical advantage separating sports by sex is not "discrimination" under Title IX when the separation does not treat either sex worse than the other. When the separation *does* treat one sex worse, the separation is discriminatory.

### B. A Trans-Identifying Exception Breaks the Biological Justification

Minnesota violates Title IX because it intentionally separates some sports by sex, and then breaks the underlying biological justification for that sex-separation by providing an exception for trans-identifying males that harms females.

---

[5] That biological differences justify sex-separation highlights another flaw in Minnesota's urging that Title IX encompasses "gender identity." If "sex" means "gender identity" then Minnesota has no non-discriminatory basis for separating sports at all.

The Minnesota statute authorizes educational programs to intentionally separate school athletics by "sex," not gender identity. Minn. Stat. § 121A.04; *see also* Minn. R. 3535.3200. The Minnesota Human Rights Act then provides an exception that allows trans-identifying males to participate in athletics that are already intentionally designated for only females. *See* Minn. Stat. § 363A.02, subd. 1(a)(5) (using "sex" and "gender identity" as different terms); Minn. Stat. § 363A.13, subd. 1.

The State High School League ("MSHSL") that provides interscholastic athletics also intentionally separates some athletics based on sex. The state statute authorizing sex-separated scholastic athletics specifically mandates that the MSHSL "shall provide rules and regulations and conduct its activities so as to permit its [school] members to comply fully with" the statute. Minn. Stat. § 121A.04. The MSHSL Handbook also specifically recites the full text of that statute that authorizes sex-separated scholastic athletics, Minn. Stat. § 121A.04. *See* MSHSL 2024-25 Handbook App'x at p. 126.[6] The MSHSL, however, then carves out an exception for trans-identifying males that allows them to participate in athletics that are already intentionally designated for only females. MSHSL 2024-25 Handbook Bylaw 300.00 (at pp. 61-62).

Minnesota's exception for trans-identifying males treats females worse than males. It violates both the underlying justification for separating sports and Title IX's overriding command that the sex separation in athletics cannot disadvantage either sex. Contrary to

---

[6] https://www.mshsl.org/mshsl-handbook-governance-documents.

Title IX, Minnesota jettisons biology as its justification for separation and causes an imbalanced, unfair disadvantage to female athletes.

As discussed above, the physical advantages of males make the sexes dissimilarly situated in athletics and provides the only justification for why Title IX does not prohibit separation as discrimination. Minnesota breaks this justification. Title IX prohibits allowing some male athletes to compete on female teams because that directly undermines the justification for separating the sports in the first place. Sex-separated athletics are not ordinarily discriminatory under Title IX, but that is because such classification is permissibly accounting for biological differences between women and men to avoid subjecting women to a competitive disadvantage. When Minnesota chooses to allow some male athletes to compete on female teams—thereby subjecting females to an unfair competitive disadvantage—it severely undermines its justification for intentionally separating the teams by sex at all. Since Minnesota's exception disregards the biological differences, it is now intentionally "discriminating" by separating the sexes without any valid basis—and at the same time disadvantaging one of the sexes. Having thrown out the biological justification, Minnesota's policy is akin to separated math classes where there are no relevant biological differences between the sexes.

That the males Minnesota favors happen to be trans-identifying is irrelevant and cannot override that biology justifies separation under Title IX, and that the separation cannot disadvantage either of the sexes. Regardless of whether athletes *identify* with the opposite sex, they possess the *biology* of their own sex.

Nor does excluding males who identify as females from female teams constitute "discrimination" "on the basis of sex" under Title IX. Males are not similarly situated to females in athletics given their physiological differences. This remains true whether the male identifies as a female. As the teams are permissibly separated based on biological sex, it does not somehow become prohibited sex discrimination to neutrally apply that valid criterion to trans-identifying students like everyone else. Their subjective gender identity has nothing to do with the objective biological differences justifying sex-separated sports. Accordingly, barring a trans-identifying male from competing on female teams is not providing less favorable treatment than females receive. *Jackson*, 544 U.S. at 174. Rather, it is ensuring *equal* treatment for both sexes and not unfairly harming female athletes.

## CONCLUSION

This Court should dismiss all claims against all Defendants.

Respectfully submitted,

 /s/ Matthew J. Donnelly
MATTHEW J. DONNELLY
Attorney
Attorney ID Number 1186694CA
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: (202) 616-2788
Email: matthew.donnelly3@usdoj.gov

Dated: March 12, 2026         Counsel for the Defendants