08UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, *by and through its Attorney General Keith Ellison*, | File No. 25-cv-1608 (ECT/DLM) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Donald J. Trump, *in his official capacity as President of the United States*; United States Department of Justice; Todd Blanche, *in his official capacity as Acting Attorney General of the United States*;[1] United States Department of Education; Linda McMahon, *in her official capacity as Secretary of Education*; United States Department of Health and Human Services; and Robert F. Kennedy, Jr., *in his official capacity as Secretary of Health and Human Services*, | |
| Defendants. | |

Peter J. Farrell, Katherine Bies, and Maura C. Allen, Minnesota Attorney General's Office, St. Paul, MN, for Plaintiff State of Minnesota.

Abhishek Kambli and Matthew Donnelly, United States Department of Justice, Washington, D.C., for Defendants Donald J. Trump, Todd Blanche, United States Department of Education, Linda McMahon, United States Department of Health and Human Services, and Robert F. Kennedy, Jr.

---

President Trump and executive agencies acting at his direction understand Title IX

to forbid transgender women and girls from participating on athletic teams and using locker

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Todd Blanche is substituted for Pamela Bondi.

rooms and restrooms based on their gender identity.  Minnesota sees things differently.  It understands Title IX to require (or at least to allow) states to permit these activities, and it brought this case claiming that Defendants' contrary position violates federal law in several respects.  Minnesota seeks injunctions and declarations that would prevent Defendants from enforcing their understanding of Title IX.

Defendants seek the case's dismissal on jurisdictional and merits grounds. Defendants don't seem to dispute that the Title IX-centered legal dispute between them and Minnesota deserves judicial resolution.  After all, the United States has sued Minnesota the Minnesota Department of Education and State High School League in a separate case teeing up essentially the same disputed legal issues Minnesota presents in this case.  *See United States v. Minn. Dep't of Educ.*, No. 26-cv-2078 (ECT/DLM) (D. Minn. Mar. 30, 2026).  Regardless, Defendants argue this case is not a legally viable vehicle for adjudicating these issues.

Defendants' motion will be granted for the most part.  The short story is this: (1) I conclude Minnesota has shown it possesses Article III standing and that the case is ripe. (2) Minnesota has not plausibly alleged final agency action, meaning its claim under the Administrative Procedure Act fails.  (3) Minnesota does not plausibly allege a specific prohibition sufficient to support its Title IX ultra vires claim.  (4) Minnesota's separation-of-powers claim is fundamentally a statutory ultra vires claim, meaning it fails for essentially the same reasons as the Title IX claim fails.  (5) The Spending Clause claim is fundamentally a constitutional claim, meaning it withstands Defendants' contention that it is an impermissible statutory claim.  (6) The Tenth Amendment claim fails on the merits.

(7) The Declaratory Judgment Act claim fails because the Act creates no independent, freestanding cause of action.  (8) Though there is room for disagreement, I conclude that the President may be the subject of declaratory relief.

I

*Minnesota law forbids discrimination based on gender identity.*  The Minnesota Human Rights Act ("MHRA") forbids discrimination "in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person" based on "gender identity." Minn. Stat. § 363A.13, subdiv. 1.  The MHRA defines "gender identity" to mean "a person's inherent sense of being a man, woman, both, or neither." Minn. Stat. § 363A.03, subdiv. 50.  It clarifies that "[a] person's gender identity may or may not correspond to their assigned sex at birth or to their primary or secondary sex characteristics. A person's gender identity is not necessarily visible to others." *Id.*  Minnesota's Safe and Supportive Schools Act requires Minnesota schools to adopt and implement "a written policy to prevent and prohibit student bullying" based on, among other characteristics, "gender identity and expression."  Minn. Stat. § 121A.031, subdivs. 2(g), 3(a).  To implement these statutes, in 2017, the Minnesota Department of Education published a "Toolkit for Ensuring Safe and Supportive Schools for Transgender and Nonconforming Students."  Am. Compl. ¶ 26 [ECF No. 53]; Minn. Dep't of Educ., *A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students* (Sep. 25, 2017), https://perma.cc/RK3E-HFTM.  The Toolkit instructs schools to "work with transgender and gender nonconforming students to ensure that they are able to access needed facilities in a manner that is safe, consistent with their gender identity and does not

3

stigmatize them."  Minn. Dep't of Educ., *A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students*, at 10.  The Toolkit further advises: "Transgender and gender nonconforming students should be afforded the opportunity to use the restroom of their choice."  *Id.*

*Beginning with two executive orders, President Trump interprets and applies federal law to forbid the recognition of gender-identity-based rights in some situations where Minnesota law requires it.*  (1) On January 20, 2025, President Trump issued Executive Order 14168, entitled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Ideology Order").  Am. Compl. ¶ 41; ECF No. 53-1.  The Gender Ideology Order defines several terms and prescribes that these definitions "shall govern all Executive interpretation of and application of Federal law and administration policy."  ECF No. 53-1 at 2.[2]  As relevant here, the Gender Ideology Order defines "sex" as "refer[ring] to an individual's immutable biological classification as either male or female" and clarifies that the term "is not a synonym for and does not include the concept of 'gender identity.'"  *Id.*  It defines "[f]emale" as "a person belonging, at conception, to the sex that produces the large reproductive cell" and "[m]ale" as "a person belonging, at conception, to the sex that produces the small reproductive cell."  *Id.*  It defines "gender ideology" by explaining that the concept

> replaces the biological category of sex with an ever-shifting
> concept of self-assessed gender identity, permitting the false

---

[2]     Page citations are to a document's CM/ECF pagination appearing in the upper right corner, not to a document's original pagination.

claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

*Id.* at 2–3. The Gender Ideology Order mandates that "[e]ach agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes" and requires federal agencies to use the Gender Ideology Order's definitions "when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications." *Id.* at 3. The Gender Ideology Order prohibits the use of federal funds "to promote gender ideology" and requires that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* (2) On February 5, 2025, President Trump issued Executive Order 14201, entitled "Keeping Men Out of Women's Sports" (the "Women's Sports Order"). Am Compl. ¶ 50; ECF No. 53-2. The Women's Sports Order incorporates the Gender Ideology Order's definitions. ECF No. 53-2 at 2. The Women's Sports Order declares that "[i]t shall . . . be the policy of the United States to oppose male competitive participation in women's sports more broadly, as a matter of safety, fairness, dignity, and truth." *Id.* And it requires federal agencies to "review grants to educational programs and where appropriate, rescind funding to programs that fail to comply with the policy established in this order." *Id.* at 3.

*The United States Department of Education investigates the Minnesota State High School League's Title IX compliance.* On February 12, 2025, the United States Department of Education announced it would investigate the Minnesota State High School League's Title IX compliance. Am. Compl. ¶ 55. A League bylaw—Bylaw 300.00(3)—"establishes a rule allowing athletic and fine-arts 'participation for all students consistent with their gender identity or expression.'" *Id.* ¶ 54. Among other applications, the rule requires that transgender students be allowed to participate on athletic teams based on "their gender identity or expression" and not be restricted to participating on athletic teams based on their sex assigned at birth. *Id.* Following the federal Department of Education's February 12 notice, the League requested an opinion from Minnesota Attorney General Keith Ellison under Minnesota Statute § 8.07[3] regarding "whether the [Women's Sports Order] preempts the MHRA and whether prohibiting students from participating in extracurricular activities consistent with the students' gender identity would violate the MHRA." *Id.* ¶¶ 56–57; *see* ECF No. 53-4 at 2–3. Attorney General Ellison responded with a formal opinion on

---

[3]   Section 8.07 provides:

> The attorney general on application shall give an opinion, in writing, to county, city, town, public pension fund attorneys, or the attorneys for the board of a school district or unorganized territory on questions of public importance; and on application of the commissioner of education shall give an opinion, in writing, upon any question arising under the laws relating to public schools. On all school matters such opinion shall be decisive until the question involved shall be decided otherwise by a court of competent jurisdiction.

Minn. Stat. § 8.07.

6

February 20, 2025. Am. Compl. ¶ 58; ECF No. 53-4. In his opinion, Attorney General Ellison concluded that "educational institutions and the [League] would violate the MHRA by prohibiting transgender athletes from participating in extracurricular activities according to their gender identity." ECF No. 53-4 at 5. Attorney General Ellison also determined that the Women's Sports Order lacks the force of law and thus does not preempt the MHRA. *Id.* at 4.

*The United States Attorney General threatens to sue Minnesota and its responsible agencies because they require athletic participation based on gender identity.* On February 25, 2025, then-United States Attorney General Pamela Bondi wrote to Attorney General Ellison and the League's Executive Director explaining that the Department of Justice "stand[s] ready to sue states and state entities that defy federal antidiscrimination laws," and that "[r]equiring girls to compete against boys in sports and athletic events violates Title IX." ECF No. 53-5 at 2; Am. Compl. ¶ 59. Attorney General Bondi warned that "Minnesota should be on notice," and that "[i]f the Department of Education's investigation [into the League] shows that relevant Minnesota entities are indeed denying girls an equal opportunity to participate in sports and athletic events by requiring them to compete against boys, the Department of Justice stands ready to take all appropriate action to enforce federal law." ECF No. 53-5 at 2.

*The United States Department of Justice announces it will review Minnesota entities for Title IX compliance.* On April 8, 2025, Assistant Attorney General for the Department of Justice Civil Rights Division Harmeet Dhillon wrote to Attorney General Ellison notifying him that the Justice Department "is commencing a compliance review of

Minnesota entities pursuant to Title IX." ECF No. 53-6 at 2; Am. Compl. ¶ 62. In her letter, Assistant Attorney General Dhillon expressed concern that Attorney General Ellison's opinion "seemingly *requires* Minnesota schools to disregard the federal government's interpretation of Title IX described in" the Women's Sports Order. ECF No. 53-6 at 2. Assistant Attorney General Dhillon explained that if the opinion "compelled Minnesota schools to require women and girls to compete with men and boys, then [Attorney General Ellison] would be setting up an irreconcilable conflict between Minnesota and federal law and forcing Minnesota schools to lose their federal funds." *Id.* Assistant Attorney General Dhillon asked Attorney General Ellison to "clarify that [his] opinion does not require Minnesota schools to require men and boys to compete in women and girls' sports." *Id.* at 3. A failure to issue this clarification, Assistant Attorney General Dhillon explained, would "leave the Department with no choice but to seek judicial resolution to ensure Minnesota schools are permitted to fulfill their obligations under Title IX and maintain federal funding." *Id.* As far as the record shows, Attorney General Ellison did not clarify his February 20 opinion as Assistant Attorney General Dhillon requested. Subsequent communication between the Department of Justice and Minnesota revealed the Department was threatening grants it made to three Minnesota public entities. Am. Compl. ¶ 66; ECF No. 53-7 at 2.

*Minnesota files this case.* Minnesota filed its original Complaint on April 22, 2025. *See* ECF No. 1. As Minnesota explained, it believed that Attorney General Ellison's opinion is "a correct statement of law" and that "President Trump's Executive Orders do not and cannot reverse the federal and state statutes that prohibit discrimination against

vulnerable populations." *Id.* ¶ 4. "To protect [transgender] children from the federal government, as well as to maintain important funding to Minnesota schools," Minnesota sought declarations that the Gender Ideology and Women's Sports Orders violated federal law and an injunction preventing the federal government from taking adverse action against Minnesota, including the withdrawal of federal funding, based on President Trump's understanding of federal law as expressed in the executive orders. *Id.*

*The United States Departments of Education and Health and Human Services investigate and find the Minnesota Department of Education and State High School League are in violation of Title IX.* On June 3, 2025, the Department of Education's Office for Civil Rights announced in a letter that it was commencing a Title IX investigation into the Minnesota Department of Education. Am. Compl. ¶ 68; ECF No. 53-8. The letter noted that the "initiation of an investigation is not itself evidence of a violation of federal civil rights laws and regulations," but that the Minnesota Department of Education's "posted guidance for schools . . . appears to adopt a position in irresolvable conflict with Federal law and instruct schools throughout Minnesota to do the same." ECF No. 53-8 at 3. On June 26, 2025, the federal Department of Health and Human Services' Office for Civil Rights announced in a letter that it was opening a Title IX compliance review into the Minnesota Department of Education "based upon the participation of a male athlete in a female-only high school softball championship." ECF No. 53-9 at 2; Am. Compl. ¶ 70. The letter explained that the Office for Civil Rights "understands that 'sex' as used in Title IX refers solely to biological sex." ECF No. 53-9 at 3. On September 30, 2025, the Departments of Education and Health and Human Services' Offices for Civil Rights

9

concluded their investigations and issued a Letter of Findings ("Findings") concluding that the Minnesota Department of Education and the Minnesota State High School League are in violation of Title IX by permitting transgender women and girls to compete on athletic teams designated for women and girls and by allowing transgender women and girls to use restrooms and locker rooms designated for women and girls.  Am. Compl. ¶¶ 73–74; ECF No. 53-10 at 55, 61.

*Minnesota amends and supplements its Complaint in this case.*  On November 5, 2025, Minnesota moved to amend and supplement its original Complaint.  ECF No. 38. Among other things, Minnesota sought to supplement the Complaint with allegations regarding the Findings issued following the investigations by the Departments of Education and Health and Human Services' Offices for Civil Rights.  *See* ECF No. 40 at 6; ECF No. 41-2 ¶¶ 68–78.  Magistrate Judge Micko granted Minnesota's motion on November 25, 2025.  ECF No. 52.

*Subsequent attempts at voluntary resolution fail, and the United States sues Minnesota, alleging Title IX violations.*  After Minnesota filed its Amended Complaint in this action, the Departments of Education and Health and Human Services "made multiple attempts to reach a voluntary resolution agreement," but Minnesota was unwilling to accept the proposed resolution.  Complaint ¶¶ 212–213, *Minn. Dep't of Educ.*, No. 26-cv-2078 (ECT/DLM) (D. Minn. Mar. 30, 2026), ECF No. 1; ECF No. 66 at 14–16.  As a result, on January 26, 2026, the Departments of Education and Health and Human Services referred the matter to the Justice Department for enforcement.  Press Release, Dep't of Educ., *U.S. Departments of Education and Health and Human Services Refer Minnesota Case to U.S.*

*Department of Justice for Title IX Non-Compliance* (Jan. 26, 2026), https://perma.cc/JMG3-92YZ. On March 30, 2026, the United States filed suit against the Minnesota Department of Education and the League claiming they are in violation of Title IX for allowing transgender women and girls to compete on athletic teams and use restrooms and locker rooms consistent with their gender identity. Complaint, *Minn. Dep't of Educ.*, No. 26-cv-2078 (ECT/DLM).

*Minnesota asserts six claims in this case.* The claims are as follows: (1) Minnesota claims that the Gender Ideology and Women's Sports Ban Orders and the Justice Department's subsequent enforcement correspondence and Findings "are ultra vires and without any legal effect because they each violate the separation-of-powers principle." Am. Compl. ¶¶ 93–104 (Claim 1). (2) Minnesota claims that these same materials and actions "conflict with Title IX." *Id.* ¶ 108. In Minnesota's view, "Defendants discriminate on the basis of sex, in violation of Title IX, by requiring the recipients of federal funds to categorically ban all transgender women and girls from participating in sports and using restrooms and locker rooms that align with their gender identity." *Id.* Because Defendants' actions violate Title IX, Minnesota claims the actions are ultra vires. *See id.* ¶¶ 105–10 (Claim 2). (3) As Minnesota sees things, "Defendants are conditioning the receipt of federal funds on a change in the Minnesota Attorney General's State Opinion on the meaning of Minnesota law." *Id.* ¶ 116. In this way, Minnesota claims, Defendants seek "to commandeer state legal decision-making to achieve federal policy goals" in violation of the Tenth Amendment anticommandeering doctrine. *Id.* For this reason, Minnesota claims Defendants' actions are ultra vires. *See id.* ¶¶ 111–18 (Claim 3). (4) Minnesota

11

claims the actions of the agency Defendants—that is, Defendants other than President Trump—are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory authority, or limitations, or short of statutory right," and thus violate the Administrative Procedure Act, 5 U.S.C. § 706. *See id.* ¶¶ 119–26 (Claim 4).   (5) Minnesota claims that, to the extent Defendants seek to impose their understanding of Title IX "on funds that Minnesota has already accepted," Defendants violate the federal Constitution's Spending Clause.   *See id.* ¶¶ 127–33 (Claim 5). (6) Minnesota seeks a declaration under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, "that Title IX does not categorically prohibit Minnesota from adopting inclusive laws and policies, like the MHRA and MSHSL Bylaw 300.00(3)." *See id.* ¶¶ 134–41 (Claim 6).  Minnesota seeks declarations that Defendants' legal interpretations and actions are unlawful, injunctions aimed at halting Defendants' enforcement activities, an award of fees and costs, and "any additional relief as the interests of justice may require."  Am. Compl. at 40.

## II

### A

Begin with subject-matter jurisdiction.  Defendants first argue that subject-matter jurisdiction is lacking because "Plaintiff lacks an authorized cause of action," ECF No. 62 at 9, but this confuses subject-matter jurisdiction with the merits.  Whether a plaintiff possesses an authorized or viable cause of action is ordinarily a merits question. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 690 (2021) (Gorsuch, J., concurring) (recognizing that "the existence (or not) of a cause of action does not go to a court's subject-

matter jurisdiction" (citing *Mata v. Lynch*, 576 U.S. 143, 150 (2015))); *see also BCBSM, Inc. v. GS Labs, LLC*, No. 22-cv-513 (ECT/DJF), 2023 WL 2044329, at *2–4 (D. Minn. Jan. 30, 2023) (analyzing existence of right of action as merits question). Defendants do not explain how the lack of an authorized cause of action might implicate subject-matter jurisdiction. Their assertion that Minnesota lacks a cause of action is followed by citations to two cases, but these cases do not support the idea that the absence of an authorized cause of action implicates subject-matter jurisdiction. In the first case Defendants cite, *Nuclear Regulatory Commission v. Texas*, the Supreme Court addressed a Hobbs Act provision permitting any "party aggrieved by" a final agency order to seek review in a court of appeals. 605 U.S. 665, 670 (2025) (quoting 28 U.S.C. § 2344). The Supreme Court described this provision as one that "limits jurisdiction," *id.* at 673, and it held that "those who were not license applicants or granted intervention in the Commission's licensing proceeding do not qualify as parties who can obtain judicial review under the Hobbs Act," *id.* at 678. Defendants identify no jurisdiction-limiting provision here, however.[4] The second cited case is *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). There, the D.C. Circuit held that the plaintiffs lacked a cause of action as part of analyzing, not standing, but whether the plaintiffs had shown a likelihood of success on the merits for the

---

[4] The only candidate might have been the APA, but the Eighth Circuit has explained that "the APA's requirements are part of a party's cause of action and are not jurisdictional." *Iowa League of Cities v. EPA*, 711 F.3d 844, 863 n.12 (8th Cir. 2013); *see also Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523 n. 3 (1991) ("The judicial review provisions of the APA are not jurisdictional."); *Folsom v. U. S. Army Corps of Eng'rs Neb. Dist.*, No. 4:17-CV-3143, 2018 WL 2049839, at *4 (D. Neb. Apr. 23, 2018) (reading *Iowa League of Cities* to say that the APA's "final agency action" issue is not jurisdictional).

purpose of securing a preliminary injunction. *See id.* at 12–21. Defendants' contention that Minnesota "lacks an authorized cause of action," ECF No. 62 at 9, does not implicate subject-matter jurisdiction.

B

Defendants' second jurisdictional contention is that Minnesota lacks Article III standing. A court addressing this question must first determine whether the movant is making a "facial" attack or a "factual" attack. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015). Here, Defendants present a facial attack to subject-matter jurisdiction because they accept as true all of Minnesota's factual allegations relevant to jurisdiction. *See Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). A court analyzing a facial attack "restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citation modified). Under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). The complaint must allege facts plausibly showing that Article III's justiciability requirements are present. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Hawse v. Page*, 7 F.4th 685, 688–89 (8th Cir. 2021) (applying the *Twombly*/*Iqbal* plausibility standard to jurisdictional allegations); *Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018) (same); *Penrod v. K&N Eng'g, Inc.*, No. 18-cv-2907 (ECT/LIB), 2019 WL 1958652, at *3–4 (D. Minn. May 2, 2019) (same). Where, as here, a party supplements and amends its original complaint, *see* ECF No. 38 (motion to amend and supplement the

14

complaint), the supplemented and amended pleading is operative, *Wullschleger v. Royal Canin U.S.A., Inc.*, 75 F.4th 918, 923 (8th Cir. 2023). And the supplemented and amended complaint may cure a jurisdictional defect "by alleging the subsequent fact which eliminates the jurisdictional bar." *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286, 290 (8th Cir. 1988) (citing *Mathews v. Diaz*, 426 U.S. 67, 75 (1976)).

Article III of the Constitution limits the federal judicial power (or jurisdiction) to adjudicating "Cases" and "Controversies." This provision keeps the federal courts out of the business of the legislative and executive branches, and the Supreme Court's standing jurisprudence guides the federal courts in determining whether a litigant seeks adjudication of a genuine "Case" or "Controversy" or instead hopes to have the court act as if it were one of the political branches. The general rules governing Article III standing are settled:

> Federal jurisdiction is limited by Article III, § 2, of the U.S. Constitution to actual cases and controversies. Therefore, the plaintiff's standing to sue "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth* [*v. Seldin*, 422 U.S. 490, 498 (1975)]. To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an "injury-in-fact," (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

*Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000). An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified). To have standing to obtain injunctive relief, the plaintiff must show that it is likely to suffer future injury by the defendant and that the sought-after relief will prevent that future

injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). "In future injury cases, the plaintiff must demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017) (citation modified); *see Lujan*, 504 U.S. at 564 n.2 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (citation modified)). "Allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified).

The disputed issue is whether the Amended Complaint alleges facts plausibly showing that Minnesota faces a certainly impending threatened injury, and I conclude it does. A state has "Article III standing when 'quasi-sovereign rights [are] actually invaded or threatened.'" *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 591 (6th Cir. 2024) (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10 (2015)). A state's quasi-sovereign rights include "the continued enforceability of its own statutes." *Id.* (quoting *Maine v. Taylor*, 477 U.S. 131, 137 (1986)); *see Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982) (recognizing that "the power to create and enforce a legal code, both civil and criminal" is a sovereign interest). Therefore, "'when a federal regulation purports to preempt state law,' states have 'a sovereign interest to sue the United States.'" *Id.* (quoting *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022)); *see Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 835–36 (5th Cir. 2023) (concluding that Texas met Article III's injury-in-fact requirement because federal law

16

preempted Texas law), *rev'd on other grounds*, 605 U.S. 665 (2025); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) ("Federal regulatory action that preempts state law creates a sufficient injury-in-fact to satisfy this prong." (citing *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989), and *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.,* 766 F.2d 228, 232–33 (6th Cir.1985)). Here, the Amended Complaint alleges that Minnesota law requires schools to allow transgender girls to participate on athletic teams that align with their gender identity. *See* Am. Compl. ¶¶ 18–27, 56–58. And, the Amended Complaint alleges, Defendants take the position that federal law preempts Minnesota law and requires the opposite—*i.e.*, that Minnesota schools receiving Title IX funding are forbidden from allowing transgender girls to participate on girls' athletic teams. *See id.* ¶¶ 41–42, 47, 50–53, 59–64, 73–78. As the Amended Complaint alleges things, this injury to Minnesota sovereignty is not speculative. Defendants arrived at and communicated their interpretation of federal law and its assertedly preemptive consequences for Minnesota law before Minnesota filed this case— more so after that and before Minnesota filed its Amended Complaint. With respect to this injury, causation and redressability are plainly satisfied. Defendants' interpretation of federal law triggers the purported preemption, and the declarations and injunctions Minnesota seeks to the effect that Defendants' interpretation is not correct would eliminate the preemption-driven injury to Minnesota's sovereign interests in the enforceability of its laws and policies.[5]

---

[5] This conclusion makes it unnecessary to consider the other Article III injuries Minnesota identified to show its standing.

C

Defendants' third jurisdictional contention is that Minnesota's claims are not ripe. "Ripeness is a justiciability doctrine 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Minn. Bankers Ass'n v. FDIC*, 152 F.4th 893, 897 (8th Cir. 2025) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003)). The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 608 (8th Cir. 2022) (quoting *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997–98 (8th Cir. 2022)). "Ripeness depends on 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Minn. Bankers Ass'n*, 152 F.4th at 897 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)). "The fitness prong safeguards against judicial review of hypothetical or speculative disagreements," whereas "[t]he hardship prong asks whether delayed review inflicts significant practical harm on the plaintiffs." *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (citation modified). A "case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities." *Pub. Water Supply Dist. No. 10 of Cass Cnty. v. City of Peculiar*, 345 F.3d 570, 573 (8th Cir. 2003). Ripeness is assessed as of the time of decision, not as of the case's filing date. *Pub. Water Supply Dist. No. 8 of Clay Cnty. v. City of Kearney*, 401 F.3d 930, 932 (8th Cir. 2005) ("Whether a case is ripe depends on the

18

state of the case at the time of review, not at the time of filing."); *see Anderson v. Green*, 513 U.S. 557, 559 (1995) ("'[R]ipeness is peculiarly a question of timing,' and 'it is the situation now rather than the situation at the time of the [decision under review] that must govern.'" (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974))); *City of Kennett v. EPA*, 887 F.3d 424, 432 (8th Cir. 2018) (same); *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013) (same); *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000) ("[R]ipeness is peculiarly a question of timing and is governed by the situation at the time of review, rather than the situation at the time of the events under review." (citation modified)). *Contra Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 814 (8th Cir. 2006) ("Jurisdictional issues such as standing and ripeness are determined at the time the lawsuit was filed . . . .").

Defendants' contention that this case is not ripe is unconvincing. Minnesota's claims pose legal questions regarding the correctness of Defendants' interpretations of Title IX. *See* Am. Compl. ¶¶ 93–141. It is difficult to hypothesize what discovery might be necessary to resolve the case. In addition to showing Article III injury for standing purposes, the determination that Minnesota has suffered injury to its sovereign interests demonstrates the hardship Minnesota would face were court consideration of its claims withheld. And there is the United States' separate suit against the Minnesota Department of Education and the State High School League. *Minn. Dep't of Educ.*, No. 26-cv-2078 (ECT/DLM). In that case, the United States claims the Minnesota Department of Education and League are in violation of Title IX for allowing transgender women and girls to compete on athletic teams and use restrooms and locker rooms consistent with their

gender identity. *See* Complaint, *Minn. Dep't of Educ.*, No. 26-cv-2078 (ECT/DLM). By filing that case, the United States affirmatively invoked the court's jurisdiction seeking resolution of essentially the same issues at the core of this case. It is difficult to understand how that case might be ripe, but this one is not.

### III

Turn to the Rule 12(b)(6) aspect of Defendants' motion and the familiar standards governing its adjudication. In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Gorog*, 760 F.3d at 792. Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Considering "matters outside the pleadings" generally transforms a Rule 12(b)(6) motion into one for summary judgment, but not when the relevant materials are "necessarily embraced" by the pleadings. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Materials embraced by the complaint include "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Id.* (quoting *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012)). Here, Minnesota attached several

20

exhibits to the Amended Complaint, all of which may be considered either because they are matters of public record, are incorporated in Minnesota's Amended Complaint, or are integral to Minnesota's claims. *See* Am. Compl. Exs. A–J [ECF Nos. 1-1 to 1-10]. In addition to these exhibits, Minnesota submitted several exhibits with its memorandum in opposition to Defendants' motion. Among these are a letter dated October 10, 2025, from Minnesota to the Departments of Education and Health and Human Services regarding the Findings, ECF No. 67-1, and several subsequent communications between Minnesota and the agencies between December 9, 2025, and January 26, 2026, regarding a proposed resolution agreement and eventual referral to the Justice Department, ECF Nos. 67-2 to 67-7. I understand the October 10 letter, which confirmed Minnesota's receipt of the Findings, to be referenced in the Amended Complaint, and for that reason, it may be considered. *See* Am. Compl. ¶ 78. The remaining documents submitted with Minnesota's opposition memorandum will not be considered. They postdate the Amended Complaint's filing, and regardless, would not affect the outcome one way or the other if they were considered.

### A

The Administrative Procedure Act ("APA") provides for judicial review of "final agency action." 5 U.S.C. § 704. The APA defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "[T]he word 'action' . . . is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). The Supreme Court has described the requirements for agency action to be "final":

First, the action must mark the "consummation" of the agency's decisionmaking process, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970).

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). "To constitute a final agency action, the agency's action must have inflicted 'an actual, concrete injury' upon the party seeking judicial review." *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001)). Final agency action "may either compel affirmative action or prohibit otherwise lawful action." *Id.* (citing *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 1000 (8th Cir. 2015), *aff'd*, 578 U.S. 590 (2016)). Courts take a "'pragmatic' and 'flexible' approach to the question of finality." *Hawkes Co*, 782 F.3d at 997 n.1 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–50 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

The issue is whether the Findings and Justice Department letters that preceded them are final agency action for APA purposes, and I conclude they are not. Minnesota's front-line position is that the Findings are "a final determination of Minnesota's noncompliance with Title IX." ECF No. 66 at 22. This contention fails *Bennett*'s second requirement. A brief review of Title IX's two available enforcement paths shows why this is so. Title IX authorizes (1) the termination of funding involving "an express finding on the record, after opportunity for hearing, of a failure to comply with [a requirement]" or

22

(2) enforcement "by any other means authorized by law." 20 U.S.C. § 1682. Under either path, the "appropriate person or persons" must have been advised "of the failure to comply with the requirement" of Title IX, and the agency must "determine[] that compliance cannot be secured by voluntary means." *Id.* To terminate funding via Title IX's first enforcement route, "the head of the federal department or agency shall file with the committees of the House and Senate . . . a full written report of the circumstances and the grounds for such action." *Id.* "No [action to terminate funding] shall become effective until thirty days have elapsed after the filing of such report." *Id.* Under the second route, the Departments of Justice, Education, and Health and Human Services have incorporated Title VI enforcement regulations into Title IX. *See* 28 C.F.R. § 54.605 (Justice Department); 34 C.F.R. § 106.81 (Department of Education); 45 C.F.R. § 86.71 (Health and Human Services). The incorporated Title VI regulations provide the agencies two options for achieving compliance—they may either terminate funding or use other means authorized by law, including referral to the Justice Department for enforcement. *See, e.g.*, 34 C.F.R. § 100.8 (explaining that Title VI enforcement "may be effected by the suspension or termination of . . . Federal financial assistance or any other means authorized by law," which includes "a reference to the Department of Justice"). When pursuing enforcement through "other means authorized by law," the "responsible Department official" must "determin[e] that compliance cannot be secured by voluntary means," and "the recipient" must be "notified of its failure to comply and of the action to be taken to effect compliance." 28 C.F.R. § 42.108(d)(1); 34 C.F.R. § 100.8(d); 45 C.F.R. § 80.8(d). The regulations also

require the agencies to wait ten days after the notification of noncompliance before taking enforcement action.  34 C.F.R. § 100.8(d)(3); 45 C.F.R. § 80.8(d).

Under this regime, a letter of Findings alone does not "determine[]" "rights or obligations" or impose "legal consequences."  *Bennett*, 520 U.S. at 177–78 (citation modified).  Minnesota will not face legal consequences unless and until (1) a hearing is held in which the relevant agency finds that Minnesota is not in compliance with Title IX, or (2) a court finds, in a civil enforcement action, that Minnesota is not in compliance with Title IX.  Neither event has occurred here.  The Findings themselves impose no legal injury on Minnesota.  This conclusion is supported by many cases holding that a mere notice of a statutory or regulatory violation does not constitute final agency action.  *See, e.g.*, *AT&T Co. v. EEOC*, 270 F.3d 973, 975–76 (D.C. Cir. 2001) (holding EEOC letters finding company had unlawfully discriminated against employee and threatening enforcement did not constitute final agency action); *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014) (holding Clean Air Act notice of violation is not final agency action); *Saliba v. SEC*, 47 F.4th 961, 969 (9th Cir. 2022) (holding SEC's finding of violation was not final agency action because "by itself [it] has no legal consequences"); *Royster-Clark Agribusiness, Inc. v. Johnson*, 391 F. Supp. 2d 21, 28–29 (D.D.C. 2005) (holding Clean Air Act notice of violation is not final agency action because, "[a]lthough such notices may determine that the recipient has violated the law and threaten legal action[,] they do not themselves inflict cognizable legal injury nor bind the agency to a particular course of action").

24

Minnesota's fallback position is that the Findings and letters that preceded them represent the agencies' "clear[] articulat[ion of] their positions that Title IX *requires* discrimination against transgender athletes." ECF No. 66 at 38; *see* Am. Compl. ¶ 120 ("The DOJ Letters and the Findings are final agency action subject to judicial review . . . because they . . . reflect the agency's [sic] final position on the requirements of Title IX . . . ."). This contention also does not meet *Bennett*'s second prong. In the Eighth Circuit, an agency's interpretation that "represents a sea change" in an agency's view of the law and creates legal consequences for those affected by the agency's new interpretation such as requiring parties to "incur substantial compliance costs . . . , forego what they assert is lawful use of their property, or risk substantial enforcement penalties," meets *Bennett*'s second prong. *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 518 (8th Cir. 2024) (quoting *Hawkes Co.*, 782 F.3d at 1000 (8th Cir. 2015)). By contrast, "an agency [generally] does not inflict injury 'merely by expressing its view of the law.'" *Sisseton-Wahpeton Oyate*, 888 F.3d at 915 (quoting *AT&T Co.*, 270 F.3d at 976).

Cases help to understand this distinction. In *Hawkes*, the appellants challenged the United States Army Corps of Engineers' jurisdictional determination that appellants' property constituted "waters of the United States" within the meaning of the Clean Water Act. 782 F.3d at 996. The Corps' determination meant that, to use their land as they desired, appellants were required to "either . . . incur substantial compliance costs . . ., forego what they assert is lawful use of their property, or risk substantial enforcement penalties" under the Clean Water Act. *Id.* at 1000; *see also id.* at 997 ("The [Clean Water

Act] imposes heavy civil and criminal penalties on a person who discharges into navigable waters without a permit, or in violation of an issued permit.").  Although the jurisdictional determination did not itself impose penalties, the Eighth Circuit held the Corps' jurisdictional determination constituted final agency action, and that ruling was affirmed by the Supreme Court.  *Id.* at 1002; *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016).  Similarly, in *Garland*, the Eighth Circuit held that a Bureau of Alcohol, Tobacco, Firearms, and Explosives' ("ATF") rule that changed how ATF determines whether braced weapons constitute "short-barreled rifles," within the meaning of the National Firearms Act of 1934 and the Gun Control Act of 1968 was final agency action.  112 F.4th at 511, 517–19.  The court noted that "the consequences of possessing a braced weapon deemed to be a 'short-barreled rifle' are dire: that firearm and the person who possesses it are subject to the [National Firearms Act's] and [Gun Control Act's] stringent regulations and serious criminal penalties for non-compliance."  *Id.* at 516.  The ATF's rule required those who possessed braced weapons to choose one of five compliance options, including "paying a tax, or otherwise surrendering or destroying their weapon (their property)—or risk prosecution."  *Id.* at 518.  The court found these circumstances met *Bennett*'s second prong.  *Id.* at 519.

Although not binding authority, the Sixth Circuit's opinion in *Tennessee* is also instructive.  There, several states challenged Department of Education-issued documents saying the Department would enforce Title IX to prohibit sexual orientation and gender identity discrimination and sought a preliminary injunction enjoining the documents' enforcement.  *Tennessee*, 104 F. 4th at 584.  The challenged documents included a Title

26

IX "interpretation" published in the Federal Register and a letter and fact sheet issued to Title IX recipients. *Id.* at 586. The Sixth Circuit found the publications were likely final agency action because they were binding on the Department of Education and created "legal safe harbors" by instructing states how to avoid liability. *Id.* at 589–600 (citation modified). In *Texas v. Cardona*, a district court came to the same conclusion regarding the same Title IX publications, reasoning that the challenged documents "speak with the force of law and independently create legal effects for regulated entities, which qualifies them as a legislative or substantive rule." 743 F. Supp. 3d 824, 846 (N.D. Tex. 2024) (citation modified), *appeal dismissed sub nom. Texas v. McMahon*, No. 24-10910, 2025 WL 2840825 (5th Cir. Apr. 23, 2025).

Here, the Findings and agency letters that preceded them do not create legal consequences for Minnesota (or other Title IX-funding beneficiaries) in the way that the Eighth Circuit held was sufficient to meet *Bennett*'s second prong in *Garland* and *Hawkes*. Title IX does not provide for civil or criminal penalties in the way the Clean Water Act, National Firearms Act, and Gun Control Act do. Recall that the first Title IX enforcement path provides a mechanism to stop Title IX funding; it turns off the spigot for future funding, but it does not affect past funding or provide for any penalties for past noncompliance with Title IX. The second enforcement path—a civil suit—is not at issue here because Minnesota explicitly does not argue that an enforcement action is final agency action. ECF No. 75 at 10 ("But Minnesota is not alleging that the Enforcement Action itself is final agency action."). This argument's absence makes sense. In *FTC v. Standard Oil Co. of California*, the Supreme Court held the FTC's filing of an administrative

complaint did not constitute final agency action. 449 U.S. 232, 243 (1980). Several courts have since applied this rule to conclude that an agency's filing of a civil complaint is not final agency action. *See, e.g.*, *City of Oakland v. Lynch*, 798 F.3d 1159, 1166 (9th Cir. 2015); *Am. Fin. Benefits Ctr. v. FTC*, No. 17-04817, 2018 WL 3203391, at *7 (N.D. Cal. May 29, 2018); *Nerium Int'l, LLC v. FTC*, No. 19 C 7189, 2020 WL 5217152, at *4 (N.D. Ill. Aug. 31, 2020); *NACSO Non-Profit Bus. League, Inc. v. Consumer Fin. Prot. Bureau*, No. 20-61010-CIV, 2021 WL 863906, at *3 (S.D. Fla. Mar. 9, 2021). Nor do the Findings or letters legally bind the agencies or create legal safe harbors in the way the publications did in *Tennessee* and *Cardona* did. For one, the DOJ Letters and Findings were issued to Minnesota alone. In that respect, they are more akin to a notice of statutory or regulatory violation, which, as already discussed, ordinarily does not constitute final agency action. *See, e.g.*, *Royster-Clark Agribusiness, Inc.*, 391 F. Supp. 2d at 28–29. The agencies' statement of their position regarding Title IX's correct interpretation does not force Minnesota to choose between incurring penalties of any kind or engaging in what it believes is lawful conduct.

Minnesota cites two Supreme Court cases to support its position, but the cases are distinguishable. The first case, *Sackett v. EPA*, involved an agency determination that "expose[d] the [plaintiffs] to double penalties in a future enforcement proceeding" accruing at a rate of $75,000 per day, and "severely limit[ed] [their] ability to obtain a permit" to use their land as they wished. 566 U.S. 120, 126–27 (2012). The threat of significant penalties makes *Sackett* comparable to *Hawkes* and *Garland*. In the second case Minnesota cites, *Bell v. New Jersey*, the Supreme Court held that an agency's decision establishing

28

the amount of money certain states owed to the federal government was final agency action because the only further proceeding to take place was to "determine the method of repayment." 461 U.S. 773, 779 (1983). We don't have anything like that here. The agencies' actions here are not definitive determinations that Minnesota violated Title IX; they impose no remedial obligations.

B

1

A brief overview of sovereign immunity sets the table for the discussion regarding Minnesota's non-APA claims. Generally, the United States may not be sued without its consent. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983). This immunity applies to executive officials acting on behalf of the United States. *Hagemeier v. Block*, 806 F.2d 197, 202 (8th Cir. 1986); *Coleman v. Espy*, 986 F.2d 1184, 1189 (8th Cir. 1993); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994). There are two exceptions to this principle. The Supreme Court has recognized that courts may review executive officials' actions that exceed statutory authority. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949). And the Supreme Court has recognized that the president's actions are reviewable for constitutionality. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Dalton*, 511 U.S. at 469. These exceptions come with two important restrictions.

The first is that claims of actions in excess of statutory authority—or ultra vires—are strictly limited. A claim of ultra vires agency action is a claim to "equitable relief where an agency's action was ultra vires—that is, 'unauthorized by any law and . . . in violation of the rights of the individual.'" *Nuclear Regul. Comm'n*, 605 U.S. at 680 (alteration in

29

original) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).

However, recognizing that ultra vires review is susceptible to becoming an "end-run" around limitations imposed by judicial-review statutes (like the APA), the Supreme Court has "strictly limited nonstatutory ultra vires review" to instances where "an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition in a statute.*" *Id.* at 681 (citation modified). The Eighth Circuit understands the specific-prohibition rule to require a "plain violation of an unambiguous and mandatory provision of the statute." *Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 962 (8th Cir. 2014) (quoting *Neb. State Legis. Bd., United Transp. Union v. Slater*, 245 F.3d 656, 659 (8th Cir. 2001)); *see also id.* ("[O]ur court has expressed a clear disinclination to accept plaintiffs' characterization of agency actions as *ultra vires* where is it possible to characterize a dispute merely as one of statutory interpretation concerning the scope of agency authority."). Ultra vires review is not available "simply because an agency has arguably reached 'a conclusion which does not comport with the law.'" *Nuclear Regul. Comm'n*, 605 U.S. at 680 (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). "Ultra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Id.* (citation modified).

The Supreme Court addressed the second limitation in *Dalton v. Specter*, 511 U.S. 462 (1994). There, the Court addressed whether plaintiffs could seek review of an alleged constitutional violation by the president for accepting procedurally flawed

recommendations to close certain naval shipyards. *Id.* at 466, 473. The president's claimed authority for closing the shipyards was a statute that provided the president unlimited discretion in approving or disapproving recommendations to close naval shipyards. *Id.* at 476. In holding that the plaintiffs could not obtain review, the Court held that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims subject to judicial review." *Id.* at 473–74. The Court reasoned that its "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution. On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. The Court further held that "if every claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception [allowing for judicial review of alleged constitutional violations by the president] would be broadened beyond recognition." *Id.* at 474. Treating the claim as one that the president violated the terms of the statute (rather than a constitutional claim), the Court went on to hold that because the statute committed the decision to close the shipyards to the discretion of the president, judicial review was not available. *Id.*

Courts are not uniform in their application of the principles described in *Dalton*. *See City of Chicago v. DHS*, 815 F. Supp. 3d 727, 749–52 (N.D. Ill. 2025) (discussing competing caselaw between the Ninth and D.C. circuits). The Ninth and D.C. Circuits have established opposing positions. In *Murphy Co. v. Biden*, the Ninth Circuit took "an expansive view of the constitutional category of claims highlighted in *Dalton*." 65 F.4th

31

1122, 1130 (9th Cir. 2023). There, the plaintiffs claimed that a presidential proclamation designating certain lands as a monument under the Antiquities Act, 54 U.S.C. § 320301, violated the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act, 43 U.S.C. § 2601 *et seq.*, which provided that the same land would be used for timber production. *Id.* at 1124–25. The court reasoned that "[w]hile 'an action taken by the President in excess of his statutory authority does not necessarily violate the Constitution,' specific allegations regarding separation of powers may suffice." *Id.* at 1130 (citation modified) (quoting *Dalton*, 511 U.S. at 473). The Ninth Circuit concluded that because the plaintiff's claim "could be considered constitutional," it was "therefore reviewable." *Id.* In so holding, the Ninth Circuit relied on its earlier opinion in *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019). In *Sierra Club*, the Ninth Circuit interpreted *Dalton*'s caution against treating a claim that the president exceeded statutory authority as a claim of unconstitutional executive action to be limited to instances in which the at-issue statute "gave the President unreviewable discretion." *Id.* at 696. The Tenth Circuit has signaled its agreement with the Ninth Circuit's view of *Dalton*. *See Garfield County v. Trump*, 179 F.4th 814, 824 n.7 (10th Cir. 2026) ("[W]e are persuaded by the reasoning in *Murphy* . . . that judicial review in cases in which the authorizing statute places discernible limits on the President's discretion . . . does not implicate separation of powers concerns to the same degree as statutes, like in *Dalton*, that do not at all limit the discretion of the President." (citation modified)).

In contrast, the D.C. Circuit has taken a more restrictive view of the viability of constitutional claims under *Dalton*. The plaintiffs in *Global Health Council* challenged

32

the executive's freeze of appropriated funds on statutory and constitutional grounds. 153 F.4th at 9–10. The D.C. Circuit rejected the plaintiff's characterization of their constitutional claims, reasoning that *Dalton* "rejected [the] effort to recast statutory claims as constitutional ones." *Id.* at 14. In so holding, the D.C. Circuit interpreted *Dalton*'s holding to extend beyond instances in which the president is provided with unlimited discretion under a statute. As the court explained, "*Dalton* had four holdings." *Id.* at 16. The fourth holding was that "when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available. *Id.* (quoting *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996)). "The third holding explained that statutory claims cannot be transformed into constitutional ones." *Id.* The Fourth Circuit has adopted the D.C. Circuit's interpretation of *Dalton*, expanding on *Global Health*'s reasoning. In *Sustainability Institute v. Trump*, 165 F.4th 817, 832 (4th Cir. 2026), the Fourth Circuit explained that *Dalton*'s four holdings are distinct from one another. The court reasoned,

> Plaintiffs contend that *Dalton* rested on the conclusion that the statute at issue there committed the relevant decision to the President's discretion. But *Dalton* contained multiple distinct rulings, and Plaintiffs' argument conflates them. *See Dalton*, 511 U.S. at 476–477 (summarizing the Court's four holdings); *Glob. Health Council*, 153 F.4th at 16–17 (distinguishing between *Dalton's* holdings). As explained above, the Supreme Court first held that nonstatutory constitutional review was unavailable for the plaintiffs' claim that the President exceeded his statutory authority because the claim was statutory, not constitutional. *See Dalton*, 511 U.S. at 472–474. The Court then separately considered whether ultra vires review was available and concluded it was not because the statute at issue

> did not limit the President's discretion.  *See id.* at 474–476; *see Nuclear Regul. Comm'n*, 145 S. Ct. at 1776 (explaining the requirements of ultra vires review).  Plaintiffs focus on this second holding, but it is the first that is relevant here.  And nothing about the second holding narrowed the Court's prior conclusion that plaintiffs cannot avoid the limits of ultra vires review by arguing that executive officials' statutory violations implicate the separation of powers. We therefore reject Plaintiffs' attempts to do so here.

*Id.*

I conclude the D.C. and Fourth Circuits have the better position.  For one, the Supreme Court's reasoning in *Dalton* indicates its holdings are separate and distinct.  The Court expressed concern that if every claim that the president exceeded his statutory authority were treated as a constitutional violation, the exception allowing for judicial review of unconstitutional executive actions would be "broadened beyond recognition." *Dalton*, 511 U.S. at 474.  It is difficult to see how the Court's concern about unduly broadening that exception would be alleviated by any considerable measure if its refusal to allow statutory claims to be recast as constitutional ones were limited to statutes providing the president with unlimited discretion.  A plain reading of *Dalton* gives no indication that the Court's refusal to treat the challenged action as a constitutional claim was due to the president's unlimited discretion under the statute.  *See, e.g.*, *id.* at 474 ("So the claim raised here is a statutory one: The President is said to have violated the terms of the 1990 Act by accepting procedurally flawed recommendations. The exception identified in *Franklin* for review of constitutional claims thus does not apply in this case."); 476–77 ("The claim that the President exceeded his authority under the 1990 Act is not a constitutional claim, but a

statutory one. Where a statute, such as the 1990 Act, commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available.").

2

Plaintiffs claim that Defendants acted ultra vires by issuing the Executive Orders, the Findings, and the letters that preceded them because the views and conclusions expressed in them "discriminate based on sex and conflict with Title IX" by "requiring the recipients of federal funds to categorically ban all transgender women and girls from participating in sports and using restrooms and locker rooms that align with their gender identity." Am. Compl. ¶ 108. This claim does not clear the bars set in *Nuclear Regulatory Commission* and *Burwell*. Title IX does not contain the requisite "specific prohibition" to lodge an ultra vires claim. *See Nuclear Regul. Comm'n*, 605 U.S. at 681. There is no "plain violation of an unambiguous and mandatory provision of the statute." *Burwell*, 764 F.3d at 962 (citation modified). As the Eighth Circuit recently explained, "there can be no dispute that whether Title IX . . . permits[] or prohibits the participation of transgender athletes in female athletics remains an open question of law." *Female Athletes United v. Ellison*, 172 F.4th 1019, 1029 (8th Cir. 2026). Just this term the Supreme Court overruled the Fourth Circuit in determining that "Title IX allows schools to provide separate women's and men's sports teams defined by biological sex." *West Virginia v. B. P. J. ex rel. Jackson*, 609 U.S. --- , No. 24–38, 2026 WL 1868739, at *9 ( June 30, 2026). Although the Court did not decide "the distinct question of whether, under Title IX . . . , schools may allow biological males who identify as female to participate on girls' and women's sports teams," *id.* at *4 n.1, the Supreme Court's determination that "sex" in Title IX refers to biological

35

sex provides at least some support for the Defendant's interpretation of the statute.  In other words, at best, Minnesota has plausibly alleged that "an agency has arguably reached 'a conclusion which does not comport with the law.'"  *Nuclear Regul. Comm'n*, 605 U.S. at 681.  But this is insufficient.  Moreover, as to the agency action at issue, the APA provides for review so long as its reviewability standards are met, and Minnesota does not argue that the APA would not provide for adequate review.  *See id.*

3

In its separation-of-powers claim, Minnesota contends that the Executive Orders, Findings, and the letters preceding the Findings effectively modify the terms of Title IX grants by prohibiting funding recipients from allowing transgender women and girls to participate on sports teams designated for women and girls.  Am. Compl. ¶¶ 93–104; *see also* ECF No. 66 at 26 (arguing "the President sought to amend Title IX by Executive Order" and "no constitutional or statutory provision allows" him to do so).  Minnesota claims this is an attempt by the executive to "usurp Congress's Article I powers."  Compl. ¶ 102.  The problem is that Minnesota's argument relies entirely on adopting its interpretation of Title IX.  The executive will only have amended or modified Title IX if the statute does not in fact prohibit allowing transgender girls to participate in sports designated for girls.  In other words, this is a dispute over statutory interpretation, and under *Dalton*, it cannot be recast as a separate constitutional issue.

Minnesota attempts to analogize this case with *Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952), but *Youngstown* is inapposite.  ECF No. 66 at 27–28.  In *Youngstown*, the Supreme Court held the president was without constitutional authority to

seize the nation's steel mills.  343 U.S. at 589.  There, the president did not rely on any statutory authority for the seizure.  *Id.* at 585.  Here, by contrast, the agency defendants rely on Title IX, the Gender Ideology Order relies on "the laws of the United States of America, including section 7301 of title 5, United States Code,"[6] ECF No. 53-1 at 2, and the Women's Sports Order relies on Title IX, ECF No. 53-2 at 2.  And it would be a mistake to conclude that Defendants acted without statutory authority considering Congress tasked the executive with enforcing Title IX.  *See* 20 U.S.C. § 1682 ("Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity . . . .").  Because Minnesota's separation-of-powers claim is really another Title IX ultra vires claim, it fails.

4

Turn next to Minnesota' Spending Clause claim.  Congress enacted Title IX under its Spending Clause powers.  *See, e.g.*, *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999).  "[L]egislation enacted pursuant to the spending power is much in the nature of a contract."  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed

---

[6]     This provision states that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."  5 U.S.C. § 7301.

37

conditions.'"  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (quoting *Pennhurst*, 451 U.S. at 16–17); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("[T]o be bound by federally imposed conditions, recipients of federal funds must accept them voluntarily and knowingly." (citation modified)).  The spending power has limits.  Conditions on the states' receipt of federal funds must be "unambiguous[]" such that "States [may] exercise their choice [to accept the funds] knowingly, cognizant of the consequences of their participation."  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst*, 451 U.S. at 17).  "[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"  *Id.* (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)).  Nor may federal-grant conditions violate some other constitutional provision.  *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269–70 (1985).  And "the financial inducement offered by Congress" may not become "so coercive as to pass the point at which 'pressure turns into compulsion.'"  *Dole*, 483 U.S. at 211 (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)); *see also NFIB v. Sebelius*, 567 U.S. 519, 580–82 (2012).

Minnesota alleges a plausible Spending Clause claim.  It alleges that the Executive Orders, Findings, and associated letters impose conditions that (1) are unclear, (2) are unrelated to Title IX's purpose, (3) "will induce recipients to violate the constitutional rights of students by discriminating against transgender individuals," and (4) are unlawfully coercive.  Am. Compl. ¶ 130.  This claim is not a disguised statutory claim.  Unlike the separation-of-powers claim, the Spending Clause requirements are not

38

coextensive with Title IX's requirements. Consider, for example, the clear notice requirement. It may be that Title IX does in fact prohibit transgender women and girls from participating on sports teams designated for women and girls or from using restrooms or locker rooms consistent with their gender identity. But that does not mean Minnesota had sufficiently clear notice that Title IX contained that prohibition when it decided to accept federal funding. The Spending Clause analysis is distinct from the Title IX statutory interpretation issue. In other words, Defendants may comply with Title IX but simultaneously violate the Spending Clause. Consider also Minnesota's claim that the Defendants' actions are unlawfully coercive in that they threaten $2.9 billion in federal funding to Minnesota. ECF No. 66 at 42–43 (arguing that "the sheer amount of funding that is being threatened based on the sudden imposition of new conditions on that funding means that states are not merely pressured to comply but compelled"). For the Title IX conditions Defendants seek to enforce to be "new" or "retroactive," Compl. ¶ 131, Title IX must not have contained those conditions in the first place. The text of Title IX has not changed. The issue is whether Title IX is appropriately interpreted to contain the conditions asserted by Defendants. If I determine that Title IX contains the prohibitions advanced by Defendants, Minnesota's argument of coerciveness fails. But if I determine that Title IX does *not* contain the prohibitions Defendants seek to enforce, Minnesota does not necessarily win on its claim of coerciveness. It must separately be determined whether Title IX's "financial inducement" is "so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211 (citation modified). In this way, the statutory issue is not coextensive with the constitutional issue. Accordingly, Minnesota's

39

Spending Clause claim does not fall within *Dalton*'s reach.  Because Defendants have made no other argument in favor of dismissing this claim, Count V will not be dismissed.

5

Minnesota claims Defendants have violated the Tenth Amendment by "conditioning the receipt of federal funds on a change in the Minnesota Attorney General's opinion on the meaning of Minnesota law," and "coerc[ing] the Minnesota Attorney General into changing his opinion on state law by exerting economic pressure."  Compl. ¶ 116.  As Minnesota sees things, the Defendants' "actions are all designed to push Minnesota to adopt a federal policy that directly conflicts with Minnesota law" in violation of the Tenth Amendment's anticommandeering doctrine.  ECF No. 66 at 44.

The anticommandeering doctrine is "the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018).  "Congress cannot compel the States to enact or enforce a federal regulatory program," nor may it "circumvent that prohibition by conscripting the State's officers directly."  *Printz v. United States*, 521 U.S. 898, 935 (1997).  Notwithstanding these Tenth Amendment principles, however, the Supreme Court has "upheld Congress's authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'"  *NFIB*, 567 U.S. at 580; *see also New York v. DOJ*, 951 F.3d 84, 115 (2d Cir. 2020) ("[W]here Congress places conditions on a State's receipt of federal funds—whether directly, or by delegation of clarifying authority

40

to an executive agency—there is no commandeering of reserved State power so long as the State has 'a legitimate choice whether to accept the federal conditions in exchange for federal funds.'" (quoting *NFIB*, 567 U.S. at 578)).

Defendants first contend that Minnesota's Tenth Amendment claim is a statutory claim improperly recast as a constitutional claim under *Dalton*.  ECF No. 62 at 13–16.  I disagree.    Minnesota's Tenth Amendment claim does not depend on the correct interpretation of Title IX.  As I understand it, Minnesota contends that Defendants are attempting to coerce the Minnesota Attorney General to modify his opinion, which has the force of law.  *See* Minn. Stat. § 8.07.  This is so regardless of whether Defendants have the better interpretation of Title IX or not.  Regardless, Minnesota's Tenth Amendment claim fails on the merits.  As outlined above, Title IX provides several enforcement mechanisms. Minnesota does not contend Title IX is an invalid Spending Clause statute, or that these enforcement mechanisms are invalid.  *See* ECF No. 66 at 44 (recognizing that "Title IX itself is a valid, non-coercive exercise of the Congress's spending clause authority"). Defendants are merely attempting to use the tools available under Title IX to enforce what they believe to be the conditions attendant to the receipt of Title IX funding.  This does not implicate the Tenth Amendment.

C

Minnesota seeks a declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201, that "Title IX does not categorically prohibit Minnesota from adopting inclusive athletics, locker room, and restroom laws and policies."  Compl. ¶ 139.  Defendants contend that the Declaratory Judgment Act does not provide an independent cause of

41

action, and that this claim should be dismissed. ECF No. 62 at 16–18. Defendants are correct. "The Declaratory Judgment Act does not create an independent cause of action or confer substantive rights; rather, it provides a procedural mechanism through which courts may declare the rights of parties in actual controversies." *Gagnon v. Maharishi Int'l Univ.*, 800 F. Supp. 3d 943, 953 (S.D. Iowa 2025); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017) (recognizing that the Declaratory Judgment Act "cannot be used as an independent cause of action" when the underlying statute contains no private right of action); *see Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) ("[T]he Declaratory Judgment Act does not provide an independent basis for federal jurisdiction." (citation modified) (quoting *Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles Cnty., Inc.*, 977 F.2d 1224, 1227 (8th Cir. 1992))); *First Fed. Sav. & Loan Ass'n of Harrison, Ark. v. Anderson*, 681 F.2d 528, 533 (8th Cir. 1982) ("It is well settled that the declaratory judgment statute is strictly remedial in nature and does not provide a separate basis for subject matter jurisdiction." (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950)). For these reasons, Minnesota's claim under the Declaratory Judgment Act will be dismissed, though this will not prevent Minnesota from seeking a declaratory judgment as a remedy.

D

Minnesota seeks only declaratory relief against the President (not injunctive relief). ECF No. 66 at 30–31. Defendants contend that no relief may be granted against the President, meaning all claims against him must be dismissed. This is not convincing. Declaratory judgments have been issued against presidents in the past. *See, e.g., Clinton*

*v. City of New York*, 524 U.S. 417 (1998) (affirming grant of declaratory judgment against President Clinton); *Kingdom v. Trump*, No. 1:25-CV-691, 2025 WL 1568238, at *16 (D.D.C. June 3, 2025) (collecting cases). Though some courts have declined to issue declaratory judgments against presidents due to separation-of-powers concerns, *see, e.g.*, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 105 (D.D.C. 2025) (declining to enter declaratory relief against the president); *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 253 (S.D.N.Y. 2020) (dismissing the president from suit when it would have "no substantive effect on the outcome"), "the only real support for dismissing a claim for declaratory relief against [a president is] Justice Scalia's concurring opinion in *Franklin*." *Missouri v. Biden*, 662 F. Supp. 3d 626, 682 (W.D. La. 2023). In that opinion, Justice Scalia stated, "I think we cannot issue a declaratory judgment against the President. It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court." *Franklin*, 505 U.S. at 827 (Scalia, J., concurring). As discussed in *Missouri*, however, just "six years after Justice Scalia's statement in *Franklin*, in *Clinton*, the Supreme Court expressly stated that a declaratory judgment against the President could redress the plaintiff's injuries." 662 F. Supp. 3d at 682 (citation modified) (quoting *Stone v. Trump*, 400 F. Supp. 3d 317, 359 (D. Md. 2019)). The claims against the President will not be dismissed on this basis. *See Kingdom*, 2025 WL 1568238, at *16; *see also Missouri v. Biden*, 738 F. Supp. 3d 1113, 1145 (E.D. Mo. 2024), *aff'd and remanded sub nom. Missouri v. Trump*, 128 F.4th 979 (8th Cir. 2025); *Stone*, 400 F. Supp. 3d at 360; *Missouri*, 662 F. Supp. 3d at 680–83.

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Motion to Dismiss the First Amended Complaint [ECF No. 60] is **GRANTED IN PART AND DENIED IN PART** as follows:

1.    Defendants' motion is **GRANTED** as to Claims 1, 2, 3, 4, and 6, and these Claims are **DISMISSED WITHOUT PREJUDICE**.

2.    Defendants' motion is **DENIED** as to Claim 5.

Dated: August 10, 2026                         s/Eric C. Tostrud
                                               Eric C. Tostrud
                                               Chief Judge, United States District Court